UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**MILLENNIUM PIPELINE COMPANY, L.L.C.,**

$\qquad$ *Plaintiff,*

-vs-

**CERTAIN PERMANENT AND TEMPORARY EASEMENTS IN (No Number) ROUTE 55, S.B.L. No. 4.B-1-1, TOWN OF HIGHLAND, COUNTY OF SULLIVAN, NEW YORK, Pfeifer Realty Corporation, et al., and Unknown Owners,**

$\qquad$ *Defendants.*

**COMPLAINT**

Civil Action No.

**07 CIV 10605**

---

1.     This is an action of a civil nature brought by plaintiff MILLENNIUM PIPELINE COMPANY, L.L.C. ("MILLENNIUM") for the taking of permanent and temporary easements in certain property identified in the caption above and more fully below under the power of eminent domain and for the ascertainment and award of just compensation to the fee owner of such property and any other parties in interest.

2.     The authority for the taking is the Natural Gas Act, 15 U.S.C. §717, *et seq.* Jurisdiction is proper in all respects according to 28 U.S.C. §1331.

3.     The uses for which permanent and temporary easements in the property identified more fully below are to be taken are to acquire, construct and operate pipeline facilities from a new compressor station in Corning, New York (milepost 190.6) to the Ramapo, New York measuring and regulating station (milepost 376.6) pursuant to the December 21, 2006 Order issued by the United States Federal Energy Regulatory Commission ("FERC") entitled "Order Issuing and Amending Certificates, Approving Abandonment, Vacating Certificate and Granting and Denying Requests for Rehearing and Clarification" ("FERC Order"). MILLENNIUM

accepted the FERC Order on January 19, 2007, and a copy of the FERC Order is attached hereto as Exhibit 1. The MILLENNIUM pipeline for which permanent and temporary easements in the property are being taken will, *inter alia*:

- provide the northeast with access to gas supplies from the Dawn hub in Ontario, Canada and the upstream Chicago, Illinois hub;

- increase pipeline capacity in southeastern New York and provide access to existing storage fields in western New York;

- help satisfy the increasing demand for natural gas including from electric generating plants fueled primarily by natural gas at a time when the gas demand in New York is close to exceeding the capacity of the pipelines serving it and the demand in the New York City metropolitan area is growing.

Exhibit 1 hereto, pp. 29-30.

4.    MILLENNIUM seeks to acquire permanent pipeline and temporary construction easements from property known as (No Number) Route 55, Town of Highland, County of Sullivan, New York, S.B.L. No. 4.B-1-1, MILLENNIUM Tract Nos. 10S209.11 and 10S209.03 (the "Pfeifer Property").  Such easements to be acquired in the Pfeifer Property are more specifically described in Exhibit 2 attached hereto and made a part hereof.  Such permanent and temporary easements to be acquired shall run under, on, across and through such Pfeifer Property.

5.    MILLENNIUM also seeks to acquire a temporary access easement from the Pfeifer Property, as more specifically described in Exhibit 3 attached hereto and made a part hereof.  Such temporary access easement to be acquired shall run under, on, across and through the Pfeifer Property

6.    The permanent easement that MILLENNIUM seeks to acquire in this action will give MILLENNIUM the right to:

- construct, operate, inspect, maintain, replace, repair, alter the size of and remove or abandon (anywhere within the right-of-way area defined above in paragraph 4 and in Exhibit 2 attached hereto) a pipeline or pipelines for transporting gas with associated fluids, or other substances that can be transported through pipelines, and appurtenant facilities including, but not limited to, cathodic protection and above-ground pipeline markers; and

- perform pre-construction work and post construction restoration work.

7.    The temporary construction easements designated in paragraph 4 above and depicted in Exhibit 2 attached hereto are for the purpose of work areas for MILLENNIUM's use and exercisable during the construction, preconstruction and testing of the pipeline and restoration of the Pfeifer Property, as reasonably required by MILLENNIUM for the purpose of constructing and testing the pipeline and restoring the Pfeifer Property and to conduct all activities incident thereto, terminating upon the approval of the completed work, testing and property restoration, unless sooner terminated by MILLENNIUM or its authorized representative.  Such temporary easements are designated as Temporary Work Space and/or Extra Temporary Work Space in the description attached hereto as Exhibit 2 reserving, however, to the property owner, its successors or assigns, the right of using said Pfeifer Property and such use shall not be further limited or restricted under these temporary easements beyond that which is necessary to effectuate their purposes for the construction and testing of the pipeline and restoration of the Pfeifer Property.

8.    The temporary access easement designated in paragraph 5 above and depicted on Exhibit 3 attached hereto is for the purpose of an access road and pullover areas for use and exercisable during the construction, preconstruction and testing of the pipeline and restoration of the owner's property, as reasonably required by MILLENNIUM for the purpose of constructing and testing the pipeline and restoring the owner's property and to conduct all activities incident

thereto, terminating upon the approval of the completed work and property restoration, unless sooner terminated by MILLENNIUM or its authorized representative.

9.    MILLENNIUM may be required to make certain pre-pipeline-construction improvements to the Pfeifer Property in the area of the temporary access road easement in order to make such temporary access road suitable for travel by tractor-trailers hauling pipe and for related pipeline-construction purposes.    MILLENNIUM reserves its right to make all such improvements to the temporary easement area that it deems necessary to construct and test the pipeline.  Following the completion of the pipeline, and at the owner's option, MILLENNIUM will leave such improvements in place or remove them and, if removed, MILLENNIUM will use reasonable efforts to restore the Pfeifer Property to its pre-temporary easement condition or as close thereto as reasonably possible.

10.    The persons known to MILLENNIUM to have or claim an interest in the Pfeifer Property in which Millennium seeks to acquire permanent and temporary easements for the Project are:

| Person | Interest |
| --- | --- |
| Pfeifer Realty Corporation<br>282 Barnstable Drive<br>Wyckoff, New Jersey 07481 | Fee Owner; by Deed dated April 13, 2000; recorded in<br>Liber 2184 of Deeds at page 223 on April 20, 2000 |

11.    The Fee Owner identified in paragraph 10 above may fully use and enjoy the Pfeifer Property in which MILLENNIUM seeks to acquire permanent and temporary easements to the extent that such use and enjoyment does not interfere with MILLENNIUM's permanent and temporary easements.  However, the Fee Owner shall not, including but not limited to, change the depth of cover over any installed pipeline at the Pfeifer Property without the written consent of MILLENNIUM and shall not place or permit to be placed any temporary or

permanent structure or obstruction of any kind, including but not limited to, buildings, mobile homes, trees, fences, paved roads or passage ways or the like on or over those portions of the Pfeifer Property to be encumbered by the permanent and temporary easements, and shall not store any materials of any kind or operate or allow to be operated any heavy machinery or equipment over such portions of the Pfeifer Property.

12.    In addition to the persons named in paragraph 10 of this Complaint, there are or may be others who have or may claim some interest in the Pfeifer Property identified in paragraph 4 above, whose names are unknown to MILLENNIUM and on diligent inquiry have not been ascertained.  They are made parties to the action under the designation "Unknown Others."

WHEREFORE, MILLENNIUM PIPELINE COMPANY, L.L.C. demands judgment that the permanent and temporary easements in the aforementioned Pfeifer Property be condemned and that just compensation for the takings be ascertained and awarded and for such other relief as may be lawful and proper.

DATED:    November 20, 2007    HISCOCK & BARCLAY, LLP

By: _____
    Mark D. Lansing MDL1647
    Darryl J. Colosi DC2929

*Attorneys for Plaintiff*
Millennium Pipeline Company, LLC
Office and Post Office Address
50 Beaver Street
Albany, New York  12207-2830
Telephone: (518) 434-2163

Ex. 1

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Suedeen G. Kelly, Marc Spitzer,
Philip D. Moeller, and Jon Wellinghoff.

| | |
|---|---|
| Millennium Pipeline Company, L.L.C. | Docket Nos. CP98-150-006<br>CP98-150-007<br>CP98-150-008 |
| Columbia Gas Transmission Corporation | CP98-151-003<br>CP98-151-004 |
| Columbia Gas Transmission Corporation | CP05-19-000 |
| Empire State Pipeline and<br>Empire Pipeline, Inc. | CP06-5-000<br>CP06-5-002<br>CP06-6-000<br>CP06-6-002<br>CP06-7-000<br>CP06-7-002 |
| Algonquin Gas Transmission, LLC | CP06-76-000 |
| Iroquois Gas Transmission System, L.P. | CP02-31-002 |

ORDER ISSUING AND AMENDING CERTIFICATES, APPROVING
ABANDONMENT, VACATING CERTIFICATE, AND GRANTING AND DENYING
REQUESTS FOR REHEARING AND CLARIFICATION

(Issued December 21, 2006)

1.     In *Millennium Pipeline Company, L.P.*, the Commission authorized Millennium
Pipeline Company, L.L.C. (Millennium) to construct and operate a pipeline from the
United States-Canada border in Lake Erie across southern New York to a terminus in

Docket No. CP98-150-006, et al.                                    - 2 -

Mount Vernon, New York.[1]  In addition, we authorized Columbia Gas Transmission
Corporation (Columbia) to abandon jurisdictional facilities and to lease capacity on
Millennium's proposed pipeline.  The project was designed to bring new gas supplies
from Canada to growing markets in the New York City area.  The Millennium pipeline,
however, was never constructed.

2.      Now, the applicants in this proceeding seek to reconfigure the project authorized
in the 2002 *Millennium* Order.  Specifically, Millennium proposes to acquire, construct,
and operate pipeline facilities from the North Greenwood compressor station in south
central New York, east to the Buena Vista measurement and regulation station in
Rockland County, New York.  Millennium also requests that the Commission vacate that
portion of the 2002 *Millennium* Order that authorized it to construct facilities from the
United States-Canada border to North Greenwood and from the Ramapo measurement
and regulation station (Ramapo station) to Mount Vernon.  In a contemporaneous
application, Columbia requests authority to change some of the facilities it proposes to
abandon and to alter the capacity lease proposals.  Empire Pipeline, Inc. (EPI), a newly
formed pipeline company, proposes to construct facilities to connect Empire State
Pipeline's (Empire) existing system to Millennium at the Corning compressor station,
near Corning, New York.  (Empire's existing pipeline extends from the United States-
Canada border to a point near Syracuse, New York.)  In addition, EPI requests
authorization to operate the facilities to be constructed, as well as Empire's existing
system.[2]  At the Ramapo station, Millennium will connect with Algonquin Gas
Transmission, LLC (Algonquin).[3]  Algonquin also proposes to construct and operate
facilities in order to transport gas from the Ramapo station to a connection with Iroquois
Gas Transmission System, L.P. (Iroquois) in the Town of Brookfield, Connecticut.
Iroquois proposes to construct and operate facilities to transport gas into the New York
City metropolitan area.  These proposals are known as the Northeast (NE)-07 project.

---

        [1] *Interim Order*, 97 FERC ¶ 61,292 (2001), *order issuing certificates, granting
and denying requests for rehearing, and granting and denying requests for clarification*,
100 FERC ¶ 61,277 (2002) (the 2002 *Millennium* Order).  In 2006, Millennium Pipeline
Company, L.P. changed its name to Millennium Pipeline Company, L.L.C.

        [2] Subject to an evaluation of environmental issues, we issued a preliminary
determination authorizing EPI's proposals.  *Empire State Pipeline*, 116 FERC ¶ 61,074
(2006) (EPI's preliminary determination).

        [3] Millennium will also connect to three local distribution companies along its
route.

Docket No. CP98-150-006, et al.                                    - 3 -

3.    This order amends the certificates issued to Millennium and Columbia in the 2002 *Millennium* Order, vacates the portions of the 2002 *Millennium* Order that are no longer needed, issues certificates to EPI to construct and operate facilities and to operate the existing Empire system, grants and denies requests for rehearing and clarification of EPI's preliminary determination, issues a certificate to Algonquin to construct and operate facilities, and amends a certificate issued to Iroquois to construct and operate facilities.

## I.    Background

4.    In 1997, Millennium, a newly formed company with no facilities, filed an application, as amended in 2000, proposing to construct and operate approximately 424 miles of 24- and 36-inch diameter pipeline extending from an interconnection with facilities to be constructed by TransCanada PipeLines Limited (TransCanada) at the United States-Canada border in Lake Erie through southern New York across the Hudson River and Westchester County to a connection with Consolidated Edison Company of New York, Inc.'s (Consolidated Edison) high-pressure pipeline in the City of Mount Vernon, New York. Millennium contemplated that the 36-inch diameter portion of its proposed pipeline would extend from the connection with TransCanada to the Ramapo station – a distance of approximately 373.4 miles – and that the 24-inch diameter portion of its proposed pipeline would extend from the Ramapo station to the pipeline's terminus in Mount Vernon – a distance of approximately 50.6 miles.

5.    Millennium proposed that its pipeline follow the route of Columbia's existing Line A-5 from the vicinity of Columbia's North Greenwood compressor station in Steuben County, New York for approximately 223.9 miles to the Ramapo station. Millennium also proposed to acquire from Columbia and operate approximately 6.7 miles of 24-inch diameter pipeline, known as Line 10338, extending from the Ramapo station to the Buena Vista measuring station in Clarkstown, New York.[4] Thus, under its proposals, Millennium would be using existing utility corridors and easements to be acquired from Columbia for the portion of its pipeline route from North Greenwood to Buena Vista.

6.    In addition, Millennium proposed to acquire and operate: (1) approximately 10.5 miles of 10- and 14-inch diameter pipeline, known as the Milford line, extending in a southwesterly direction from Line A-5 in Rockland County to the Milford compressor

---

[4] Line 10338 begins at the end of Line A-5.

Docket No. CP98-150-006, et al.                                    - 4 -

station in Pike County, Pennsylvania;[5] (2) the 700-horsepower Milford compressor station in Pike County;[6] (3) 9.6 miles of short pipeline segments consisting of 4-, 6-, 8-, 12-, and 14-inch diameter pipeline and appurtenances in New York and Pennsylvania; and (4) various metering and regulating stations and related facilities.

7.     Millennium stated that the capacity of the proposed pipeline was 714,000 Dth per day, with a maximum allowable operating pressure of 1,440 psig. At the Ramapo station, the pressure would drop to approximately 670 psig and, at the terminus of the pipeline in Mount Vernon, the pressure would drop to 375 psig. Millennium proposed to deliver approximately one-half of its capacity by Ramapo and the remaining capacity by Mount Vernon.

8.     In a companion application, as amended, Columbia requested permission and approval to abandon Line A-5,[7] measuring and regulating stations along Line A-5 that Columbia uses to make deliveries to its customers, Line 10338, the Milford line, and the Milford compressor station. Specifically, in regard to Line A-5, Columbia proposed to abandon in place a 129.8-mile segment of 10- and 12-inch diameter line from the North Greenwood compressor station to the Hancock measuring station in Delaware County, New York; to abandon by removal a 92.2 mile segment of 8- and 24-inch diameter line from the Hancock station to the Ramapo station; and to abandon by conveyance a 1.9- mile segment of 12-inch diameter pipeline in Chemung County, New York.

9.     Columbia, however, did not propose to abandon firm transportation service to its existing Line A-5 customers. Consequently, the Interim Order authorized Millennium to lease up to 14,000 Dth per day of capacity on its proposed pipeline to Columbia so that Columbia could provide transportation service to its Line A-5 customers under the terms and conditions of Columbia's FERC Gas Tariff. For the lease capacity, Columbia agreed to pay a monthly firm charge for an equivalent amount of firm long-haul capacity on Millennium's system. In addition, subsequent to Columbia's abandonment of the Line A-5 facilities, but prior to completion of construction of Millennium's system, the Interim Order authorized Columbia to lease capacity on Millennium's incomplete system at no charge to maintain service to Columbia's A-5 customers. Under the lease proposals, the

---

[5] The portion of the Milford line in New York is also known as Line K and the portion of the Milford line in Pennsylvania is also known as Line 1278.

[6] The Milford compressor station consists of two 350-horsepower compressor units.

[7] Line A-5 consists of 24-, 20-, 16-, 12-, 10-, and 8-inch diameter pipeline.

Docket No. CP98-150-006, et al.                                    - 5 -

facilities providing the lease capacity would remain the property of Millennium and Millennium would use the necessary provisions of its tariff to maintain operational control of the facilities used for the lease capacity.

10.    The Interim Order found that Millennium's and Columbia's proposals were in the public interest because the facilities would provide fuel for needed electric generation, help relieve constraints on other area pipeline systems, and accommodate anticipated long-term growth in northeastern markets. The Interim Order also found that there were no preferable alternatives. Thus, the Interim Order authorized Millennium's and Columbia's proposals, as well as the lease proposals.

11.    Many residents of Mount Vernon, however, raised significant opposition to pipeline construction through their city and the location of Millennium's termination point with Consolidated Edison. For these reasons, the Interim Order required Millennium to negotiate with elected officials and interested parties and citizens in Mount Vernon to work toward reaching an agreement on a route to an interconnection with Consolidated Edison's high-pressure line. Thus, the Interim Order did not authorize Millennium to construct facilities through Mount Vernon.

12.    At the time the Interim Order was issued, the New York State Department of State (NYSDOS) had not completed its consistency review of Millennium's application under the Coastal Zone Management Act (CZMA).[8] Thus, the Interim Order held that Millennium could not construct facilities until it received an affirmative coastal zone determination from the NYSDOS.

13.    After Millennium and Mount Vernon reached a comprehensive settlement on the route of the pipeline through the city, the 2002 *Millennium* Order issued a final certificate to Millennium to construct and operate its pipeline, including a specific route through Mount Vernon. The 2002 *Millennium* Order, among other things, also held that we did not err in issuing a certificate prior to Millennium's receiving a consistency determination from the NYSDOS under the CZMA.

14.    On May 9, 2002, the NYSDOS found that Millennium's proposals were inconsistent with New York's Coastal Management Program. The NYSDOS decision prevents Millennium from constructing its pipeline across the Hudson River and through portions of Westchester County. Millennium appealed the NYSDOS' decision to the Secretary of Commerce. The Secretary of Commerce denied Millennium's appeal and

---

    [8] 16 U.S.C. § 1451 *et seq.* (2004).

Docket No. CP98-150-006, et al.                                    - 6 -

Millennium appealed the denial to the United States District Court for the District of Columbia. The court denied Millennium's appeal.[9] Consequently, the Millennium pipeline was never constructed.

## II.    The Applications

15.    As a result of the decision in *Gutierrez* and to meet the current needs of the natural gas market in the northeast, Millennium states that it redesigned the project approved for construction in the 2002 *Millennium* Order in part to eliminate the need to cross the Hudson River and the parts of Westchester County found to be inconsistent with New York's coastal management plans. The applications involved in the NE-07 project are described in sequential order from west to east below.

### A.    EPI's and Empire's Application

#### 1.    Introduction

16.    Empire is a 24-inch diameter natural gas pipeline that extends approximately 157 miles from a connection with TransCanada at the United States-Canada border near Chippawa, Ontario to a terminus near Syracuse, New York. Empire was constructed under a certificate issued by the New York State Public Service Commission (New York PSC). Currently, Empire provides firm and interruptible transportation services to utilities, power producers, industrial companies, marketers, and other shippers under rates, terms, and conditions regulated by the New York PSC. Empire has a capacity of 556,207 Dth per day.

17.    Empire is a Hinshaw pipeline exempt from the Commission's jurisdiction under section 1(c) of the Natural Gas Act (NGA).[10] Subsequent to the finding that it was a Hinshaw pipeline, the Commission authorized Empire to transport gas for two interstate

---

[9] *Millennium Pipeline Co. v. Gutierrez*, No. 04-233, 2006 U.S. Dist. LEXIS 14273 (D.C. Cir. March 31, 2006) (*Gutierrez*). Millennium did not appeal the *Gutierrez* decision.

[10] *Empire State Pipeline*, 56 FERC ¶ 61,050 at 61,168 (1991). The Hinshaw amendment allows a pipeline located wholly within one state to engage in interstate commerce without becoming subject to the Commission's jurisdiction, if the pipeline's rates, services, and facilities are regulated by the state and the gas is consumed within that state.

Docket No. CP98-150-006, et al.                                      - 7 -

pipelines – National Fuel Gas Supply Corporation and Dominion Transmission, Inc. – under a blanket certificate issued pursuant to section 284.224 of the regulations.[11]

### 2.    Proposals

18.    EPI, a new company with no pipeline facilities, proposes to construct and operate a 78-mile-long, 24-inch diameter pipeline from Empire's existing pipeline in Victor, New York to a connection with Millennium near Corning, New York. (Victor is approximately 60 miles west of Empire's terminus.) EPI also proposes to construct a 20,620-horsepower compressor station, known as the Oakfield compressor station, west of Victor on Empire's existing pipeline near Oakfield, New York. The proposed connector facilities will have a design capacity of 250,000 Dth per day in the winter (November through March) and 221,100 Dth per day in the summer (April through October), and a maximum allowable operating pressure of 1,440 psig.[12]

19.    Starting on the in-service date of the proposed connector facilities, EPI requests authority to operate the existing 157-mile-long Empire system and the proposed connector facilities as a jurisdictional pipeline under the NGA.[13]  EPI also requests a blanket construction certificate under Subpart F of Part 157 and a blanket transportation certificate under Subpart G of Part 284 of the regulations.

20.    EPI states that it entered into a precedent agreement with KeySpan Gas East Corporation (KeySpan) to transport 150,750 Dth of gas per day on a firm basis from a connection with TransCanada at the United States-Canada border to a connection with Millennium's proposed pipeline at Corning for a primary term of 10 years. This represents approximately 60.3 percent of the winter capacity and 68.2 percent of the summer capacity of the proposed connector facilities.

---

[11] *Empire State Pipeline*, 70 FERC ¶ 61,162 (1995).

[12] EPI states that it will also construct auxiliary facilities such as valves, drips, pig launchers and receivers, cathodic protection equipment, yard and station piping, electrical and communication equipment, and buildings under section 2.55 of the regulations. There are no non-jurisdictional facilities associated with EPI's proposed construction.

[13] Empire requests that the Commission terminate its section 284.224 blanket certificate on the in-service date of the proposed connector facilities.

Docket No. CP98-150-006, et al.                                     - 8 -

21.     Empire and EPI estimate that the cost of the proposed connector project will be $144.2 million.  They anticipate that corporate funds from National Fuel Gas Company (NFG), their corporate parent, will be used to finance the proposed facilities.

22.     EPI proposes to establish separate firm, interruptible, and overrun rates for the existing and connector facilities, based on the respective cost of service and billing determinants for service using the existing Empire facilities and for service on the proposed connector facilities.  EPI also submitted a *pro forma* tariff for service on the existing facilities and on the proposed Empire connector facilities.  EPI states that it will provide service to new shippers under the form of service agreement in the proposed tariff, while continuing to provide service to Empire's existing shippers using the form of service agreement in the tariff approved by the New York PSC.

23.     On July 20, 2006, in EPI's preliminary determination, we held that contingent on a favorable result in our then pending environmental review, EPI's proposed construction of the connector project and operation of the Empire pipeline and the connector facilities to be constructed were in the public convenience and necessity.  We also required EPI to make numerous revisions to its proposed rates and tariff.  Several parties filed requests for rehearing and clarification of the preliminary determination.  Further, EPI submitted its compliance filing to the preliminary determination addressing various rate and tariff issues.  The issues raised on rehearing and clarification and by the compliance filing will be discussed later in this order.

> **B.     Millennium's Applications**

> **1.     Introduction**

24.     On August 1, 2005, Millennium filed an application in Docket No. CP98-150-006 under section 7(c) of the NGA to amend the authorization issued in the 2002 *Millennium* Order.  On December 20, 2005 and May 3, 2006, Millennium filed in Docket Nos. CP98-150-007 and CP98-150-008, respectively, to amend the application in Docket No. CP98-150-006.

25.     Notice of Millennium's application in Docket No. CP98-150-006 was published in the *Federal Register* on December 7, 2005 (70 Fed. Reg. 72811).  Notices of the amendments to Millennium's application in Docket Nos. CP98-150-007 and CP98-150-008 were published in the *Federal Register* on January 13, 2006 (71 Fed. Reg. 2206) and May 16, 2006 (71 Fed. Reg. 28314), respectively.

26.     After the issuance of the 2002 *Millennium* Order, Millennium converted its organizational form from a Delaware limited partnership to a Delaware limited liability

Docket No. CP98-150-006, et al.                                                              - 9 -

company composed of three members: Columbia, KeySpan Corporation, and DTE
Energy. Currently, Columbia holds a 47.5 percent interest in Millennium, with KeySpan
Corporation and DTE Energy each holding a 26.25 percent interest.

    2.    **Proposals**

27.    In its applications in Docket Nos. CP98-150-006 and CP98-150-007, which were
filed prior to the decision in *Gutierrez*, Millennium proposed to amend the 2002
*Millennium* Order to phase construction of the project. In Phase I, Millennium proposed
to acquire, construct, and operate facilities from the North Greenwood station east to the
Ramapo station, as well as to acquire pipeline facilities from the Ramapo station to the
Buena Vista station in Clarkstown, New York. Millennium requested that the
Commission defer consideration of the portion of the 2002 *Millennium* Order that
authorized the crossing of Lake Erie to North Greenwood and the crossing of the Hudson
River to Mount Vernon until Phase II. Subsequent to the decision in *Gutierrez* upholding
the NYSDOS finding that Millennium's proposals were inconsistent with New York's
Coastal Management Program, Millennium filed an application in Docket No. CP98-150-
008 stating that it no longer seeks to phase construction and requesting that the
Commission vacate the portions of the 2002 *Millennium* Order that relate to the Phase II
facilities and vacate the certificate and environmental conditions that relate to Phase II.

28.    Under its amended proposals, Millennium requests authorization to:

- construct and operate approximately 181.7 miles of 30-inch diameter pipeline
  from the Corning compressor station to the Ramapo station (mileposts (MP) 190.6
  to 376.6) where the pipeline will connect with Algonquin;[14]

- replace approximately 1,278 feet of 10-inch diameter pipeline on Columbia's
  existing Line A-5 from MPs 343.8 to 344.1 with 24-inch diameter line in Orange
  County, New York;

- acquire from Columbia and operate approximately: (1) 3.1 miles of 10- and
  12-inch diameter pipeline in Steuben County, New York, known as Line 10325;
  (2) 0.4 mile of 10-inch diameter pipeline in Broome County, New York, known as
  Line 10356; (3) 52.5 miles of 10-, 12-, and 24-inch diameter segments of Line A-5

---

[14] Millennium will also connect to three LDCs along its route – Central Hudson
Gas & Electric Corporation (Central Hudson), New York State Electric & Gas
Corporation (NYSEG), and Orange and Rockland Utilities, Inc. (Orange and Rockland).

Docket No. CP98-150-006, et al.                                                    - 10 -

in Steuben, Chemung, Broome, and Orange Counties, New York; (4) 2.6 miles of six-inch diameter pipeline in Tioga County, known as Line AD-31; (5) 0.1 mile of 12-inch diameter pipeline in Broome County, known as Line N; and (6) 6.7 miles of 24-inch diameter pipeline in Rockland County, known as Line 10338;

- acquire from Columbia and operate 23 metering and regulating stations as identified in Exhibit Z-1 of Millennium's application;

- construct and operate a 15,002-horsepower compressor station and measuring and regulating facilities at a site adjacent to Columbia's existing Corning compressor station on property owned by Columbia at MP 190.6;

- construct the Wagoner measurement and regulation station in Deer Park, New York at MP 337.9;

- install upgrades to the Ramapo station;

- modify the existing measurement and regulation stations at Tuxedo, Sloatsburg, and Ramapo to accommodate the replacement 30-inch line.[15]

29.    Millennium's proposals herein differ from the authorization granted in the 2002 *Millennium* Order in that the proposals:  (1) reduce the length of pipeline to be constructed from approximately 424 to 181.7 miles; (2) reduce the diameter of the pipeline from 36 to 30 inches; (3) reduce the maximum allowable operating pressure of the pipeline from 1,440 to 1,200 psig; (4) reduce the capacity of the pipeline from 714,000 to 525,400 Dth per day; (5) realign approximately 19 miles of approved pipeline route in three locations as a result of discussions with NYSEG (the NYSEG route variations);[16] (6) reroute approximately 5,600 feet of pipeline between MPs 350.8 and

---

[15] Orange and Rockland plans to relocate approximately 475 feet of four-inch diameter non-jurisdictional pipeline adjacent to Line A-5 at the Sloatsburg station at MP 373.3 to ensure that it has maximum flexibility to continue to receive gas from Columbia's Line A-5 while Millennium is constructed.  Orange and Rockland's modifications would not connect directly to Millennium's facilities.  There are no other non-jurisdictional facilities associated with Millennium's proposals.

[16] The locations are the Chemung variation from MPs 198.0 to 203.6, the Tioga-Broome variation from MPs 232.2 to 245.0, and the Delaware variation from MPs 284.4 to 284.9.

351.6 to avoid a planned residential subdivision in the Town of Warwick, New York (the Warwick Isle route variation); (7) seek to acquire from Columbia approximately 7.1 miles of 24-inch diameter pipeline between MPs 340.5 and 347.7 in Orange County, rather than replacing the pipeline with larger diameter line; (8) seek to construct a compressor station and measuring and regulating facilities next to Columbia's existing Corning compressor station on property owned by Columbia; (9) no longer seek approval to acquire the Milford line and the Milford compressor station; and (10) use alternate construction techniques/measures for crossing bodies of water at 12 places, rather than using a horizontal bore technique.[17]

30.        Millennium states that it conducted an open season for its amended project from June 13 to June 30, 2005.  Millennium asserts that it entered into precedent agreements with Consolidated Edison, KeySpan, Columbia, and Central Hudson.  Specifically, Millennium states that it will transport (1) 150,000 Dth of gas per day on a firm basis for Consolidated Edison, increasing to 180,000 Dth per day after the first year of service; (2) 150,000 Dth of gas per day on a firm basis for KeySpan, increasing to 175,000 Dth per day after the first year of service and to 200,000 Dth per day after the second year of service; (3) 5,000 Dth of gas per day on a firm basis for Central Hudson, increasing to 10,000 Dth per day after the third year of service; and (4) 24,600 Dth per day on a firm basis for Columbia.[18]  The precedent agreements with Consolidated Edison, KeySpan, Central Hudson, and Columbia are for 10 years.

### 3.        Rates

31.        Millennium estimates that the cost to construct its proposed project will be $663,818,878, which includes the acquisition cost for Columbia's facilities.[19] Millennium proposes to finance the construction and acquisition of facilities through a combination of its partners' equity contributions and non-recourse debt.

---

[17] The bodies of water are Catharine Creek, Catatonk Creek, Chenango River, Owego Creek, Nanticoke Creek, Susquehanna River, West Branch Delaware River, East Branch Delaware River, Wallkill River, and Pochuck Creek.

[18] Columbia also holds another 25,400 Dth per day of forward-haul capacity on Millennium through a capacity lease agreement that is discussed below.

[19] In Docket No. CP98-150-008, Millennium states that it reduced the cost to acquire Columbia's facilities from $40,218,018 to $30,676,147, as a result of Columbia's decision to retain the Milford line.  Millennium states that any associated cost savings will be reflected in its Contingency Fund.

Docket No. CP98-150-006, et al.                                           - 12 -

32.     Millennium proposes four services:  firm transportation service under Rate Schedule FT-1, interruptible transportation service under Rate Schedule IT-1, parking and lending service under Rate Schedule PALS, and interruptible paper pools under Rate Schedule IPP.  Millennium proposes to charge recourse and negotiated rates.[20]  To support the recourse rates, Millennium proposes a capital structure of 70 percent debt and 30 percent equity, with a 14 percent return on equity and a 6.5 percent cost of debt resulting in an overall rate of return of 8.75 percent.[21]  Millennium proposes to depreciate the facilities over a 30-year period at a rate of 3.33 percent.

33.     Millennium requests negotiated rate authority, which was granted in the Interim Order,[22] and has agreed to negotiated rates in its precedent agreements, which include rate caps.  Millennium states that the negotiated rates are designed under a levelized cost-of-service rate design.  Millennium states that it assumes the risk for any annual revenue shortfalls associated with the design of the negotiated rates when such rates exceed the rate cap and that any revenue shortfall under negotiated rates will not be adjusted for in the design of the recourse rates.  Consistent with our policy, Millennium indicates that it will file negotiated rate agreements or tariff sheets that reflect the essential elements of such agreements in sufficient detail to enable shippers to evaluate whether they are similarly situated to a particular negotiated rate customer.  Millennium asserts that it will also maintain separate and identifiable accounts for volumes transported, billing determinants, rate components, surcharges, and revenues associated with the negotiated rates in sufficient detail so that they can be identified in Statements G, I, and J in any future NGA section 4 or 5 rates cases.

---

[20] The proposed recourse rates are as follows:  Rate Schedule FT-1 has a maximum reservation charge of $19.7690 per Dth and a commodity charge of $0.0019 per Dth; Rate Schedule IT-1, which is based on a 100 percent load factor rate of Rate Schedule FT-1, has a maximum commodity charge of $.6518 per Dth and a minimum commodity charge of $0.0019 per Dth; and Rate Schedule PALS has a maximum parking and lending service charge of $.6518 per Dth.  Millennium does not propose a rate for Rate Schedule IPP.

[21] The proposed capital structure, rate of return, and cost of debt are consistent with the rate structure approved in the Interim Order at 62,323, as modified in the 2002 *Millennium* Order at P 117-119.

[22] Interim Order at 62,323-4.

Docket No. CP98-150-006, et al.                                      - 13 -

### 4.    Justification for Proposals

34.    Millennium states that its proposals will have no adverse effect on existing pipelines and their captive customers and that it has minimized the potential for adverse impacts on landowners and communities affected by the project.  Millennium also contends that the proposals will provide the northeast with access to gas supplies from the Dawn hub in Ontario and the upstream Chicago hub.  In addition, Millennium asserts that its proposals will increase pipeline capacity in southeastern New York and provide access to existing storage fields in western New York.  Finally, Millennium contends that demand for gas in the New York City area  is increasing and that the precedent agreements demonstrate a strong market demand and commitment to the Millennium project.

### C.    Columbia's Applications

### 1.    Introduction

35.    On August 1, 2005, Columbia filed an application in Docket No. CP98-151-003 under sections 7(b) and 7(c) of the NGA, as amended on May 3, 2006, in Docket No. CP98-151-004, to amend the 2002 *Millennium* Order.

36.    Notice of Columbia's application in Docket No. CP98-151-003 was published in the *Federal Register* on December 7, 2005 (70 Fed. Reg. 72805).  The amendment to Columbia's application in Docket No. CP98-151-004 was noticed in the *Federal Register* on May 16, 2006 (71 Fed. Reg. 28313).

37.    Columbia is a natural gas company under the NGA that transports gas and operates storage fields in interstate commerce.  Columbia operates facilities in Delaware, Kentucky, Maryland, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

### 2.    Proposals

38.    Columbia proposes to abandon in place approximately 4.5 miles of 10-inch diameter pipeline, 82.8 miles of 12-inch diameter pipeline, 0.2 mile of 16-inch diameter pipeline, and 2.5 miles of 20-inch diameter pipeline in Steuben, Chemung, Tioga, Broome, Orange, and Delaware Counties.  These segments are part of Line A-5.

39.    Columbia also proposes to abandon by removal approximately 55.5 miles of 12-inch diameter pipeline, 16.6 miles of 10-inch diameter pipeline, and 8.8 miles of 8-inch diameter pipeline in Delaware, Sullivan, Orange, and Rockland Counties.  These

Docket No. CP98-150-006, et al.                                                    - 14 -

segments are part of Line A-5.  Further, Columbia proposes to abandon the Walton Deposit metering and regulating station in Delaware County.

40.     Finally, Columbia proposes to abandon by conveyance to Millennium approximately: (1) 3.1 miles of 10- and 12-inch diameter pipeline in Steuben County, known as Line 10325; (2) 0.4 mile of 10-inch diameter pipeline in Broome County, known as Line 10356; (3) 52.5 miles of 10-, 12-, and 24-inch diameter segments of Line A-5 in Steuben, Chemung, Broome, and Orange Counties; (4) 2.6 miles of six-inch diameter pipeline in Tioga County, known as Line AD-31; (5) 0.1 mile of 12-inch diameter in Broome County, known as Line N; and (6) 6.7 miles of 24-inch diameter pipeline in Rockland County, known as Line 10338.  Finally, Columbia proposes to abandon 23 metering and regulating stations.

41.     Millennium will replace the facilities that Columbia proposes to abandon in place or to abandon by removal with new pipeline facilities.  Millennium will continue to use the facilities that it will acquire by conveyance.

### 3.     The Leases and Limited-Term Certificate

42.     The Interim Order authorized Millennium to lease capacity to Columbia when Millennium commences service.  The Interim Order also authorized Millennium to lease capacity on its incomplete system to Columbia at no charge after Columbia's abandonment of Line A-5, but prior to completion of Millennium's system.  The leases were designed to enable Columbia to provide transportation service to its Line A-5 customers.

43.     Columbia proposes to amend the lease authorizations.  Under the amended lease proposals, Millennium will lease capacity to Columbia but, rather than Millennium leasing capacity to Columbia at no charge prior to Millennium's in-service date, the new lease will not commence until Millennium goes into service (Columbia's lease).  The lease will enable Columbia to provide transportation service to its Line A-5 customers. Columbia proposes to lease 25,400 Dth per day of capacity from Millennium.

44.     In addition, in lieu of leasing capacity prior to Millennium's completion, Columbia requests a limited-term certificate of public convenience and necessity, with pre-granted abandonment authority, to temporarily operate segments of Millennium's incomplete pipeline to continue service to its existing Line A-5 customers.  The interim certificate will expire when Millennium places its proposed pipeline into service. Columbia states that it will provide service to the Line A-5 customers under the terms of its tariff.  Columbia also states that its lease will not require any payment to Millennium. As part of its proposal, Columbia requests that the Commission waive the certificate

Docket No. CP98-150-006, et al.                                              - 15 -

compliance and/or reporting requirements that may pertain to the interim use of Millennium's pipeline segments.

45.     The Interim Order authorized Columbia to abandon to Millennium the Milford line and the Milford compressor station.[23]  As a result of the proposed amendments here, Columbia will retain the facilities and not abandon them.  Nevertheless, Columbia now proposes to lease 29,248 Dth per day of capacity on these facilities to Millennium (Millennium's lease).  Columbia contends that the lease will provide Millennium with capacity comparable to what it would have obtained through the acquisition of the Milford line and compressor station and that the lease will eliminate the construction of duplicate facilities.

46.     Columbia's lease and Millennium's lease will become effective on the date that Millennium commences transportation service through its proposed pipeline.  Each lease is for a term of 10 years.  Millennium and Columbia will use the capacity they lease to provide service under their tariffs.  Millennium will retain operational control of the facilities involved with the lease to Columbia and Columbia will retain operational control of the facilities involved with the lease to Millennium.

    **4.    Lease Rates**

47.     For the Columbia lease, Columbia proposes to pay Millennium a monthly lease charge of $455,824, which is based on 25,400 Dth per day multiplied by $17.9458 per Dth for an annual payment of $5,469,890.[24]  Columbia contends that the charge is based on the amount of firm long-haul capacity that would have been available to Millennium had Columbia not required capacity to serve its customers at existing service levels. Columbia proposes to treat the lease as an operating lease under the Uniform System of Accounts and to record the costs in Article IV of the lease agreement to Account 858 as operational Account 858 costs.  Columbia proposes to begin the recovery of Account 858 costs through a filing under its Transportation Cost Rate Adjustment (TCRA) to be effective with its general section 4 rate case in which the costs of the Line A-5 facilities are removed from its rate base.

---

[23] The Milford line is 10.5 miles long and crosses the New York-Pennsylvania border.  The Milford compressor station is in Pennsylvania.

[24] The proposed rate of $17.9458 per Dth reflects the maximum transportation rate to be paid by Columbia, resulting in the most conservative net benefit to Columbia's customers.  The minimum charge is $15.7387 per Dth, resulting in a monthly charge of $399,762.98 for an annual payment of $4,797,156 per year.

Docket No. CP98-150-006, et al.                                              - 16 -

48.     Under the Millennium lease, Millennium proposes to pay Columbia $36,677 per month, which is based on 29,248 Dth per day multiplied by $1.254 per Dth per day for an annual payment of $440,124.

### 5.     Justification for Proposals

49.     Columbia asserts that its proposals are an integral part of the NE-07 project. Columbia contends that its customers will benefit from the proposals, because they will receive continued service via the Columbia lease through new pipeline facilities with their "attendant efficiencies," without having to incur replacement costs in future years. Columbia also asserts that the proposals will enable Millennium to use Columbia's existing facilities and rights of way, while eliminating the necessity to construct duplicate facilities. Further, Columbia contends that Millennium's lease will not affect Columbia's ability to meet its existing firm service obligations, because the lease merely replicates the amount of capacity that would have been provided through the facilities that would otherwise have been conveyed to Millennium. Finally, Columbia avers that the proposals will not affect the rates paid by its Line A-5 shippers.

### D.     Columbia's Application in Docket No. CP05-19-000

#### 1.     Introduction

50.     On November 2, 2004, Columbia filed an application in Docket No. CP05-19-000 under sections 7(b) and 7(c) of the NGA for a certificate of public convenience and necessity to construct and operate replacement facilities on Line A-5. These proposals are known as the Line A-5 replacement project.

51.     Notice of Columbia's application was published in the *Federal Register* on November 18, 2004 (69 Fed. Reg. 67556).

#### 2.     Proposals

52.     Under its Line A-5 replacement project, Columbia proposes to replace approximately 8.8 miles of 8- and 16-inch diameter segments of Line A-5 with 30-inch diameter pipeline in Orange and Rockland Counties, to modify the Tuxedo, Sloatsburg, and Ramapo measurement and regulation stations, and to abandon in place approximately one mile of Line A-5.

53.     The 2002 *Millennium* Order authorized Columbia to abandon the facilities that make up the Line A-5 replacement project. In 2003, with the construction of

Docket No. CP98-150-006, et al.                                              - 17 -

Millennium's facilities delayed, Columbia met with the United States Department of Transportation (DOT) and the New York PSC[25] and agreed to replace a deteriorated 37-mile portion of Line A-5 between the Huguenot station and the Ramapo station with 10-inch diameter pipeline. The deteriorated 37-mile portion of line included the 8.8-mile segment of line in the Line A-5 replacement project. Columbia states that in 2005 it re-evaluated its plan to replace the 8.8-mile segment of Line A-5 with 10-inch diameter pipeline and decided to replace the segment with 30-inch diameter pipeline in an attempt to avoid repeated disturbance of environmentally sensitive areas in the event that the Millennium system was constructed in the future. As a result, Columbia filed its application in Docket No. CP05-19-000.

54.      Subsequent to the filing in Docket No. CP05-19-000, Millennium and Columbia filed to amend the 2002 *Millennium* Order. In light of the amended filings, Columbia now proposes to abandon by removal the pipeline facilities that make up the Line A-5 replacement project and Millennium proposes to replace the 8.8 miles of 8- and 16-inch diameter segments of Line A-5 with 30-inch diameter pipeline. Millennium also proposes to modify the Tuxedo, Sloatsburg, and Ramapo stations and to abandon in place approximately one mile of Line A-5.[26]

      E.      **Algonquin's Application**

            1.      **Introduction**

55.      On March 1, 2006 Algonquin filed an application in Docket No. CP06-76-000 under sections 7(b) and 7(c) of the NGA for a certificate of public convenience and necessity authorizing it to abandon, construct, and operate facilities in New York and Connecticut as part of the NE-07 project.

56.      Notice of Algonquin's application was published in the *Federal Register* on March 17, 2006 (71 Fed. Reg. 13820).

57.      Algonquin is engaged in the transportation of natural gas in interstate commerce subject to the jurisdiction of the Commission. Algonquin owns and operates a pipeline system that extends from Lambertville and Hanover, New Jersey through New York,

---

      [25] The New York PSC acted as an agent for DOT's Office of Pipeline Safety.

      [26] The 8.8-mile pipeline segment is included in the 181.7 miles of 30-inch diameter pipeline that Millennium proposes to construct.

Docket No. CP98-150-006, et al.                                        - 18 -

Connecticut, Rhode Island, and Massachusetts to points near the Boston metropolitan area.

### 2.    Proposals

58.    Algonquin states that its proposals are designed to enable it to receive gas from Millennium at the Ramapo station and to transport gas for Consolidated Edison and KeySpan, as part of the NE-07 project. Specifically, Algonquin proposes to:

- replace approximately 4.8 miles of 26-inch diameter pipeline with 42-inch diameter pipeline in Rockland County;

- construct and operate a compressor station consisting of three turbine compressor units, totaling 37,700 horsepower, in Oxford, Connecticut;

- construct and operate two compressor units, totaling 18,010 horsepower, at the existing Southeast station in the Town of Southeast, New York;

- construct and operate two 7,700-horsepower turbine compressor units to replace two existing 4,700-horsepower compressor units and upgrade a 12,600-horsepower compressor unit to 15,000 horsepower at the existing Stony Point station in Stony Point, New York; and

- construct and operate a 7,700-horsepower turbine compressor unit at the existing Hanover station in Hanover, New Jersey.

59.    Algonquin also proposes minor pipe replacement on the west side of its existing Hudson River crossing to improve throughput, piping modifications at two existing interconnections, and the addition of a new delivery point at an existing interconnect with Iroquois at Brookfield, Connecticut.[27] Algonquin estimates that the cost of its proposed facilities will be $191,701,900.

60.    Algonquin states that it entered into precedent agreements with Consolidated Edison and KeySpan. Specifically, Algonquin states that it will provide 125,000 Dth per day of firm transportation for Consolidated Edison for 10 years from the Ramapo station to an interconnect with Iroquois at Brookfield. In addition, Algonquin states that it will provide 150,000 Dth per day of firm transportation for KeySpan, increasing to

---

[27] There are no non-jurisdictional facilities associated with Algonquin's proposals.

Docket No. CP98-150-006, et al.                                                    - 19 -

200,000 Dth per day of firm transportation over a two-year period, from the Ramapo station to an interconnect with Islander East Pipeline Company, L.L.C. (Islander East) at the Cheshire compressor station in Connecticut.[28]  The agreement with KeySpan is for 15 years.

### 3.     Rates

61.     Algonquin proposes to charge an incremental reservation rate under Rate Schedule AFT-1 to those shippers using the proposed facilities.  The incremental reservation rate charged for use of the proposed facilities will be in addition to the Rate Schedule AFT-1 system rate.  The cost of service for the proposed initial incremental reservation rate was developed using Algonquin's cost of service factors approved in Docket No. RP99-262. The rate of return is 10.37 percent, the depreciation rate is 1.81 percent, the operation and maintenance expense factor of 2.8 percent, and the tax expenses other than income equal 1.85 percent.  The surcharge for the service on the proposed facilities was designed to recover the remainder of the cost of service of the facilities that was not recovered under the AFT-1 system reservation rate.  The recourse rates for the shippers using the proposed facilities comprise the AFT-1 (F-1/WS-1) reservation and usage charges in effect for the month of service, plus the incremental reservation rate which will be $3.788 per Dth.

62.     Algonquin proposes to reflect fuel use and lost and unaccounted-for fuel (LAUF) associated with the proposals in the fuel retention percentages, calculated under section 32 of the General Terms and Conditions (GT&C) of the Algonquin's FERC Gas Tariff, as indicated on Sheet No. 40.  Algonquin filed a *pro forma* tariff sheet reflecting the proposed initial incremental rates.

63.     Under section 46 of the GT&C, Consolidated Edison and KeySpan were given the option of selecting negotiated rates or the recourse rates.  Both shippers opted to sign negotiated rate service agreements. Algonquin states that prior to commencement of service it will file numbered tariff sheets that state the name of the shipper paying the negotiated rate, the negotiated rate, the applicable receipt and delivery points, and the volume to be transported.  Also, Algonquin states it will maintain separate and identifiable accounts for volumes transported, billing determinants, rate components,

---

[28] We authorized the construction of the Islander East pipeline from Connecticut to Long Island in *Islander East Pipeline Co., L.L.C.*, 97 FERC ¶ 61,363 (2001), *order on reh'g and issuing certificates*, 100 FERC ¶ 61,276 (2002), *order on reh'g*, 102 FERC ¶ 61,054 (2003).  The Islander East pipeline has not yet been constructed.

Docket No. CP98-150-006, et al.                                    - 20 -

surcharges, and revenues associated with the negotiated rates in sufficient detail so that they can be identified in Statements G and I in any future NGA section 4 or 5 rate case.

### 4.    Justification for Proposals

64.    Algonquin contends that its existing customers will not subsidize the project, that the project will have no adverse effect on existing customers or existing pipelines and their captive customers, and that it has minimized the potential for adverse impacts on landowners and communities affected by the project. In addition, Algonquin asserts that the project will enhance the flexibility and reliability of its system and provide capacity for the NE-07 project .

### F.    Iroquois' Application

#### 1.    Introduction

65.    On March 29, 2006, Iroquois filed an application in Docket No. CP02-31-002 to amend the authorization issued in *Iroquois Gas Transmission System*, 101 FERC ¶ 61,131 (2002) (the *Iroquois* Order).[29] The *Iroquois* Order authorized Iroquois to construct and operate a compressor station in Brookfield, Connecticut.

66.    Notice of Iroquois' application was published in the *Federal Register* on April 13, 2006 (71 Fed. Reg. 19181).

67.    Iroquois transports natural gas in interstate commerce. Iroquois' pipeline extends from the United States-Canada border near Iroquois, Ontario through New York and Connecticut to South Commack, New York on Long Island and to Hunts Point, New York in the Bronx. Iroquois interconnects with Algonquin at Brookfield, Connecticut. At Brookfield, since the pressure in the Iroquois pipeline is substantially higher than the pressure in Algonquin's pipeline, Iroquois is only able to deliver gas into, but not receive gas from, the Algonquin system.

68.    In the *Iroquois* Order, we authorized Iroquois to construct and operate a 10,000-horsepower compressor unit at Brookfield. Iroquois designed the compressor unit to enable it to provide up to 85,000 Dth per day of firm transportation capacity for two shippers planning on building electric generation plants in the New York City area.

---

[29] *Order on reh'g and clarification*, 102 FERC ¶ 61,129 (2003).

Both shippers, however, decided not to go forward with their electric generation projects and the Brookfield compressor station was not constructed.

## 2.    Proposals

69.    Iroquois states that it designed the proposals herein to enable it to receive gas from Algonquin at Brookfield and to transport the gas to Consolidated Edison at Hunts Point, as part of the NE-07 project.  Specifically, Iroquois proposes to:  (1) reduce the size of the compressor unit authorized in the *Iroquois* Order from 10,000 to 7,700 horsepower; (2) convert the authorized compressor to a transfer compressor unit capable of receiving gas from Algonquin; and (3) install gas cooling facilities at the Brookfield compressor station and at its existing compressor station in Dover, New York.[30]  Iroquois estimates that the total cost of its proposals will be $41,600,000.

70.    Iroquois states that it conducted an open season that ended on May 31, 2005.  In addition to the open season, Iroquois states that it solicited its existing firm transportation customers for turnback capacity that could be used by expansion shippers.  As a result of the solicitation, Reliant Energy released 10,000 Dth per day of capacity.  Also, Iroquois asserts that it will use 30,000 Dth per day of firm capacity that is unsubscribed on a year-round, long-term basis for the NE-07 project.  Following the open season and turnback solicitation, Iroquois states that it executed a binding precedent agreement with Consolidated Edison for 100,000 Dth per day of firm transportation service under Rate Schedule RTS from Brookfield to Hunts Point.

## 3.    Rates

71.    Iroquois proposes to charge as initial recourse rates the currently effective Part 284 rates under the Rate Schedule RTS applicable to service on the Eastchester extension for deliveries to Hunts Point.[31]  Iroquois also proposes to charge Consolidated Edison a negotiated rate for firm transportation service in accordance with the Negotiated Rate

---

[30] Iroquois states that Connecticut Light & Power Company will need to extend an electric utility line to serve the proposed facilities at Brookfield.  No other non-jurisdictional facilities are required for Iroquois' project.

[31] These rates are subject to a rate moratorium and will not change before December 31, 2011.  *Iroquois Gas Transmission System, L.P.*, 109 FERC ¶ 61,059 (2004).

Docket No. CP98-150-006, et al.                                           - 22 -

Policy Statement[32] and the negotiated rate provisions contained in its tariff.[33] Iroquois indicates that prior to commencing service to Consolidated Edison, it will file a numbered tariff sheet stating the applicable negotiated rate for Commission review and approval, and that it will account for these volumes and revenues separately so that they can be identified in subsequent rate proceedings.

72.    Iroquois proposes to roll the costs associated with construction and operation of the compressor unit and associated facilities into the costs of its Eastchester project in the next general section 4 rate proceeding applicable to the Eastchester rates after the in-service date of the proposed facilities. Iroquois contends that its existing shippers will receive operational benefits as a result of the project, as well as financial benefits upon the roll-in of facility costs and billing determinants to Iroquois' currently approved Eastchester rates. Iroquois further contends that the proposed service includes a positive net fuel contribution, resulting in an incremental Eastchester fuel cost benefit of approximately $60,000 (based on an average annual gas cost of $9.81 per Dth).[34]

### 4.    Justification for Proposals

73.    Iroquois contends that its existing customers will not subsidize the project and that the project will have no adverse effect on its existing customers or existing pipelines and their captive customers. Iroquois states that Brookfield was selected for the new compressor station because it is an existing interconnection between Algonquin and Iroquois, which minimizes the need for construction of new pipeline facilities as well as the impact on the environment. Iroquois points out that in the *Iroquois* Order, the Commission found that a larger compressor station was in the public interest. Iroquois states that there have been no intervening events that would compel a contrary finding here for a smaller compressor station.

---

[32] *Natural Gas Pipeline Negotiated Rate Policies and Practices*, 104 FERC ¶ 61,134 (2003).

[33] *See* section 32, Negotiated Rates, of the GT&C of Iroquois' FERC Gas Tariff.

[34] Average Daily Midpoint (Iroquois Zone 2) reported in "*Gas Daily*" for the period March 6, 2005 through March 6, 2006.

Docket No. CP98-150-006, et al.                                    - 23 -

### III.    Interventions

74.     The parties in Appendix A filed timely, unopposed motions to intervene in the listed dockets.[35]  In addition, the New York PSC filed notices of intervention in Docket Nos. CP98-150-006, CP05-19-000, CP06-76-000, and CP02-31-002.

75.     The motions to intervene of the Town of Cortlandt, New York (Cortlandt) and the Village of Croton-on-Hudson, New York (Croton-on-Hudson) in Docket Nos. CP98-150-006 and CP98-150-007 and Woodstone Lakes Development, LLC (Woodstone) in Docket Nos. CP98-150-006 and CP98-151-003 included protests.  Millennium filed an answer to the protests.  Cortlandt and Croton-on-Hudson filed an answer to Millennium's answer.  Millennium filed an answer to Cortlandt's and Croton-on-Hudson's answer.  Croton-on-Hudson filed an answer to Millennium's answer.

76.     The Cities of Charlottesville and Richmond, Virginia (Charlottesville and Richmond) filed a joint motion, protesting Columbia's application in Docket No. CP05-19-000.  Columbia filed an answer to Charlottesville's and Richmond's protest.  Charlottesville and Richmond filed an answer to Columbia's answer.

77.     Answers to protests and answers to answers are not allowed under our rules.[36]  Nevertheless, we will accept all of Millennium's and Columbia's answers to the protests, as well as all of the answers to Millennium's and Columbia's answers, because these pleadings provided information that assisted us in our decision making.

78.     The parties listed in Appendix B filed untimely motions to intervene.  All of the late motions to intervene have demonstrated an interest in this proceeding and have shown good cause for intervening out of time.  Further, the untimely motions will not delay, disrupt, or otherwise prejudice this proceeding.  Thus, we will grant the untimely motions to intervene.[37]

---

[35] Timely, unopposed motions to intervene are granted by operation of Rule 214.

[36] 18 C.F.R. § 385.213 (a)(2) (2006).

[37] 18 C.F.R. § 385.214(d) (2006).

Docket No. CP98-150-006, et al.                                    - 24 -

## IV.    Consolidation of Docket No. CP05-19-000

79.    On August 1, 2006, Columbia filed a motion, requesting that its application in Docket No. CP05-19-000 involving the Line A-5 replacement project be consolidated with Millennium's amended applications.

80.    The facilities in the Line A-5 replacement project are the same facilities that are involved in Millennium's proposals. The only difference is that now Millennium proposes to replace the existing facilities with 30-inch diameter pipeline and upgrade the compressor stations, rather than as Columbia proposed in Docket No. CP05-19-000. We note that numerous parties filed motions to intervene and comments to Columbia's application. In addition, Columbia, our staff, and many environmental permitting agencies have done extensive work on Columbia's proposals. Thus, rather than dismissing Columbia's application, we believe that the interests of all parties will be best served by consolidating this docket with Millennium's application and considering the environmental issues relating to the Line A-5 replacement project raised by the intervenors, commenters, and permitting agencies when addressing Millennium's proposals.

81.    As to the non-environmental issues raised in this docket, Charlottesville and Richmond contend that Columbia failed to demonstrate that its existing customers would not subsidize the Line A-5 replacement project, that Columbia did not solicit the turnback of capacity from its existing customers, and that Columbia did not support the level of costs associated with the replacement project. Piedmont Natural Gas Company, Inc. (Piedmont) filed comments, contending that the Commission should ensure the proper allocation of costs, given Columbia's proposal to roll in the portion of project costs that would have been attributable to a 10-inch diameter replacement project. Baltimore Gas and Electric Company (Baltimore Gas) requests a technical conference, contending that Columbia should be required to show cause for any proposed increase in its overall rate base, if Columbia intends to roll in the cost of the proposed Line A-5 replacement project.

82.    Columbia no longer proposes to replace the Line A-5 facilities, nor does it propose to roll the cost of the replacement facilities into its rate base since Millennium now proposes to own and operate the facilities. Thus, we find that Charlottesville's and Richmond's joint protest is moot, as are the concerns of Piedmont. Further, we find that no purpose would be served by convening a technical conference as requested by Baltimore Gas.

Docket No. CP98-150-006, et al.                                              - 25 -

V.    **Discussion**

83.    Since the construction, operation, and abandonment of the proposed facilities would involve the transportation of natural gas in interstate commerce, the proposals are subject to the jurisdiction of the Commission under sections 7(b) and 7(c) of the NGA.

   A.    **Applicability of the Certificate Policy Statement**

84.    Millennium contends that the Commission should not apply the Certificate Policy Statement to its amended proposals herein.[38]  Millennium asserts that it is not filing a new proposal, but only seeks to amend a certificate that was previously approved under the construction policy that existed prior to the adoption of the Certificate Policy Statement. To support its position, Millennium quotes from the Certificate Policy Statement, which holds that it "will not be applied retroactively where the case has already been issued and the investment decisions made."[39]  Millennium states that under the prior construction policy, its amended applications should be approved because it has entered into long-term binding precedent and lease agreements for 80 percent of the pipeline's capacity.

85.    Under our policy as it existed prior to the issuance of the Certificate Policy Statement, an applicant was required to demonstrate that it had entered into long-term, executed contracts or binding precedent agreements (*i.e.*, 10-year contracts or precedent agreements) for a substantial amount of the firm capacity of the proposed facilities.[40] The minimum level of firm commitment that we recognized as sufficient for new on-shore facilities was 25 percent of the pipeline's proposed capacity.[41]

86.    In contrast, the Certificate Policy Statement established criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explained that in deciding whether to authorize the construction of major new pipeline facilities, we balance the

---

   [38] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *order on clarification*, 90 FERC ¶ 61,128, *order on clarification*, 92 FERC ¶ 61,094 (2000) (*Certificate Policy Statement*).

   [39] *Certificate Policy Statement*, 88 FERC at 61,750.

   [40] *El Paso Natural Gas Co.*, 65 FERC ¶ 61,276 (1993).

   [41] *See, e.g., Ouachita River Gas Storage Co.*, 76 FERC ¶ 61,139 (1996); *Steuben Gas Storage Co.*, 72 FERC ¶ 61,102 (1995).

Docket No. CP98-150-006, et al.                                    - 26 -

public benefits against the potential adverse consequences. Our goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

87.     The Certificate Policy Statement applies to applications filed after July 29, 1998, which is the date that we issued the Notice of Proposed Rulemaking (NOPR) that resulted in the issuance of the Certificate Policy Statement.[42] Since Millennium filed its original application in Docket No. CP98-150-000 on December 22, 1997, we did not apply the Certificate Policy Statement to Millennium in the 2002 *Millennium* Order.

88.     Millennium claims that the Certificate Policy Statement should not apply here, because it only seeks to amend its certificate and not file a new proposal. We disagree with Millennium's premise. While the goals of the proposals herein remain the same – increasing gas supply in the New York City area – many of the specifics of the NE-07 project are different from the proposals certificated in the 2002 *Millennium* Order. Here, Millennium proposes to reduce the length of facilities to be constructed from 424 to 181.7 miles, reduce the diameter of the pipeline from 36 to 30 inches, reduce the capacity of the pipeline from 714,000 Dth to 525,000 Dth per day, and reduce the operating pressure of the pipeline from 1,440 to 1,200 psig. In addition, the shippers that Millennium proposes to serve from the NE-07 project are all different from the shippers who requested service under the original proposals. Finally, Millennium's initial amended application was filed on August 1, 2005, more than seven years after the issuance of the NOPR. Considering the changes here from the proposals approved in the 2002 *Millennium* Order and the length of time that has passed between the NOPR and the filing of the amended applications, we believe that it is appropriate to require Millennium to comply with the same standards as all other pipelines that have sought certificate authority for construction of facilities over the last seven years. Our holding will not be burdensome to Millennium, as the information we need to make our decision under the Certificate Policy Statement is contained in Millennium's pleadings. Thus, we will apply the Certificate Policy Statement here.

---

[42] *Certificate Policy Statement*, 88 FERC at 61,751 (concurring opinion).

Docket No. CP98-150-006, et al.                                    - 27 -

B.    **The Certificate Policy Statement**

89.    Under the Certificate Policy Statement, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, we will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will we proceed to complete the environmental analysis where other interests are considered.

1.    **Subsidization**

90.    Millennium is a new pipeline company with no existing customers.  The threshold requirement of no subsidization from a pipeline's existing customers is not applicable here.  Thus, we find that there is no risk of subsidization of Millennium's proposed pipeline.

91.    Algonquin's proposals will not be subsidized by its existing customers, since it proposes to charge an incremental rate to Consolidated Edison and KeySpan that will fully recover the costs of the proposed facilities.  Further, as discussed below, we will require that Algonquin ensure that no expansion fuel costs attributable to the proposed construction will be charged to existing shippers.  We have previously determined that where a pipeline proposes to charge an incremental rate for new construction, it satisfies the threshold requirement that its proposals will not be subsidized by its existing shippers.[43]

92.    We also conclude that Iroquois' existing customers will not subsidize the proposed expansion service.  Exhibit Z-1 of Iroquois' application demonstrates that revenues will exceed expenses for each of the first three years of service at a progressively higher amount, resulting in cumulative revenues exceeding the cost of service by $39,441,491

---

[43] *See Eastern Shore Natural Gas Co.*, 95 FERC ¶ 61,344 (2001); *Transcontinental Gas Pipe Line Corp.*, 94 FERC ¶ 61,380 (2001); *Texas Eastern Transmission Corp.*, 92 FERC ¶ 61,285 (2000).

over the initial three years of service. Thus, we will make a predetermination here that rolled-in rate treatment in Iroquois' next section 4 rate proceeding would be appropriate, absent material changes in the relevant facts and circumstances. To ensure that all parties have full knowledge of the costs and revenues attributable to the expansion, we will require Iroquois to account for the construction and operating costs and revenues separately in its next section 4 rate proceeding. With such information, the parties and the Commission can evaluate the costs of the project and protect existing shippers from cost overruns and be able to identify any change in material circumstances that may warrant a re-examination of rolled-in rate treatment.

### 2.    Existing Customers, Competing Pipelines, and Landowners

93.    Millennium's proposals will not have a negative impact on its existing services, since it does not have any current customers. Algonquin's and Iroquois' proposals will not degrade service to their existing customers. In Algonquin's case, the proposals will provide a direct connection to a new source of supply in the northeast, which will improve reliability and supply stability for its customers. Similarly, for Iroquois, the proposed project will establish the first alternative receipt point for Canadian supplies for its system, which will afford its customers a measure of supply security. The proposals also will not adversely affect existing pipelines in the region or their customers, since the proposals are designed to meet new requests for service by Consolidated Edison and KeySpan.

94.    Under section 7(h) of the NGA, an applicant with a Commission-issued certificate has the right to exercise eminent domain to acquire the land necessary to construct and operate its proposed facilities, when it cannot reach a voluntary agreement with the landowner. Landowners whose land may be condemned have an interest in the applicant's proposals, as does the community near the right-of-way.[44] In our consideration of landowner and community interests under the Certificate Policy Statement, we seek to avoid unnecessary construction in order to minimize the applicant's need to condemn land to construct facilities under the eminent domain rights conveyed by our certificate.[45]

95.    Almost all of Millennium's proposed pipeline facilities will be constructed in powerline or pipeline rights of way. New segments of rights of way are distributed along

---

[44] *Certificate Policy Statement*, 88 FERC at 61,748.

[45] *Id. See also Order on Clarification*, 90 FERC at 61,398.

Docket No. CP98-150-006, et al.                                    - 29 -

the Millennium pipeline route and are incorporated into the proposed route because of topography, engineering, or residential constraints in areas adjacent to the existing rights of way. The Sterling Forest State Park/Laurel Ridge alternative and the Warwick Isle Route variation are designed to avoid planned residential communities along Millennium's route.

96.    Algonquin's proposed replacement of approximately 4.8 miles of pipeline facilities will take place in its existing 75-foot-wide permanent right of way. Algonquin's addition of compressor units will be at three existing compressor stations on property that Algonquin owns. As for the proposed Oxford compressor station, Algonquin has entered into an agreement to purchase the land where the station will be located.

97.    Iroquois' proposed construction at Brookfield and Dover will take place at existing compressor stations on land that it owns. Iroquois states that it will engage in minimal tree clearing and that the remaining trees and foliage will provide an additional barrier to minimize potential visual and noise impacts of the new compressor unit.

98.    For the reasons discussed above, we find that Millennium's, Algonquin's, and Iroquois' proposals will have minimal adverse impacts on landowners and communities near the project.

### 3.    Public Convenience and Necessity Finding

99.    Millennium's, Algonquin's, and Iroquois' proposed facilities will be constructed without subsidies. Also, the proposals will not degrade service to any of the applicants' existing customers, nor will the proposals adversely affect existing pipelines in the region or their customers, or nearby landowners and communities.

100.    In addition, the NE-07 project will provide the northeast with access to gas supplies from the Dawn hub in Ontario and the upstream Chicago hub. The project will increase pipeline capacity in southeastern New York and provide access to existing storage fields in western New York. Also, the demand for natural gas in the New York area is increasing due to electric generation plants fueled primarily by natural gas.[46] Further, we recognized that gas demand in New York is close to exceeding the capacity

---

[46] *ISO Power Trends 2005: A Report by the New York Independent System Operator* (April 2005).

Docket No. CP98-150-006, et al.                                                    - 30 -

of the pipelines serving it .[47]  In addition, market studies continue to indicate a growth in demand in the New York City metropolitan area.[48]

101.    Algonquin's and Iroquois' proposed facilities are necessary to provide the new transportation services contemplated by the NE-07 project.  The NE-07 project will provide significant benefits to Algonquin's system by introducing a direct connection to a new source of supply, which will improve reliability and supply stability for its customers.  Also, the NE-07 project will improve access to market-area storage for Algonquin's shippers.  Further, the NE-07 project will establish the first alternative receipt point for Canadian supplies for Iroquois' system, which will afford its customers a measure of supply security.

102.    Accordingly, for the reasons stated above, we find that, consistent with the Certificate Policy Statement and section 7(c) of the NGA, that the public convenience and necessity requires the approval of Millennium's, Algonquin's, and Iroquois' proposals.

C.    **The Applicants' Rates**

1.    **Millennium**

103.    We will accept Millennium's proposed recourse rates because the proposed capital structure, rate of return, and cost of debt are consistent with the Interim Order and recent Commission rulings.

104.    Consistent with our precedent and the holding in the Interim Order,[49] we will require Millennium to file a cost and revenue study at the end of its first three years of actual operation to justify its existing recourse rates or to propose alternative recourse rates to be effective no later than three years after the in-service date of its facilities.  In its filing, Millennium's projected units of service must be no lower than those upon which the approved initial rates are based.  The filing must include a cost and revenue

---

[47] FERC Presentation at 2004 Northeast Energy Infrastructure Conference.

[48] *See, e.g.*, Department of Energy, Energy Information Administration, "Annual Energy Outlook 2006 with Projections to 2030," Tables 1 and 2, available at http:\\www.eia.doe.gov/oiaf/aeo/index/html.

[49] Interim Order at 62,324.

Docket No. CP98-150-006, et al.                                         - 31 -

study in the form specified in section 154.313 of the regulations, updating cost-of-service data.

### 2.    Algonquin

105.    We find that the incremental reservation rate under Rate Schedule AFT-1 is designed to recover the cost of service of the proposed facilities and is consistent with the Certificate Policy Statement. Thus, we conclude that the reservation rate is appropriate. However, Algonquin must file a tariff sheet to place the rate into effect at least 60 days prior to commencement of service on the proposed facilities.

106.    New England Local Distribution Companies (New England LDCs)[50] filed a motion to intervene and comments in the Algonquin proceeding, contending that use of Algonquin's fuel retention percentages to recover the cost of fuel use and LAUF associated with the 71,810 horsepower increase in compression could result in the existing firm shippers subsidizing the proposals. The New England LDCs assert that Algonquin's application contains insufficient information to make a determination that existing firm shippers will not subsidize the two expansion shippers. The New England LDCs request that the Commission direct Algonquin to provide sufficient information to confirm that there will be no subsidy by existing firm customers with respect to the fuel use and LAUF associated with the proposed 71,810 horsepower increase in compression.

107.    We agree with the New England LDCs' comments on fuel retention. The Certificate Policy Statement requires that expansion facilities be financially viable without subsidies from existing customers. Here, Algonquin seeks to charge the system fuel retention rate for the expansion service, but does not specify if it intends to apply any under or over recoveries to its fuel tracker account. To the extent that fuel use on the expansion facilities exceeds the system charge, existing customers could subsidize the expansion shippers. This would be contrary to our policy. Thus, we will require Algonquin to ensure that expansion fuel use costs are the responsibility of only the expansion shippers and Algonquin and that no costs attributable to the proposed expansion will be charged to existing shippers.[51] We will also require Algonquin to delineate the actual fuel use and LAUF associated with the proposal in its annual fuel tracker filing required by section 32 of the GT&C of its tariff. Existing shippers can

---

[50] The New England LDCs consist of Bay State Gas Company, City of Norwich, Department of Public Utilities, Connecticut Natural Gas Corporation, New England Gas Company, Northern Utilities, Inc., NSTAR Gas Company, and The Southern Connecticut Gas Company.

[51] *Texas Eastern Transmission, LP,* 101 FERC ¶ 61,120 at P 36 (2002).

Docket No. CP98-150-006, et al.                                    - 32 -

review the costs included in Algonquin's tracker filings to verify that only expansion shippers are assessed fuel costs attributable to expansion service.

### 3.    Iroquois

108.    We will approve Iroquois' recourse rate for the proposed transportation service, because it is the Rate Schedule RTS rate applicable to the Eastchester project facilities through which the service will be provided.

### 4.    Negotiated Rates

109.    Millennium, Algonquin, EPI, and Iroquois propose negotiated rate agreements with their shippers. While we do not approve negotiated rate agreements in certificate proceedings,[52] in order to comply with the Alternative Rate Policy Statement[53] and our decision in *NorAm Gas Transmission Co.*,[54] we will direct Algonquin and Iroquois to file their negotiated rate expansion contracts or numbered tariff sheets at least 60 days, and Millennium and EPI at least 90 days, prior to the commencement of service on the expansion facilities stating for each shipper paying a negotiated rate: (1) the exact legal name of the shipper; (2) the total charges (the negotiated rate and all applicable charges); (3) the receipt and delivery points; (4) the volumes of gas to be transported; (5) the applicable rate schedule for the service; (6) any formula upon which the negotiated rate is designed; and (7) a statement affirming that the negotiated rate contract does not deviate in any material respect from the form of service agreement in their FERC Gas Tariffs. Millennium, Algonquin, EPI, and Iroquois must also disclose all consideration received that is associated with their agreements. Finally, Millennium, Algonquin, EPI, and Iroquois must also maintain separate and identifiable accounts for volumes transported,

---

[52] *See East Tennessee Natural Gas Co.*, 98 FERC ¶ 61,331 (2002); *Texas Eastern Transmission Corp.*, 95 FERC ¶ 61,057, *order on reh'g*, 95 FERC ¶ 61,367 (2001); and *Independence Pipeline Co.*, 91 FERC ¶ 61,102 and 92 FERC ¶ 61,022, *order on reh'g and clarification*, 92 FERC ¶ 61,367 (2000).

[53] *Alternative to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines and Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076 (1996), *reh'g and clarification denied*, 75 FERC ¶ 61,024 (1996), *reh'g denied*, 75 FERC ¶ 61,066 (1996); *petition for review denied, Burlington Resources Oil & Gas Co. v. FERC*, Nos. 96-1160, et al., U.S. App. Lexis 20697 (D.C. Cir. July 20, 1998) (Alternative Rate Policy Statement).

[54] *NorAm Gas Transmission Co.*, 77 FERC ¶ 61,011 (1996).

Docket No. CP98-150-006, et al.                                    - 33 -

billing determinants, rate components, surcharges and revenues associated with their negotiated rates in sufficient detail so that they can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case.

## 5.     Cost Overruns

110.    In the Certificate Policy Statement, we urged pipelines and project customers to use their business expertise and negotiating skills to apportion the risks of construction cost overruns in their service contracts,[55] noting that the parties are in the best position to allocate such risks at the time of contracting, rather than leaving such issues for litigation at the Commission.[56]

111.    Millennium has addressed the issue of cost overruns, with Millennium and its shippers agreeing to rate caps over a ten-year term as set forth in an amendment to section 3 of the *pro forma* firm transportation service agreements. To the extent the negotiated rate methodology would yield a rate above the cap due to project cost overruns, Millennium will bear the cost of such overruns. When Millennium files its statement on construction costs within six months after the facilities are constructed in compliance with section 157.20(c)(3) of the regulations, Millennium will be required to compare the projected construction costs to the actual costs and explain any significant differences. Thus, we find that Millennium has adequately addressed the issue of cost overruns.

112.    We find that Iroquois and Consolidated Edison have addressed the issue of cost overruns in their negotiated rate agreement, since the agreement provides for a rate cap for the firm transportation service tied to the cost of the new facilities, which protects Iroquois' other customers from cost overruns. Further, if the facilities exceed a given cost, the rate charged to Consolidated Edison will not go above the cost specified in the negotiated rate agreement and Iroquois will bear the cost of the overruns. However, for recourse rate shippers, Iroquois and the prospective shippers are encouraged during contract negotiations to reach an agreement concerning who will bear the risk of cost overruns. The Certificate Policy Statement found that the responsibility for cost overruns should be apportioned between the pipeline and the new customers that have subscribed

---

[55] *Certificate Policy Statement*, 88 FERC ¶ 61,227 at 61,747.

[56] *Order on Clarification*, 90 FERC ¶ 61,128 at 61,396.

Docket No. CP98-150-006, et al.                                                    - 34 -

for the new capacity, so that the overruns will not become the responsibility of the existing shippers.[57]

### D.     Columbia's Proposals

#### 1.     Abandonment Authorization

113.    The proposed abandonment will permit Millennium to use Columbia's existing facilities and rights of way to provide more gas to the New York City metropolitan area, while eliminating the necessity to construct duplicate facilities.  Even though it proposes to abandon facilities, Columbia's Line A-5 customers will continue to receive service through Millennium.  Nevertheless, the A-5 customers will not have to bear the costs to replace deteriorated existing facilities that would otherwise be incurred by Columbia in the future.  The proposed abandonment will not affect Columbia's ability to meet its firm service obligations or the rates paid by the Line A-5 customers.  Thus, we find that Columbia's proposed abandonment of facilities is in the public interest.

#### 2.     The Leases and Limited-Term Certificate

114.    Our test for approving the lease arrangements is whether the lease payments are less than, or equal to, the lessor's firm transportation rates for comparable service over the terms of the lease on a net present value basis.[58]  Here, we compared the cost of Columbia's annual lease payments of $5,029,766[59] to the cost of service savings of $6,381,235[60] realized from the abandonment and found that the lease payments were less

---

[57] *Certificate Policy Statement*, 88 FERC ¶ 61,227 at 61,747.

[58] *See, e.g., Columbia Gas Transmission Corp.*, 79 FERC ¶ 61,160 at 61,755-59 (1997); *Midwestern Gas Transmission Co.*, 73 FERC ¶ 61,320 at 61,888 (1995); and *Mobile Bay Pipeline Projects*, 55 FERC ¶ 61,358 at 62,078 (1991).

[59] Columbia's annual lease payment of $5,029,766 consists of its annual lease charge of $5,469,890 to Millennium for service provided under Columbia's lease, less Millennium's annual lease charge of $440,124 to Columbia for service provided under the Millennium lease.

[60] *See* Columbia's November 30, 2006 data response.  Columbia's cost of service savings of $6,381,235 consists of Columbia's $6,821,359 reduction in costs realized from the abandonment of facilities, less Millennium's $440,124 monthly lease payment to Columbia.

Docket No. CP98-150-006, et al.                                    - 35 -

than the lessor's firm transportation rates for comparable service over the terms of the lease on a net present value basis.

115.    The combination of the reduction in Columbia's cost of service and the Millennium lease payments results in a projected net reduction to Columbia's cost of service of $1,351,469. We find that Columbia and its Line A-5 customers will realize a net economic benefit from the proposed lease arrangement.

116.    The Columbia lease will enable Columbia's Line A-5 customers to continue to receive service at existing levels through Millennium's pipeline. The Columbia lease will eliminate the necessity for Millennium to construct duplicative facilities. In addition, Columbia's lease will not affect the rates paid by the Line A-5 customers. Likewise, the Millennium lease will enable Millennium to serve its customers and will eliminate the need for Millennium to construct duplicative facilities. Neither lease will affect Columbia's other system wide customers. Finally, the proposed limited-term certificate will allow Columbia to continue to serve its Line A-5 customers without interruption while the Millennium pipeline is constructed. For the reasons stated above, we find that the Columbia lease, the Millennium lease, and Columbia's limited-term certificate, with pre-granted abandonment authority, are in the public convenience and necessity.

117.    As to its request for waiver of the certificate compliance and reporting requirements, Columbia is an interstate pipeline, engaging in a jurisdictional activity when it transports gas to serve its customers on Millennium's incomplete system. As a transporter, Columbia must account for the revenues and expenses involved in the transportation activity. Moreover, we do not know how long the transportation service will continue, because there is no way of knowing at this time how long the limited-term certificate will continue in effect. Thus, we will not waive the certificate compliance and reporting requirements for Columbia's limited-term certificate.

118.    Columbia proposes to begin recovery of the lease payments recorded in Account 858 through a TCRA filing,[61] effective with Columbia's next general section 4 rate filing in which the costs of the existing Line A-5 facilities are removed from Columbia's base rates. To avoid the potential for double recovery of Columbia's lease payments to Millennium through the TCRA adjustment while it is still charging its Line A-5 customers, we will prohibit Columbia from submitting a TCRA filing to recover the

---

[61] Columbia submits its annual TCRA filing on or before March 1 to become effective April 1. *See* Sixth Revised Sheet No. 452 of Columbia's FERC Gas Tariff, Second Revised Volume No. 1.

Docket No. CP98-150-006, et al.                                    - 36 -

Account 858 costs associated with the Millennium lease until Columbia submits a section 4 filing to remove the costs of the Line A-5 facilities from its base rates.

### 3.    Gas Quality Specifications

119.   On June 5, 2006, Consolidated Edison and Orange and Rockland jointly protested Columbia's tariff filings in Docket Nos. RP06-231-002 and RP06-365-000 and requested that we convene a consolidated technical conference in the dockets involved in Columbia's tariff filings and the dockets involved in Millennium's and Columbia's proceedings to discuss Columbia's proposed gas quality specifications.

120.   Columbia's proposed gas quality specifications are part of an ongoing section 4 proceeding in Docket Nos. RP06-231-002 and RP06-365-000 in which we held a technical conference on July 25, 2006.  Since a technical conference on the same issue is not necessary in Millennium's and Columbia's proceedings, we will deny the requests for a consolidated technical conference.

### E.    Other Issues Relating to Millennium

### 1.    Motion to Vacate

121.   In its original proposals filed in 1997 and 2000, Millennium proposed to construct facilities across the Hudson River through Westchester County to Mount Vernon.  The construction of facilities across the Hudson River through portions of Westchester County involved New York's coastal zone.  Thus, in approving its proposals in the 2002 *Millennium* Order, we required Millennium to obtain a CZMA determination from NYSDOS before commencing the construction of those facilities to Mount Vernon. NYSDOS found that Millennium's proposals were inconsistent with New York's Coastal Management Program.  Millennium appealed the NYSDOS finding.

122.   In its applications in Docket Nos. CP98-150-006 and CP98-150-007, Millennium proposed to amend the 2002 *Millennium* Order to phase construction of the project.  In Phase I, Millennium proposed to acquire, construct, and operate facilities from the North Greenwood station east to the Ramapo station, among other things.  Millennium requested that the Commission defer consideration of the portion of the 2002 *Millennium* Order that authorized the crossing of the Hudson River to Mount Vernon until Phase II, because its appeal of NYSDOS' decision was pending.  Millennium also requested that the Commission defer consideration of the Lake Erie to North Greenwood portion of pipeline, because that segment was no longer needed due to changes in the market.

Docket No. CP98-150-006, et al.                                                    - 37 -

123.    Subsequent to its filings in Docket Nos. CP98-150-006 and CP98-150-007, the *Gutierrez* decision upheld NYSDOS' finding that the proposed construction of facilities across the Hudson River through portions of Westchester County were inconsistent with New York's Coastal Management Program. In Docket No. CP98-150-008, Millennium filed a motion to vacate the portion of the 2002 Millennium Order that authorized construction from Lake Erie to North Greenwood and from Ramapo to Mount Vernon, *i.e.*, the Phase II facilities. In support of its motion, Millennium states that it no longer seeks authority to construct the Phase II facilities because it does not intend to request review of the District Court's decision in *Gutierrez*, which precludes the construction of facilities across the Hudson River through Westchester County.

124.    Croton-on-Hudson and Cortlandt protested Millennium's applications in Docket Nos. CP98-150-006 and CP98-150-007, objecting to the proposed phasing of the 2002 *Millennium* Order. The County of Westchester, New York (Westchester) filed comments also objecting to the proposed phasing. In their answers to the motion to vacate, Cortlandt and Westchester state that they support the motion. Croton-on-Hudson states that it will not oppose Millennium's motion as long as Millennium does not have authority to construct facilities on any route that does not comply with the CZMA, that the proposed facilities approved here comply with all applicable statutory and regulatory requirements, that no other phases of the Millennium project are approved here, and that additional proposals for future phases must be the subject of a new application by Millennium.

125.    In its motion to vacate, Millennium states that it does not intend to construct facilities from Lake Erie to North Greenwood or from the Ramapo station to Mount Vernon. No party opposes Millennium's motion. Thus, we find that it is in the public interest to vacate the portions of the 2002 *Millennium* Order that relate to these facilities and to vacate the corresponding certificate and environmental conditions.

126.    In regard to Croton-on-Hudson's concerns, the amended certificate approved herein authorizes Millennium to construct facilities from Corning to the Ramapo station only. The certificate is conditioned upon Millennium's compliance with the applicable NGA and environmental regulations and does not authorize Millennium to construct facilities on any route that raises CZMA concerns. If Millennium wishes to construct any facilities other than those authorized in this order, it must seek additional authorization from the Commission.

### 2.    Status as a Natural Gas Company

127.    Millennium requests that the Commission make a finding that it will not be considered a "natural gas company" subject to the Commission's jurisdiction until it

Docket No. CP98-150-006, et al.                                    - 38 -

commences the transportation of natural gas in interstate commerce. Millennium raises this issue because Columbia is requesting a limited-term certificate to temporarily operate segments of Millennium's pipeline to continue service to Columbia's existing Line A-5 customers, while other segments of Millennium's pipeline are under construction.

128.    Section 2(6) of the NGA defines a "natural gas company," in part, as a "person engaged in the transportation of natural gas in interstate commerce . . . ." Section 7(c)(1) of the NGA provides, in part, that:

> No natural gas company or person which will be a natural gas company upon completion of any proposed construction or extension, shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission . . . unless there is in force with respect to such natural gas company a certificate of public convenience and necessity . . . .

129.    Section 2(6) implies that a person must be engaged in the transportation of natural gas in interstate commerce to be a natural gas company. Section 7(c)(1) implies that to be a new natural gas company, a person must complete any proposed construction. At the time Columbia operates segments of Millennium's pipeline under the limited-term certificate, Millennium will not have engaged in any transportation in interstate commerce, nor will it have completed the construction of its facilities. Thus, we find that Millennium will not be a natural gas company when Columbia operates segments of Millennium's system under Columbia's limited-term certificate.

3.    **Accounting**

a.    **Book Depreciation Rate**

130.    For financial accounting purposes, Millennium proposes to use a straight-line depreciation rate of 3.33 percent per year over a 30-year period for the proposed transportation facilities. A straight-line method to record book depreciation is acceptable because it is a systematic and rational method consistent with the Commission's Uniform System of Accounts. Thus, we will approve a 3.33 percent depreciation rate for Millennium.

b.    **Regulatory Assets**

131.    Millennium proposes to record a regulatory asset for differences in depreciation amounts recorded on its books and depreciation amounts recovered in its negotiated rates by debiting Account 182.3, Other Regulatory Assets, and by crediting Account 407.4, Regulatory Credits. Millennium also proposes to extinguish or amortize the regulatory

Docket No. CP98-150-006, et al.                                                    - 39 -

asset by crediting Account 182.3 and debiting Account 407.3, Regulatory Debits, as the amounts are recovered in rates. Millennium contends that the depreciation component of the proposed levelized negotiated rates will, by the end of the contract term, equal the accumulated book depreciation. Millennium also contends that it is assured of recovery of the regulatory asset, because of binding commitments in executed precedent agreements with its shippers.

132.    Under our Uniform System of Accounts, it is appropriate to record a regulatory asset for costs that would otherwise be chargeable to expense only when it is probable that the costs will be recovered in future rates.[62] For rate levelization proposals, we have previously concluded that the Order No. 552 probability test is met to the extent that a pipeline's capacity is subscribed when the facilities are authorized.[63] Thus, we allow regulatory assets, or liabilities, to be recorded for the differences between book depreciation expense and the amount of depreciation included in rates to the extent the pipeline's capacity is subscribed.

133.    Millennium indicates that it currently has approximately 80 percent of its total firm capacity subscribed under precedent agreements at negotiated rates. To the extent Millennium has executed contracts for its usable capacity over the respective terms of the shippers' agreements, we conclude that it would be appropriate for Millennium to record a regulatory asset for differences in depreciation amounts recorded on its books and depreciation amounts recovered in its negotiated rates. Nevertheless, we will condition our approval of Millennium's proposed accounting treatment: (1) on Millennium and its shippers executing and filing service agreements that are consistent with their precedent agreements and which provide assurance of recovery of the regulatory asset and (2) on future Commission acceptance of the negotiated rate filings.[64] Further, we will not allow

---

[62] The term "probable," as used in the definition of regulatory assets, refers to that which can reasonably be expected or believed on the basis of available evidence or logic but is neither certain or proved. *Revisions to Uniform System of Accounts to Account for Allowances under the Clean Air Amendments of 1990 and Regulatory-Created Assets and Liabilities and to Form Nos. 1, 1-F, 2, and 2-A*, Order No. 552, FERC Stats. & Regs., Regulations Preambles January 1991-June 1996 ¶ 30,967 (1993).

[63] *E.g., TransColorado Gas Transmission Co.*, 67 FERC ¶ 61,301 at 62,064, *order on reh'g*, 69 FERC ¶ 61,066 (1994); *Mojave Pipeline Co.*, 69 FERC ¶ 61,244 (1994), *order issuing certificate and denying reh'g*, 72 FERC ¶ 61,167 (1995), *order vacating prior orders and dismissing motions*, 75 FERC ¶ 61,108 (1996).

[64] *Northwest Pipeline Corp.*, 116 FERC ¶ 61,151 at P 28 (2006).

Docket No. CP98-150-006, et al.                                           - 40 -

Millennium to shift any unrecovered costs associated with the negotiated rate agreement to any of its other customers.[65]

134.    Our acceptance is subject to Millennium's continuing obligation to meet the criteria for recognition of its regulatory asset. Should circumstances change so that Millennium is no longer entitled to recognize a regulatory asset, Millennium must promptly notify the Commission in an appropriate filing that would propose to remove the regulatory asset from its accounts.[66]

## 4.    Tariff

135.    We find that Millennium's *pro forma* tariff generally complies with Commission policy and precedent, except for certain provisions noted below. In accordance with the discussion below, we will require Millennium to file actual tariff sheets at least 90 days prior to the in-service date of the proposed facilities.

### a.    Scheduling

#### (1)    Proposals

136.    Section 7.1 describes the order of scheduling when nominations exceed available capacity.[67] According to section 7.1, Millennium proposes to schedule capacity first at delivery points, followed by internal constraint points, and finally receipt points. At each location, Millennium will first schedule nominations for firm primary capacity, followed by nominations for firm secondary capacity. Millennium will schedule nominations for firm secondary capacity within a shipper's primary path ahead of nominations for firm secondary capacity outside the primary path.[68] Within each group of secondary firm nominations (within-the-path versus outside-the-path), nominations at the maximum tariff rate will be allocated capacity *pro rata* based on nominated quantities, followed by

---

[65] *Id.* at P 29.

[66] *Northwest Pipeline Corp.*, 116 FERC ¶ 61,151 at P 30.

[67] Unless otherwise indicated, references to Millennium's tariff are to sections in the GT&C.

[68] Millennium defines the primary path as capacity physically located between the primary receipt and delivery points designated by a shipper, taking into consideration the flow direction from receipt point to delivery point.

Docket No. CP98-150-006, et al.                                              - 41 -

nominations at a contract rate with the highest net present value, until all secondary firm nominations are scheduled.

137.    After firm nominations are scheduled, Millennium will schedule Rate Schedule IT-1 nominations together with Rate Schedule FT-1 overrun nominations, with priority given to confirmed flowing nominations on a *pro rata* basis, followed by other such nominations in the order in which they were received (with nominations submitted the same day receiving equal allocations).

138.    Finally, where applicable, Millennium will schedule Rate Schedule IPP (Interruptible Paper Pools) nominations, followed by Rate Schedule PALS (Parking and Lending Service) nominations.[69]  Specifically, paragraph (e) of section 7.4 provides that if there is insufficient capacity to satisfy all IPP and PALS nominations, the nominations will be rejected and the holders of rejected nominations for IPP and PALS service will be notified so that they can arrange for or implement a transfer between pools under Rate Schedule IPP, arrange for an inventory transfer under section 18 (Transfers of Imbalance Netting and Trading), arrange for a predetermined allocation method, re-nominate directly from a receipt point and not from the IPP pool, or make other arrangements agreed to by Millennium.

(2)    **Commission Holding**

139.    In *Columbia Gas Transmission Corporation (Columbia)*,[70] we rejected a proposal to allocate firm secondary capacity based on the present value of the rate paid, finding that it favored shippers with long term contracts. We held that the length of a contract should not determine how much a shipper values secondary capacity, since one has nothing to do with the other. Consistent with our decision in *Columbia*, we will reject Millennium's proposal to allocate secondary capacity under Rate Schedule FT-1 based on the net present value of the rate paid, as described in paragraphs (b) and (c) of sections 7.2, 7.3, and 7.4. Rather, we will require Millennium to allocate nominations for firm secondary capacity *pro rata* based on each shipper's contract demand. This allocation method is appropriate because: (1) firm shippers are entitled to use available secondary capacity up to their contract demand within the zone for which they are paying

---

[69] PALS service can only be nominated at receipt and delivery points and IPP service can only be nominated at receipt points.

[70] 100 FERC ¶ 61,084 at P 101 (2002); *order on reh'g, clarification, and compliance filing*, 104 FERC ¶ 61,168 (2003).

Docket No. CP98-150-006, et al.                                                    - 42 -

and (2) firm shippers are able to access secondary points on a nondiscriminatory basis, unlike the net present value method.

140.    Moreover, we will require Millennium to explain its proposal in paragraph (d) of sections 7.2, 7.3 and 7.4, to allocate IT-1 and FT-1 overrun quantities based on a queue that gives scheduling priority to nominations involving flowing interruptible and overrun volumes over nominations for volumes whose flow has not yet begun. Millennium should also include in its explanation the reason why it believes such an allocation method is more appropriate than allocating such volumes based on price or *pro rata* based on nominated quantity.

141.    We also note that Millennium has not described the method for allocating receipt point capacity among IPP and PALS nominations under section 7.4(e). We will require Millennium to revise section 7.4(e) to include that description. We will also require Millennium to revise section 7.4(e) to detail the procedures and timelines under which it will implement various alternative scheduling arrangements for rejected PALS and IPP nominations.

142.    Finally, although the tariff refers to backhaul retainage on Sheet No. 6 and defines "backhaul" in section 1.1, it is not clear what scheduling and curtailment priorities have been assigned to backhaul transactions. Thus, we will require Millennium to add tariff language addressing the scheduling and curtailment priorities of backhaul transactions.

### b.    Interruptions of Service

#### (1)    Proposals

143.    Section 16 describes the circumstances and rules under which Millennium may decrease, suspend, or discontinue the receipt and delivery of gas. Such interruptions may occur due to *force majeure* or other unforeseen conditions; operating conditions such as (but not limited to) performance of routine non-critical maintenance, repairs, tests and modification of the system; for protection of the integrity and performance capability of the system; and to make capacity being utilized by interruptible service available for firm service. Millennium will issue a notice to shippers 72 hours in advance of an interruption due to routine maintenance specifying the date and time for compliance and the lowered flow quantity. Millennium will limit a notice of interruption to shippers only on the affected segment of the system. A shipper failing to comply with the notice will be subject to penalties, as described later in this order.

144.    Section 16.4 describes the order in which Millennium will interrupt the receipt, delivery, or transportation of scheduled and flowing volumes on constrained portions of

Docket No. CP98-150-006, et al.                                              - 43 -

its system. Specifically, Millennium proposes to curtail PALS volumes on a *pro rata* basis according to scheduled parking or lending quantity followed by IT-1 volumes together with FT-1 overrun volumes, FT-1 volumes at secondary receipt or delivery points outside shippers' primary paths, FT-1 volumes at secondary receipt or delivery points within shippers' primary paths, FT-1 volumes at primary receipt points, and FT-1 volumes at primary delivery points.

## (2)    Commission Holding

145.    We will require Millennium to revise section 16.4 so that within any constrained portion of its system, all scheduled firm nominations will be curtailed at the same priority, *pro rata* based on scheduled daily quantity. Our policy provides that "once secondary firm capacity is scheduled, primary firm capacity does not have a higher priority for the purposes of bumping or curtailing firm service."[71] In addition, Millennium should explain in detail why it proposes to curtail firm capacity at receipt points ahead of firm capacity at delivery points. Finally, Millennium should add language to section 16.4 describing the curtailment priority of IPP quantities and the method for allocating capacity among such quantities.

### c.    Penalties

146.    In section 4(e) of Rate Schedule IT-1, Millennium proposes what appears to be a $5.00 per Dth penalty on unauthorized quantities taken by a shipper under Rate Schedule IT-1 despite the shipper not having an IT-1 service agreement. The language describing this penalty is confusing and would appear to impermissibly duplicate penalties under the shipper's applicable rate schedule or applicable penalties under Millennium's GT&C. We will require Millennium to explain this provision and make clarifying revisions or remove it from the tariff.

147.    Section 19.6 describes a mechanism by which Millennium will credit penalties, net of costs, to non-penalized FT-1 and IT-1 shippers, excluding replacement shippers using released capacity. It is the Commission's policy that penalty revenue credits should be distributed to all the pipeline's customers, because penalties are imposed on all interruptible shippers and all non-offending interruptible shippers should be credited with a portion of these revenues.[72] Interruptible rates also include a representative portion of

---

[71] *Algonquin Gas Transmission Co.*, 104 FERC ¶ 61,118 at P 34 (2003).

[72] Section 284.12(b)(2)(v) requires that pipelines credit penalty revenues to "shippers."

Docket No. CP98-150-006, et al.                                                    - 44 -

all costs, including fixed costs, of operating the pipeline and all interruptible shippers are entitled to share in the proceeds of credits.[73] Moreover, as explained in Order No. 637, crediting penalty revenues to non-offending shippers provides a positive incentive for shippers to stay in balance in order to help protect the operational integrity of the pipeline. Thus, any replacement shipper under a permanent release of capacity is entitled to be included in the crediting mechanism. We will require Millennium to apply the crediting mechanism to all non-penalized shippers on its system including PALS shippers, IPP shippers, and replacement shippers, not just the FT-1 and IT-1 shippers as proposed.

148.    In addition, we will require Millennium to add a paragraph to section 19.6 stating that it will file a report within 60 days of the close of the contract year (for calculating penalties) showing how it calculated and apportioned the penalty revenues, the costs netted against the penalty revenues, and the resulting penalty revenue credits for each month of the contract year (November 1 to October 31).

149.    In paragraph (b) of section 9.7, Millennium proposes to sell any remaining over delivery imbalance to the shipper whose agreement has terminated at 150 percent of a specific spot market price, plus transportation costs, and to keep all amounts as a reimbursement fee. We will require Millennium to include as penalty amounts in its crediting mechanism any proceeds, net of Millennium's actual costs, from over delivery imbalance sales which exceed 100 percent of the spot market price. Also, in paragraph (c) of section 9.7, Millennium proposes to forward to a shipper 80 percent of the proceeds of the sale of any under delivery imbalance left on the system and confiscated by Millennium at the termination of the agreement, keeping the remaining 20 percent as a reimbursement fee. We will require Millennium to include as penalty revenues in its crediting mechanism any proceeds, net of Millennium's actual costs, from under delivery imbalance sales which exceed amounts forwarded to the shipper whose gas was confiscated.

150.    Finally, we will require Millennium to add a provision to section 19.7 stating that within two weeks of a critical day event, it will post information on its electronic bulletin board describing the events leading up to the declaration of the critical day.

---

[73] *Transcontinental Gas Pipe Line Corp.*, 96 FERC ¶ 61,352 at 62,317 (2001).

Docket No. CP98-150-006, et al.

- 45 -

### d.   Creditworthiness

151.   Section 3.9(c) requires insolvent or uncreditworthy FT-1 shippers to provide collateral assurance equal to three months of demand charges in order to receive or continue to receive service. However, Millennium appears not to have provided collateral requirements for shippers using interruptible services. We will direct Millennium to explain this omission or revise section 3.9.

152.   Section 3.9(c) also provides that any deposit held by Millennium will accrue simple interest at the Federal Funds Rate. Our Creditworthiness Policy Statement provides that if a pipeline holds the collateral, the applicable interest rate will be at least the same rate that the pipeline earns.[74] We will require Millennium to explain how this provision of section 3.9(c) is consistent with the Creditworthiness Policy Statement and to make any necessary revisions.

153.   Further, in section 3.9(c), Millennium proposes the right to seek additional security to cover the value of any existing imbalance or estimated future monthly imbalance owed by a non-creditworthy shipper. For a new shipper, the collateral would be based on 10 percent of the shipper's estimated monthly usage. For an existing shipper, the collateral would be based on the largest monthly imbalance the shipper owed to Millennium during the most recent 12 months of service.

154.   In *Gulf South Pipeline Company, LP (Gulf South)*,[75] we approved a provision similar to that in section 3.9(c) for existing shippers based on the largest monthly imbalance over the preceding 12 months. We also found that for new shippers, seven months was an adequate period to establish an imbalance history upon which a collateral requirement could be based. Thus, consistent with *Gulf South*, the imbalance collateral requirement for new shippers during the first seven months of service should be based on 10 percent of the shipper's estimated monthly usage, after which the shipper's collateral requirement should be based upon the highest monthly imbalance over the most recent period of service not to exceed 12 months. With the revision described above, we will approve Millennium's right to seek additional security for the value of imbalances as provided in section 3.9(c).

---

[74] *Policy Statement on Creditworthiness for Interstate Natural Gas Pipelines,* 111 FERC ¶ 61,412 (2005) (Creditworthiness Policy Statement).

[75] 111 FERC ¶ 61,110 (2005).

Docket No. CP98-150-006, et al.                                                                 - 46 -

155.    Sections 3.10(a) and (b) of the tariff appear to address Millennium's right to suspend service to a shipper that has lost its creditworthiness status, although the word "suspension" is not used.  Paragraph (b) provides that regardless of whether the shipper has lost its creditworthiness status, is insolvent, or does not desire to continue service, the shipper will continue to be liable for all charges due Millennium.  Under the Creditworthiness Policy Statement, a pipeline is not permitted to impose reservation charges during a period of suspension, nor is the suspended shipper permitted to release its capacity.[76]  Because sections 3.10(a) and (b) do not expressly state whether the shipper's service is suspended in such circumstances, we will require Millennium to explain whether this is the case and to clarify its tariff consistent with the Creditworthiness Policy Statement.

156.    Section 3.10(c) addresses the circumstances under which Millennium may terminate a service agreement, if a shipper fails to pay any outstanding balance or provide adequate credit assurance within a 30-day notice period.  Millennium should revise this section to include a requirement that a pipeline seeking to terminate a release of capacity to a replacement shipper on account of the termination of a releasing shipper's contract must provide the replacement shipper with the opportunity to continue receiving service if the replacement shipper agrees to pay, for the remaining term of the replacement shipper's contract, the lesser of:  (1) the releasing shipper's contract rate; (2) the maximum tariff rate applicable to the releasing shipper's capacity; or (3) some other rate that is acceptable to the pipeline.[77]  Millennium should also revise section 14.12, which addresses termination of a releasing shipper's contract, to be consistent with this requirement.

e.    **Discounting**

157.    Under section 20.2, Millennium proposes that it "may agree to a discount which provides for increasing (or decreasing) a discounted rate for service under one rate schedule to make up for a decrease (or increase) in the maximum rate for a separate service provided under another rate schedule."  This provision, in effect, would appear to establish a maximum recourse rate that would be applicable to a combination of services. We will require Millennium to justify this provision under our policy or remove it from the tariff.

---

[76] Creditworthiness Policy Statement at P 24.

[77] *Id.* at P 32.

Docket No. CP98-150-006, et al.                                    - 47 -

### f.    Auctions of Available Firm Service

158.    Under section 4, Millennium provides both contractual and regulatory rights of first refusal to shippers receiving service under an agreement with a term of 12 or more consecutive months at the recourse rate.  We will require Millennium to revise section 4 to apply the regulatory rights of first refusal to multi-year seasonal agreements at the maximum recourse rate.  Millennium may also apply its contractual rights of first refusal provisions to such multi-year seasonal agreements.[78]

### g.    Termination of Service Agreement

159.    Section 154.602 of the regulations requires a natural gas company to notify the Commission at least 30 days prior to terminating a shipper's contract.  Sections 10.4 (Suspension of Termination for Nonpayment) and 14.12 (Termination) are not consistent with this requirement.  Thus, we will require Millennium to revise these sections.

### h.    Non-Conforming Agreements

160.    Section 5.1 requires shippers to enter into service agreements "under [the] applicable standard Form of Service Agreement or Assignment Agreement," but also provides that a "Service Agreement that was in effect on the effective date of this Tariff shall remain in effect until it is replaced . . . or expires by its own terms, and shall be considered as an executed Service Agreement to the extent that its provisions are not superseded by or in conflict with . . . this Tariff."  We will advise Millennium that this language does not preclude its compliance with section 154.112(b) of the regulations, requiring that Part 284 contracts that deviate in any material aspect from the form of service agreement must be filed with the Commission and referenced in the tariff.

---

[78] In reviewing Millennium's tariff, we also found several minor errors that should be corrected.  Specifically, Millennium should substitute the word "Millennium" for the words "El Paso" in section 15.3(b)(iii); update its tariff to reflect the version of the North American Energy Standards Board (NAESB) Standards, including annual plan items and recommendations, in effect at the time it files actual tariff sheets; substitute "NAESB" for all references to "GISB;" and, in section 3.9(k), move the comma from after the first occurrence of the word "Days" to before the first occurrence of the word "within" to conform to NAESB Standard 0.3.9.

Docket No. CP98-150-006, et al.                                        - 48 -

### i.    Fuel Retainage

161.    In section 35, Millennium proposes tariff language which appears intended to implement an annual fuel tracking mechanism similar to the currently effective provisions in Columbia's tariff. Millennium's proposed tariff provides for an annual filing to adjust the retainage quantities, but does not specify that the annual filing will account for over- and under-recovered company use and LAUF. Further, the proposed tariff language lacks a detailed description of the mechanism by which it will separately calculate current retainage and over- and under-recovered retainage. Thus, we will direct Millennium to revise its tariff to incorporate clarifying language as discussed above.

### F.    Requests for rehearing and clarification of EPI's Preliminary Determination

162.    EPI, Hess Corporation (Hess),[79] and the New York PSC filed requests for rehearing and clarification of EPI's preliminary determination.

### 1.    Acquisition Adjustment

### a.    Request for Rehearing

163.    The preliminary determination held that EPI could not include in its rate base the proposed $36 million acquisition adjustment reflecting a portion of the amount paid in excess of net book value when NFG acquired Empire in 2003. In making this holding, the preliminary determination found that EPI did not meet the two-prong test found in *Longhorn Partners Pipeline, L.P. (Longhorn),*[80] because EPI did not show that it was placing utility assets in jurisdictional service for the first time and because it did not show that the write-up would confer substantial benefits on ratepayers. On rehearing, EPI asserts that it meets the requirements of an exception to the original cost policy established in *Longhorn,* because: (1) it will be subject to the Commission's jurisdiction for the first time and (2) the benefits to customers are substantial and can be quantified.

164.    As to the first prong, EPI asserts that the Commission erred in finding that its facilities were devoted to NGA jurisdiction simply because Empire accepted a blanket

---

[79] Hess was formerly known as Amerada Hess Corporation.

[80] 73 FERC ¶ 61,355 (1995).

Docket No. CP98-150-006, et al.                                    - 49 -

certificate under section 284.224 of the regulations.[81]  EPI claims that for assets to be subject to Commission jurisdiction, they must be subject to the rate and certificate jurisdiction, as well as the Commission's open access requirements.  EPI points out that section 284.224 provides that it does not "subject the certificate holder to the [NGA] jurisdiction [of] the Commission except to the extent necessary to enforce the terms and conditions of the certificate."  Thus, EPI asserts that Empire is coming under the Commission's jurisdiction for the first time.  Further, EPI contends that the Commission erred in relying on the *Enbridge Pipelines (Enbridge)* case,[82] asserting that *Enbridge* did not address the issue of placing assets into jurisdictional service for the first time, because Enbridge did not raise the issue.[83]

165.   As to the second prong, EPI contends that it demonstrated that the acquisition of the Empire system and construction of the connector project will confer substantial benefits on pre-existing shippers by enhancing the reliability and flexibility of the system and by enabling the shippers to use their capacity to deliver gas to Millennium and downstream markets.  Specifically, EPI asserts that:  (1) it took into account expansion capacity held by KeySpan and future expansion shippers, since more gas can flow to Corning on a secondary basis over and above the full contract quantities of KeySpan and other expansion shippers; (2) its calculations are not speculative or excessive, since it described in detail how it determined the annual benefits for existing shippers; and (3) as a result of NFG's acquisition of Empire, NFG's new management began development of the connector project and that the benefits to the existing shippers stem from the acquisition.

166.   EPI contends that the integration of the proposed expansion project with Empire's existing facilities will enhance system reliability for existing shippers.  Further, EPI asserts that existing shippers will now have the ability to deliver gas to Millennium and to downstream markets in New York City and Long Island.  EPI calculates $5.3 million in annual benefits for existing shippers who use the Millennium point on a secondary basis,

---

[81] Empire currently transports gas for two interstate pipelines under a blanket certificate issued under section 284.224.

[82] EPI's preliminary determination at P 59, *citing Enbridge*, 100 FERC ¶ 61,260 at P 52 (2002), *order on reh'g*, 102 FERC ¶ 61,310 (2003).

[83] *Citing Enbridge*, 102 FERC ¶ 61,310 at P 17 (stating that "KPC has not previously argued that it should be given rate base treatment for its acquisition premium because it was putting facilities in FERC jurisdictional service for the first time either at the hearing or on exceptions").

Docket No. CP98-150-006, et al.                                    - 50 -

or release their capacity to other shippers that use that point. EPI asserts that it calculated the benefits by: (1) determining the amount of unused firm capacity under existing operations, based on an average of the system usage for the past two years; (2) estimating the extent to which that capacity could be used for delivery of gas into Millennium; and (3) estimating the value of the resulting capacity. According to EPI's calculations, it determined that the value of the secondary capacity would be $.05 per Dth in the summer and $.30 per Dth in the winter.

b.    **Commission Holding**

167.    Our policy is to permit a pipeline to include no more than the facilities' depreciated original cost in rate base. We make exceptions only when a pipeline can show that its acquisition of existing facilities at more than their net book value will result in substantial benefits to ratepayers under the two-prong test set forth in *Longhorn*. First, the acquiring pipeline must show that it is converting utility assets to a new public use, or that it is placing utility assets in jurisdictional service for the first time. Second, the acquiring pipeline must show by clear and convincing evidence that the acquisition provides substantial, quantifiable benefits to ratepayers.

168.    EPI's contention that it meets the first prong of *Longhorn* because it is placing utility assets into jurisdictional service for the first time is at odds with the facts in this proceeding. Empire has been subject to Commission authority since it received a blanket certificate issued under section 284.224 of the regulations to transport gas for two interstate pipelines.[84] Empire also received Commission authorization to construct and operate its natural gas facilities between the United States and Canada.[85] Acknowledging these facts, EPI asserts that in order for facilities to be subject to the Commission's jurisdiction under *Longhorn*, they must be subject to the rate and certificate jurisdiction as well as our open access requirements. However, EPI offers no support for its position and we conclude that it is not required by the wording of *Longhorn* which states, "[f]irst, [a pipeline] must show that it is either converting utility assets to a new public use, or it must show that it is placing utility assets in FERC-jurisdictional service for the first time."[86] We find the fact that Empire held a limited jurisdictional certificate under which

---

[84] *National Fuel Gas Supply Corp.*, 70 FERC ¶ 61,162 (1995).

[85] *Empire State Pipeline* 56 FERC ¶ 61,050 (1991), *order granting rehearing in part and denying rehearing in part and denying a motion to consolidate*, 61 FERC ¶ 61,091 (1992), *order on motion for clarification*, 64 FERC ¶ 61,035 (1993).

[86] *Longhorn*, 73 FERC ¶ 61,355 at 61,122.

Docket No. CP98-150-006, et al.                                                    - 51 -

it rendered interstate transportation service sufficient to preclude a finding that Empire is coming under our jurisdiction for the first time under *Longhorn*.

169.    In reviewing whether to allow the inclusion of amounts in excess of depreciated original cost, we have emphasized the need to protect consumers from write-ups that force them to pay more depreciation for the same facilities.[87] Here, Empire previously devoted its existing facilities to interstate gas service, as well as intrastate gas service. Moreover, Empire's existing customers, who paid for Empire's existing facilities, are the same customers who will be charged for the acquisition premium. Thus, if the acquisition premium is included in rate base, existing natural gas customers will be paying more for depreciation for the same facilities. For these reasons, we find that EPI is not placing Empire's utility assets into jurisdictional service for the first time. Thus, we find that EPI fails to meet the first prong of the *Longhorn* test.

170.    We also disagree with EPI's assertion that we incorrectly relied on *Enbridge* in the preliminary determination. While we agree that the main focus of the *Enbridge* Order was whether the pipeline was converting its utility assets to a new public use, other orders issued in the *Enbridge* proceedings addressed the issue of whether the facilities were newly placed under the Commission's jurisdiction. For example, in the *Enbridge* rehearing order to which EPI cites, we found that that the pipeline was not dedicating facilities to interstate natural gas service for the first time because it had a limited certificate for certain facilities at the time of the acquisition.[88]

171.    Even if it were found that the acquisition resulted in the facilities being converted to jurisdictional service for the first time, the second prong of the *Longhorn* test requires a pipeline to demonstrate that the acquisition premium provides substantial quantifiable benefits to ratepayers. Here, EPI has not shown that the benefits alleged are directly related to the acquisition. The acquisition premium was paid by NFG, Empire's affiliate, for Empire's existing system and was unrelated to its proposed expansion. Empire will provide service to its existing customers regardless of the expansion facilities, which are being constructed downstream of the existing service. Notably, the existing shippers are

---

[87] *See Enbridge*, 100 FERC ¶ 61,260 at P 58.

[88] *Enbridge*, 102 FERC ¶ 61,310 at P 16 n.17. *See also Enbridge*, 109 FERC ¶ 61,042 at P 28 (2004) (finding that there was insufficient evidence to determine that the acquisition resulted in any of the facilities being used for jurisdictional gas service for the first time because, among other things, portions of the facilities were being used to provide service under a limited jurisdiction NGA certificate).

Docket No. CP98-150-006, et al.                                    - 52 -

not entitled to use the expansion facilities unless they pay incremental rates for the expansion facilities. Thus, there clearly is no direct benefit to existing shippers from the acquisition.

172.    The $5.3 million in annual benefits to ratepayers claimed by EPI is based on the ability of existing shippers (or replacement shippers via capacity release) to deliver gas to Millennium in order to serve downstream markets in New York City and Long Island and to realize $.05 per Dth in the summer and $.30 per Dth in the winter. The future capacity usage on the existing system, the availability of capacity on the expansion, as well as the future value of capacity between Niagara and Corning are simply not known at this time. Thus, we find that EPI's alleged benefits are speculative and do not provide any certainty that the proposed $36,120,986 acquisition adjustment will be recovered. We conclude that EPI has not met its burden of demonstrating that the $5.3 million in alleged annual benefits is the type of tangible and quantifiable benefit required under the second prong of the *Longhorn* test.

173.    Consequently, for the reasons stated above, we affirm the finding in the preliminary determination that EPI can not include the proposed $36,120,986 acquisition adjustment in its rates.

        2.      **Inflation Adjustment**

             a.      **Request for Rehearing**

174.    The preliminary determination required EPI to remove the proposed four percent inflation adjustment from operation and maintenance (O&M) expenses, administrative and general (A&G) expenses, and taxes other than income for the cost of service of the existing pipeline. The order held that EPI did not demonstrate that the proposed inflation adjustment had any relevance or historic comparability to Empire's existing operating costs and held that it was inconsistent with Commission policy.

175.    EPI contends that the four percent inflation adjustment is reasonable, because it is based on a number of independent third-party measurements of inflation. For example, EPI states that the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics (BLS) increased 3.4 percent between December 2004 and December 2005; that, over the same time frame, the BLS' producer price index for all finished products increased by 5.4 percent; and that the Construction Cost Index published by McGraw Hill's *Engineering News Record* increased by five percent over a recent one year period. EPI contends that these indices in combination reflect changes in costs facing a pipeline company and concludes that its four percent inflation adjustment is proper.

Docket No. CP98-150-006, et al.                                          - 53 -

176.   In addition, EPI asserts that its proposed inflation adjustment has historic comparability to Empire's existing costs.  Specifically, EPI contends that "[b]etween the twelve-month period ending March 31, 2004, and the twelve-month period ending March 31, 2006, Empire's operating and maintenance expenses increased from $3,582,159 to $4,128,291, an average annual increase of 7.6 percent, and that its property taxes increased from $4,653,217 to $4,896,480, an average annual increase of 2.59 percent."[89]  EPI also maintains that the cases cited in the preliminary determination are distinguishable, contending that it does not propose an inflation tracker as in *Columbia Gulf Transmission Co. (Columbia Gulf)*[90] and that its proposals are supported by actual data unlike in *Williston Basin Interstate Pipeline Co. (Williston Basin)*[91] and *Transcontinental Gas Pipe Line Corp. (Transco)*.[92]

177.   EPI claims that the Commission recognized the need to use projections and account for inflation from historical data in establishing initial rates in *Maritimes & Northeast Pipeline (Maritimes)*.[93]

####   b.   Commission Holding

178.   In this proceeding, EPI developed its cost of service for its existing facilities using a base period of 12 months of actual expenses ending March 31, 2005.  EPI increased the base period actuals for O&M, A&G, and taxes other than income taxes by a four percent inflation adjustment per year in order to derive the proposed expenses for the projected in-service date of November 1, 2007.[94]  On rehearing, EPI claims that between the 12-month period ending March 31, 2004 and the 12-month period ending March 31, 2006, its O&M expenses showed an average annual increase of 7.60 percent and its property taxes showed an average annual increase of 2.59 percent.

---

[89] EPI's rehearing request at 29.

[90] 75 FERC ¶ 61,206 at 61,682 (1996).

[91] 56 FERC ¶ 61,360 at 61,371 (1991).

[92] 11 F.P.C. 94 at 106-07 (1952).

[93] 80 FERC ¶ 61,346 at 62,185 (1997).

[94] EPI proposes an inflation adjustment of $464,303 for O&M and A&G expenses and $513,830 for taxes other than income.

Docket No. CP98-150-006, et al.                                         - 54 -

179.    We do not permit a pipeline to adjust its actual cost of service components to include an inflation adjustment because an inflation adjustment is not the type of "known and measurable" costs contemplated by our regulations.[95] On their face, the numbers presented by EPI do not support its claim that certain of its cost components will increase by four percent due to inflation on an annual basis until November 2007. We note that EPI based its cost of service on actual expenses for the 12 months ending on March 31, 2005. However, the effect of inflation over this period has already been included in EPI's proposed cost of service. Moreover, EPI is using a measure of inflation for the 2004-2005 period to increase certain cost components not only to the end of 2005, but through October 2007. There is nothing in the record that supports the proposition that the inflation factors for 2004-2005 will continue over this extended period. Also, it is unclear whether these increased costs are due to inflation or attributable to increased plant costs. Finally, EPI's analysis is incomplete because it fails to include any analysis of A&G costs. In short, EPI's claim that certain cost components of its rates will increase by four percent on an annual basis until its proposed in-service date of November 2007 is speculative.[96]

180.    EPI's reliance on the Commission's decision in *Maritimes* to support its proposed inflation adjustment is misplaced. Maritimes was a new pipeline company that based its proposed cost of service on estimates at the time of filing. In that decision, we wanted to ensure that Maritimes' proposed rates and a competing pipeline's rates were stated on a comparable basis. Thus, we directed Maritimes to update its estimates based on the more current cost estimates that had been used by the competing pipeline. Here, in contrast, EPI will take over operation of an existing pipeline with actual cost data. EPI is not proposing to update its expenses based on more current information; rather EPI is using inflation factors to project the level of its expenses to November 2007, or more than two years from the date of the filing. Thus, the *Maritimes* case is distinguishable from the proposal here.

---

[95] *See Williston Basin*, 56 FERC at 61,371; *Columbia Gulf Transmission Co.*, 67 FERC ¶ 61,242 at 61,802 (1994).

[96] Because EPI's projections are not supported by actual data, we find that its attempt to distinguish the *Williston Basin* and *Transco* cases is not relevant here. We agree with EPI that its proposal does not constitute the type of tracker that was rejected in *Columbia Gulf.*

Docket No. CP98-150-006, et al.                                          - 55 -

181.   For these reasons, we find that EPI's reliance on general trends in inflation to support the inclusion of an inflation adjustment is speculative and is not a good predictor of its actual costs.  Thus, the preliminary determination did not err in requiring EPI to remove the proposed four percent inflation adjustment from O&M, A&G, and taxes other than income for the cost of service of the existing pipeline.  Nevertheless, if EPI experiences increased expenses due to inflation or otherwise, it may file under section 7 to amend its certificate filing to reflect such updated expenses prior to placing the facilities into service, or submit a section 4 filing after the facilities are placed into service.  This approach is consistent with our policy[97] and with our holding in *Maritimes*.

## 2.    Treatment of Interruptible Revenues

### a.    Request for Rehearing

182.   EPI proposed to allocate interruptible transportation revenues of $191,000 on Empire's existing system and to credit a portion of interruptible revenues to firm and interruptible shippers using the connector facilities.  The preliminary determination held that the proposed $191,000 allocation of interruptible revenues only reflected transportation on the existing system for the 12-month period that ended March 31, 2005 and that EPI projected no throughput as a result of the proposed expansion of its system.  The preliminary determination also required EPI to credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers paying the maximum rates.  Finally, the preliminary determination directed EPI to adequately explain and justify the difference in treatment of interruptible revenues between the existing pipeline and the connector pipeline.

183.   EPI states that the $191,000 reflects the actual level of interruptible transportation on Empire's system for the 12-month period that ended March 31, 2005 and reflects the reality of Empire's recent operations.  EPI contends that the finding in the preliminary determination is not consistent with existing policy since pipelines may choose to allocate fixed costs to interruptible service or to credit the interruptible revenues to firm and interruptible shippers.  As to the requirement that it credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers, EPI asserts that the two cases that the order relied on do not support this requirement.

184.   For the connector pipeline, EPI explains that section 18.3 of the GT&C provides for the crediting of a portion of interruptible revenues to firm and interruptible shippers

---

[97] Interim Order at P 116.

Docket No. CP98-150-006, et al.                                    - 56 -

using that pipeline. The percentages that would be used for the credit would be the capacity that is subscribed on the connector facilities. EPI claims this approach is reasonable because it should be permitted to retain revenues associated with capacity for which it is at risk.

      **b.**    <u>Commission Holding</u>

185.   In regard to new interruptible services, we require a 100 percent credit of interruptible revenues, net of variable costs, to firm and interruptible customers or an allocation of costs and volumes to these services.[98] For the existing pipeline, EPI allocated $191,000 to interruptible service which is equal to its interruptible revenues for the 12 months ended March 31, 2005. This is the same period used by EPI to design its rates. While the throughput may increase on the existing pipeline due to EPI's expansion, the increase in throughput is not known at this time. With the uncertainty concerning projected increases in throughput on EPI, we will grant rehearing and remove the condition that EPI credit interruptible revenues exceeding $191,000 to all firm and interruptible shippers for the existing pipeline.

186.   However, for the connector pipeline, we find that EPI did not provide sufficient support to deviate from our policy. In the absence of an allocation of costs to this service, we will require EPI to credit 100 percent of interruptible revenues to the firm and interruptible recourse rate shippers using the connector pipeline.[99] Because EPI has not assumed any risk associated with interruptible service, requiring 100 percent crediting is appropriate whether or not the pipeline is fully contracted on a firm basis.

     **3.**    <u>Discount Adjustment</u>

      **a.**    <u>Request for Rehearing</u>

187.   The preliminary determination found that a discount adjustment may be appropriate, but that EPI must make a filing recalculating the proposed adjustment. As

---

[98] *E.g., Maritimes & Northeast Pipeline, L.L.C.,* 80 FERC ¶ 61,136 at 61,475, *order on reh'g,* 81 FERC ¶ 61,166 at 61,725-26 (1997); *Steuben Gas Storage Co.,* 75 FERC ¶ 61,331 at 62,068 (1996).

[99] *See Steuben Gas Storage Co.,* 75 FERC ¶ 61,331 at 62,068 (1996); *Young Gas Storage Co., Ltd.,* 67 FERC ¶ 61,375 (1994); *National Fuel Gas Supply Corp.,* 62 FERC ¶ 61,200, *order on reh'g,* 63 FERC ¶61,291 (1993).

Docket No. CP98-150-006, et al.                                                    - 57 -

part of the filing, the order required EPI, among other things, to exclude any negotiated rate contracts and, for any discounts given to affiliates or non-affiliates, EPI must show that the discount was given for competitive reasons.

188.    EPI contends that Empire's rates are bounded by the applicable minimum and maximum rates established by the New York PSC and that none of Empire's current agreements are negotiated rate agreements in the negotiated/recourse rate context.  While EPI acknowledges that the rate provisions under some existing agreements would not fall completely within the straight-fixed variable maximum and minimum rates under EPI's FERC tariff and that EPI would need to file these discounted agreements as negotiated rate agreements, EPI asserts that we should not exclude these discounted agreements from the discount adjustment calculations.

189.    EPI also seeks clarification that the usual presumption that discounts to non-affiliates are competitively justified is applicable to EPI.  In addition, EPI seeks clarification that a currently effective long-term discount granted to National Fuel Gas Distribution Corporation (National Fuel Distribution) will be considered a non-affiliated discount to which such presumption applies, because National Fuel Distribution was not affiliated at the time the discount was negotiated, even though it is an affiliate now. [100]

### b.    Commission Holding

190.    We will permit EPI to include in its proposed discount adjustment the billing determinants related to the contracts resulting from the existing system that will convert to service under EPI's Part 284 tariff. [101]  EPI adequately explained that these contracts were priced on a cost-of-service basis and that the company did not assume the risk of under recovery.  We will also clarify that the presumption that discounts given to non-affiliates are competitively justified is applicable here. [102]

191.    Regarding the National Fuel Distribution transportation contract, we note that National Fuel Distribution was not affiliated with Empire at the time the contract was

---

[100] Empire entered into a 20-year discount agreement with National Fuel Distribution in 1994 more than eight years prior to NFG's acquisition of control of Empire in 2003.  NFG is EPI's corporate parent.

[101] The issues relating to Empire's existing contracts are addressed below.

[102] *E.g.*, *Williston Basin Interstate Pipeline Co.*, 67 FERC ¶ 61,137 at 61,379-80 (1994); *Southern Natural Gas Co.*, 65 FERC ¶ 61,347 at 62,831 (1993).

Docket No. CP98-150-006, et al.                                    - 58 -

entered into in 1994. NFG did not acquire an interest in Empire until 2003. Thus, we find that this contract is an arm's-length transaction and can be treated as a non-affiliated transaction for purposes of calculating the discount adjustment.[103]

### 4.   Rate of Return

#### a.   Request for Clarification

192.   The preliminary determination adopted a 12.5 percent return on equity and a capital structure of 60 percent debt and 40 percent equity for Empire's existing facilities. EPI contends that the order does not explicitly address total return or debt costs. EPI requests clarification that the Commission meant to adopt the 10.16 percent total return (including the 8.6 percent debt cost component) approved by the New York PSC for the existing facilities.

#### b.   Commission Holding

193.   Our intent in the preliminary determination was to adopt the rate of return components underlying Empire's existing rates approved by the New York PSC. As requested, we will clarify that EPI is authorized to adopt an overall rate of return of capital of 10.16 percent, which includes the 8.6 percent debt cost underlying Empire's current New York PSC approved rates.

### 5.   LAUF

#### a.   Request for clarification

194.   The preliminary determination required EPI to "revise its tariff to state the date that it will file an annual fuel reimbursement report for each year to support the compressor fuel and LAUF gas factors used for a 12-month period" and required EPI "to revise its tariff to provide that if a negative compressor fuel or LAUF gas factor occurs on a given month, that negative balance must be carried forward to the next month."

195.   EPI requests clarification, contending that the references to LAUF must have been inadvertent. EPI contends that section 23.2 of its GT&C provides that compressor fuel will be recovered via a compressor fuel factor, posted on its website on a monthly basis.

---

[103] Our finding assumes that the contract will not be renegotiated in the future. If the contract is renegotiated, EPI will have to justify a discount given to an affiliate.

Docket No. CP98-150-006, et al.                                    - 59 -

However, EPI explains that the recovery of LAUF is governed by section 23.4, which provides that actual LAUF experienced during a month will be reflected in each shipper's cumulative imbalance for that month and resolved pursuant to its imbalance resolution process.

### b.    Commission Holding

196.    We will grant EPI's request for clarification, since LAUF will be not be recovered through the same monthly posting mechanism as compressor fuel. However, consistent with the requirement we imposed for compressor fuel, we will require EPI to file an annual report in support of the LAUF volumes during each year.

### 6.    Deferred New York State Taxes

#### a.    Request for Clarification

197.    The preliminary determination permitted a three-year amortization of deferred New York state taxes ($1,161,936 per year, reflecting a three-year amortization of $3,485,808). The order also held that EPI should separately report the recovery of this expense in its three-year cost and revenue study or in a section 4 rate case.

198.    The New York PSC requests clarification, or in the alternative rehearing, that the three-year amortization of deferred state income taxes will be collected as a separate surcharge over a three-year period, rather than being included in EPI's initial rates. If it is included in initial rates, the New York PSC contends that this will guarantee that EPI will overrecover the deferred amount.

#### b.    Commission Holding

199.    The deferred state income tax amount is a non-recurring expense. Upon further consideration, we agree with the New York PSC that because this is a non-recurring item, it is appropriate to ensure that EPI collects no more than the deferred amount. We find that the New York PSC's request that the three-year amortization of deferred state income tax be collected as a separate surcharge is a reasonable approach to achieving this objective. EPI could also file a separate set of initial rates, with these deferred amounts excluded, that would become effective when EPI fully recovers its deferred tax balance. Thus, when it re-files its initial rates, we will require EPI to adopt one of these two methods for recovering its deferred state income tax amount.

### 7.    Non-Conforming Service Agreements

#### a.    The Preliminary Determination

200.    In the application, EPI stated that Empire currently provides firm transportation service under four contracts that were executed within the regulatory framework of the New York PSC (existing contracts).  EPI proposed to continue to provide service under the existing contracts under its Part 284 blanket certificate for the duration of the term of the contracts.  EPI's *pro forma* tariff proposal included two *pro forma* service agreements – a New York PSC *pro forma* service agreement that would have been applicable to the existing contracts and a *pro forma* service agreement for new Part 284 firm shippers transporting gas on the existing or the expansion portions of the pipeline (standard *pro forma* service agreement).  EPI stated that the existing contracts materially deviated from its New York PSC *pro forma* service agreement and sought a determination from the Commission accepting such contracts as non-conforming agreements.[104]  Citing the competitively sensitive nature of the agreements, EPI filed public and non-public versions of its application, seeking privileged treatment for the existing contracts and EPI's summaries of their non-conforming provisions in the non-public application.

201.    The preliminary determination directed EPI to remove the New York PSC *pro forma* service agreement, as well as any reference to the New York agreements in its proposed tariff.  The order also required EPI, in order to provide jurisdictional service to existing customers, to renegotiate its existing contracts using the standard *pro forma* service agreement as the starting point for drafting any negotiated rate or contract.  Further, to the extent that EPI seeks to grandfather any provision in the existing contracts, the order directed EPI to file the agreements reflecting the deviations from the standard *pro forma* service agreement in red line/strike out format.  In such filing, the order required EPI to explain the basis for any deviations and demonstrate that the deviations are not unduly discriminatory.

202.    The preliminary determination denied EPI's request for confidential treatment.  In denying this request, the order stated that where a contract deviates materially from the form of service agreement, the Commission and the public have not had an opportunity to

---

[104] EPI also noted that some of the non-conforming provisions are included in supplemental agreements to the existing contracts, and that "agreements of this kind are disfavored" by the Commission.  Nonetheless, EPI requested that the Commission accept the supplemental agreements as reflecting the regulatory environment in which they were executed.

Docket No. CP98-150-006, et al.                                    - 61 -

review the material deviation, and the contract must be filed and made public.[105] The order explained that public disclosure of contracts with material deviations is required, because such disclosure prevents undue discrimination through secret rates or terms. Consequently, the order directed EPI to make public its service agreements, if the agreements have a material deviation from the standard form of service agreement in EPI's tariff. The order required such agreements to be filed at least 30 days prior to the commencement of service.

### b.    Requests for Rehearing

203.    EPI requests that it be permitted to continue to provide service under the existing contracts, subject to the terms and conditions of its proposed FERC tariff, and that the Commission act on the request it made in the application for an up-front determination accepting the existing contracts as non-conforming agreements.

204.    EPI claims that we erred in rejecting the request to preserve its existing contracts based on reasons that relate solely to the New York PSC *pro forma* proposal.[106] Specifically, EPI points out that our rejection focused on references in the existing contracts to the New York PSC, to services and rate schedules that Empire offered as an intrastate pipeline but are not included in its FERC tariff, and to certain provisions in the New York PSC *pro forma* service agreement (*force majeure*, waiver, warranty, and indemnification) that are not consistent with EPI's proposed FERC tariff. EPI asserts that our reasons do not justify a rejection of the request to preserve the existing contracts, because these inconsistencies will disappear with the removal of the New York PSC *pro forma* service agreement.

205.    EPI also contends that we erred in failing to make an up-front determination accepting the four existing contracts as non-conforming agreements.[107] EPI states that it

---

[105] 18 C.F.R. § 154.1(d) (2006).

[106] EPI states that it does not seek rehearing of the rejection of the New York *pro forma* proposal and that it will remove the New York *pro forma* tariff and references to it from its FERC tariff.

[107] On October 5, 2006, Sithe/Independence Power Partners, L.P., one of the four shippers with an existing contract, withdrew its request for rehearing and clarification of the preliminary determination, stating that it had reached an agreement on rates, terms, and conditions of service with EPI and that the service agreement reflecting the

(continued)

Docket No. CP98-150-006, et al.                                    - 62 -

is aware of our strong preference for non-conforming service agreements to originate from *pro forma* agreements in a pipeline's tariff, but contends that this policy cannot be applied to Empire and other state-regulated pipelines with long-term agreements that were in effect for many years prior to the pipeline's becoming jurisdictional. EPI believes this policy would result in abrogation of its existing agreements. As an alternative, EPI proposes that we focus on whether the existing contracts contain provisions that create a conflict with our substantive policies or give rise to undue preference or discrimination.

206.    EPI maintains that the existing contracts will not compromise our substantive policies, since EPI will provide unbundled transportation under the provisions of Part 284 and other applicable regulations.[108] Also, EPI claims that the existing agreements will not give rise to undue discrimination or preference, since the differences between the proposed FERC *pro forma* tariff and the existing New York PSC *pro forma* tariff are immaterial.[109] Further, EPI asserts that the provisions in each existing contract that deviate from the New York PSC *pro forma* tariff are not unduly discriminatory or preferential.[110] Finally, EPI asserts that our decision here is not consistent with Commission precedent, citing the decisions in *Kansas Pipeline Co.* (*Kansas Pipeline*)[111] and *Saltville Gas Storage Co.* (*Saltville*).[112]

---

agreement will conform to the firm transportation form of service agreement in EPI's FERC *pro forma* tariff.

      [108] Hess also requests that the Commission permit EPI to continue to provide service in accordance with Hess' contracts for the remaining unexpired terms of the contract.

      [109] *See* Exhibit 3, Part 3 of EPI's application or Appendix A to EPI's request for rehearing for a comparison of the differences between the proposed FERC *pro forma* tariff and the existing New York *pro forma* tariff.

      [110] *See* EPI's rehearing request at 14-15 for EPI's analysis of the provisions in each pre-existing service agreement that deviate from the New York *pro forma* tariff.

      [111] 87 FERC ¶ 61,020, *reh'g denied*, 87 FERC ¶ 61,329 (1999).

      [112] 109 FERC ¶ 61,353 (2004).

Docket No. CP98-150-006, et al.                                                    - 63 -

207.   EPI acknowledges that we do not usually make decisions on non-conforming
agreements during certificate proceedings, but maintains that these agreements represent
a large percentage of its existing business and that it needs an up-front determination that
these agreements will be allowed to continue in effect before proceeding with spending
$144 million to construct the connector project.

c.    **Commission Holding**

208.   In the preliminary determination, we did not reject or otherwise rule on the merits
of grandfathering any provision contained in the existing contracts into EPI's
jurisdictional contracts. Rather, we ruled that EPI must renegotiate its existing contracts
using its standard FERC *pro forma* service agreement as the starting point for drafting
any negotiated rate or contract consistent with our policies.[113] The order also stated that
to the extent EPI seeks to grandfather any provision in the existing contracts, EPI must
file the agreements reflecting the deviations from the standard FERC *pro forma* service
agreement in red line/strike out format, explaining the basis for any deviations and
demonstrating that the deviations are not unduly discriminatory.[114] After EPI complies
with this directive, we will rule on the merits of any requests to grandfather provisions of
the existing contracts, consistent with our policies on non-conforming service
agreements.

209.   We disagree that there is no valid basis for requiring the renegotiation of the
existing contracts. In this proceeding, EPI proposes to provide jurisdictional service
which requires that its contracts be based, to the maximum extent possible, on EPI's
Commission-approved jurisdictional tariff. Moreover, to the extent that a provision in a
contract is to control over a generally applicable tariff provision, it must be clearly
delineated so that there is no ambiguity regarding what provision is applicable. The
preliminary determination is also consistent with the requirements of the NGA and our
regulations that require that service be provided in a not unduly discriminatory manner.
Finally, our action here is consistent with the decisions in *Kansas Pipeline* and *Saltville*.
In those proceedings, we did not merely accept the existing contracts with customers as
jurisdictional contracts, as EPI requests us to do here. Rather, we required the companies
to renegotiate contracts with their existing customers using the *pro forma* service
agreement approved by the Commission, and to file any contracts that contained

---

[113] *See National Gas Pipeline Negotiated Rate Policies and Practices,* 104 FERC
¶ 61,134 (2003).

[114] EPI's Preliminary Determination at P 136.

Docket No. CP98-150-006, et al.                                          - 64 -

deviations as non-conforming service agreements.[115] This is exactly the procedure we have directed EPI to follow here.

210.    We also clarify that it is our intent to rule in this proceeding on the merits of any non-conforming provision contained in a renegotiated contract filed by EPI consistent with our directives in the preliminary determination. While we do not usually review non-conforming contracts in the context of a certificate application, we will do so here because of the unique issues regarding the renegotiation of the existing contracts. In order that we have sufficient time to complete our review of any non-conforming contracts filed by EPI, we will require EPI to file any renegotiated contract containing non-conforming provisions at least 90 days prior to the commencement of service, rather than the 30 days required in the preliminary determination.

### 8.    Compliance Filing

#### a.    Preliminary Determination

211.    In EPI's preliminary determination, we required EPI to revise its Rate Schedule FT and IT recourse rates relating to various rate base and rate design issues for service on the existing and connector pipelines. Further, we required that a cost and revenue study be filed within the first three years of actual operations and required numerous revisions to the *pro forma* tariff. We will discuss below EPI's compliance filing.

#### b.    Commission Holding

212.    EPI revised the recourse rates for Rate Schedule FT and IT service by: (1) eliminating the proposed $36 million acquisition adjustment for service on the existing pipeline; (2) adjusting the cash working capital for the existing and connector pipelines, consistent with the lead-lag study included in its March 17, 2006 supplemental data response; (3) removing the proposed inflation adjustment for O&M and taxes other

---

[115] *See Kansas Pipeline Co.*, 83 FERC ¶ 61,107 at 61,509 (1998) (clarifying that the applicant needs to file its new service agreements with existing customers only if they are materially different from the authorized Form of Service Agreement; *Saltville*, 109 FERC ¶ 61,353 at P 5 (2004) (granting request for additional time to file non-conforming service agreements, based on the recognition that Saltville and its customers could not initiate discussion with respect to any revisions to their preexisting contracts without knowing what Saltville's new initial rates and tariff would require).

Docket No. CP98-150-006, et al.                                    - 65 -

than income taxes applicable to its existing pipeline; (4) adjusting the depreciation rate for the existing pipeline reflecting a 2.5 percent rate; (5) adjusting the rate of return on equity to 12.5 percent, with a capital structure of 60 percent debt and 40 percent equity and debt cost of 8.60 percent for the existing pipeline, which reflects the rates approved by the New York PSC; and (6) recalculating the discount adjustment for the existing pipeline applying the iterative process, using as a starting point the revised cost of service and unadjusted billing determinants. We find that EPI's proposed changes to the rates comply with the changes required in our preliminary determination and we accept them as proposed.[116]

213.    In compliance with the preliminary determination, EPI revised its *pro forma* tariff. EPI revised provisions about: (1) the reimbursement of fuel, company-use, and LAUF; (2) using the FERC *pro forma* service agreements for all its contracts; (3) the *force majeure* definition; (4) parking and lending service; (5) netting and trading of imbalances; (6) reservation charge credits; (7) imbalance resolution; (8) liability in damages; (9) capacity release; (10) reservation of capacity for expansion projects; (11) requests for service involving construction of new facilities; and (12) miscellaneous tariff changes.[117] EPI also made other minor revisions for corrections and typographical errors.[118]

214.    We note that EPI has included in its applicable rate sheets at *pro forma* Sheet Nos. 6 and 7, the Annual Charge Adjustment (ACA) of $0.0018 based on 2005 levels. When EPI files its tariff sheets, we will require EPI to change the ACA surcharge on Sheet Nos. 6 and 7 from $0.0018 to $0.0000. Section 154.402 of the regulations requires a company to pay its bill for annual charges before applying the ACA unit surcharge to its rates. Except for the changes to EPI's ACA surcharge, we accept the proposed changes to the tariff sheets as consistent with the preliminary determination.[119] We will

---

[116] As discussed above, we denied EPI's rehearing requests on several rate issues.

[117] When responding to the requests for rehearing and clarification above, we addressed several tariff issues. We will require EPI to modify its tariff to conform with our discussion of those issues.

[118] We will accept EPI's proposal not to change the periodic adjustment provision in section 18.1 of the GT&C, finding that it is consistent with section 154.403 of the regulations.

[119] We will accept EPI's additional corrections and other minor revisions to its *pro forma* tariff.

Docket No. CP98-150-006, et al.                                          - 66 -

also require EPI to file actual tariff sheets at least 90 days before the in-service date of its facilities to reflect compliance with the NAESB standards in effect at that time and the modifications discussed in this order and the preliminary determination.

### 9.   Conclusion

215.   The preliminary determination found that EPI's proposed facilities would be constructed without subsidies; that there were no identified adverse effects on existing customers, other pipelines, landowners, or communities; and that EPI's proposed facilities would be the upstream supply link in the NE-07 project. Thus, pending environmental review, the preliminary determination approved EPI's proposals. We affirm those findings here and conclude that EPI's proposals are in the public convenience and necessity.

### G.   Environment

216.   On January 10, 2006, we issued a *Notice of Intent to Prepare a Supplemental Environmental Impact Statement* (NOI) for the NE-07 project.[120] The NOI was sent to approximately 2,781 individuals and organizations, including affected landowners along the project route and site locations; landowners within one-half mile of the new and modified compressor stations; federal, state, county, and local agencies; elected officials (United States representatives and senators, state governors, and other local and state representatives); environmental and public interest groups; Native American tribes; local newspapers and libraries; and other individuals. The NOI was published in the *Federal Register.*

217.   The NOI requested written comments on the scope of the analysis for the draft supplemental EIS and requested federal, state, and local agencies with jurisdiction and/or special expertise regarding environmental issues to cooperate with the Commission in preparation of the draft supplemental EIS. The scoping period ended on February 10, 2006, although our staff accepted public and agency comments after this date, to the extent practicable, and these comments were addressed in the draft supplemental EIS.

218.   On June 15, 2006, we issued a Notice of Availability (NOA) of the draft supplemental EIS that established a comment period ending on July 31, 2006. We mailed the draft supplemental EIS to 3,273 agencies, groups, and individuals. We received

---

[120] A final environmental impact statement (EIS) for Millennium's and Columbia's original proposals was issued in October 2001.

Docket No. CP98-150-006, et al.                                      - 67 -

56 comment letters from four federal agencies, eight state agencies and state representatives, two Indian nations, two county and municipal agencies, and 32 individuals and groups.[121]  In addition, on July 18, 2006, we held a public meeting at Brookfield, Connecticut to receive comments on the draft supplemental EIS.  We addressed all comment letters on the draft supplemental EIS and oral comments from the public meeting in Appendix I of the final supplemental EIS.

219.    Our staff prepared the final supplemental EIS to consider the environmental impacts of the proposed NE-07 project.  The final supplemental EIS incorporates the analysis in the October 2001 final EIS for Millennium's original proposals and the environmental assessment for Iroquois' original proposals.[122]  The final supplemental EIS updates the information included in the 2001 final EIS for Millennium and the environmental assessment for Iroquois and provides an analysis of the project proposed here.  The final supplemental EIS addresses the purpose and need for the NE-07 project; alternatives to the proposed route and to aboveground facilities, including the "no-action" alternative; geologic resources and hazards; soils; groundwater and surface water; wetlands; vegetation and wildlife; fisheries, including essential fish habitat; endangered and threatened species; land use including residential areas, recreation and public interest areas, Coastal Zone Management Consistency, and visual resources; cultural resources; air quality and noise; and reliability and safety.

220.    On October 13, 2006, we issued an NOA of the final supplemental EIS.  The final supplemental EIS was mailed to 1,016 federal and state agencies, local governments, elected officials, interveners, and individuals who filed comments with the Commission or requested to be on the mailing list for environmental documents.

221.    After the NOA was issued, and after the final supplemental EIS went to print, we received comments from the Environmental Protection Agency (EPA) and the United States Department of the Interior, Office of the Secretary, Office of Environmental Policy and Compliance (DOI).  In its October 31, 2006 comments, the EPA states that based on its review of the final supplemental EIS, it does not believe that the NE-07 project will cause significant adverse impacts to environmental and cultural resources.  In comments filed November 15, 2006, the DOI states that it will provide a letter of concurrence or

---

[121] A few commenters submitted more than one comment.

[122] We issued the environmental assessment for Iroquois' proposals in August 2002.

Docket No. CP98-150-006, et al.                                    - 68 -

non-concurrence under separate cover to the Commission and the United States Army Corp of Engineers (COE).[123]

222.    We also received comment letters from the United States Department of Commerce, National Oceanic and Atmospheric Administration; the Oneida Indian Nation; the National Marine Fisheries Service (NMFS); Ms. Alice Supa; Mr. Peter Supa;[124] Mr. Donald Lewis; the Northern Tuxedo Residents Association; Laura and Brandon Rainoff; and Ms. Colleen Carroll. The New York State Office of Parks, Recreation and Historic Preservation (OPRHP) and Palisades Interstate Parks Commission (PIPC) filed joint comments. Algonquin and EPI also filed supplemental information. Algonquin's supplement reported about its survey for Indiana bats. EPI's supplement requests a slight route variation.[125]

### 1.    **Alternatives**

223.    In accordance with the National Environmental Policy Act of 1969 (NEPA)[126] and the Commission's policy, our staff evaluated alternatives to each section of the NE-07 project to determine whether it would be reasonable and environmentally preferable to the proposed action. As part of this evaluation, we examined the "No Action" or "Postponed Action" alternative for each project component. In addition, our staff evaluated system alternatives, major route alternatives, minor route variations, and aboveground facility alternatives for each component of the NE-07 project.

224.    We also compared the original Millennium project to the NE-07 project. The original Millennium project required approximately 5,956 acres for construction, including approximately 797.6 acres in the United States portion of Lake Erie. The permanent land requirement for easements and aboveground facilities required approximately 3,139 acres. The land requirement for the NE-07 project will be

---

[123] The DOI's comments about wetland and waterbody impacts are included in the discussions relating to surface water and wetlands below.

[124] Ms. Alice Supa's letters were filed on October 19 and November 15 and 21, 2006. Mr. Peter Supa's letters were filed on November 16 and 17 and December 19, 2006.

[125] We will address the comments letters, as well as EPI's and Algonquin's filings, under the appropriate topic headings below.

[126] 42 U.S.C. § 4321 *et seq*.

Docket No. CP98-150-006, et al.                                                    - 69 -

approximately 3,494.9 acres for construction and 1,683.5 acres for operation of the
proposed facilities.

225.    The NE-07 project will have less impact on waterbodies than the original
Millennium project, since the NE-07 project will not include 32.9 miles of construction in
the United States waters of Lake Erie or a 2.1-mile-long crossing of the Hudson River.

226.    The NE-07 project will also have less impact on wetlands than the original
Millennium project.  Construction of the original Millennium project would have directly
affected approximately 414.3 acres of wetlands and operation would have affected an
estimated 247.8 acres of wetlands.  In contrast, the NE-07 project will affect
approximately 228.7 fewer wetland acres during construction and 128.4 fewer acres
during operation.  Also, impacts to all wetland types will be less for the NE-07 project.
For example, the original Millennium project would have affected an estimated
71.6 acres of forested wetlands during construction and 43.8 acres during operation.  The
NE-07 project will reduce impacts to forested wetlands during construction by
approximately 39.9 acres and permanent impacts by 22.5 acres.

        a.      **Millennium**

                (1)      **The NYSEG Variations**

227.    Millennium developed the NYSEG variations after consultations with NYSEG
identified the need to move the pipeline so that it would be at least 55 feet from grounded
powerline structures in certain areas.  The consultations were a requirement of the Interim
Order.[127]  The final supplemental EIS compared segments of the previously approved
Millennium pipeline route to the NYSEG variations that Millennium proposed here.[128]

228.    Some affected landowners filed comments about the NYSEG variations.  They
were concerned about the project's impact on their properties and suggested that the
pipeline be constructed elsewhere.  We addressed similar suggestions from commenters
that the pipeline be constructed elsewhere in the final EIS for the original Millennium
project, as well as in the Interim Order and the 2002 *Millennium* Order.  In addressing the

---

        [127] *See* environmental condition 45.

        [128] The NYSEG variations include the Chemung route variation, the Tioga-
Broome route variation, and the Delaware route variation.  The NYSEG variations are
located along NYSEG's powerline.

Docket No. CP98-150-006, et al.                                    - 70 -

comments, the final supplemental EIS determined that no new information had been filed to support modifying the pipeline route. [129]

(a)     <u>**The Supa Family**</u>

229.    The Supa family resides near the Tioga-Broome route variation, which runs from MPs 232.2 to 243.5.

230.    In her October 19 and November 15, 2006 letters, and in his November 16, 2006 letter, Ms. Alice Supa and Mr. Peter Supa, respectively, filed comments, asserting that the Millennium pipeline should follow Columbia's Line A-5, rather than the powerline through there property.[130] In supporting the Line A-5 route, or a route close to Line A-5, Ms. Supa refers to information that was filed in 1998, including a Millennium data response concerning a route 75 feet down slope from Line A-5 off Boswell Hill Road. Ms. Supa believes that the route should be changed from the powerline, since the pipeline will impact the front yard of a residence; be close to a working barn; and will destroy wells, septic systems, a pet cemetery, a pond, a hunting cabin, and a water supply system on her property or her neighbors' properties. She states that the "DEC" has a concern about "fault currents."

231.    Mr. Peter Supa asserts that when the pipeline was moved to the route along the powerline corridor it created an identical problem for the properties on Bradley Creek Road. Further, Mr. Supa contends that Millennium's proposals should be considered a "greenfield" project since the pipeline will be constructed along and outside of the existing powerline corridor rather than within the corridor and between the powerline towers as originally contemplated. Mr. Supa asserts that if Line A-5 is replaced along a segment of pipeline that is less than one-half mile from the Mitchell and Lewis properties, there will be no homes within the 150 foot requirement and that a "dangerous and aging" pipeline will be removed.

232.    We addressed alternatives to the Millennium pipeline route along the powerline through the Supa property in the final EIS for the original Millennium project, the 2002

---

[129] In comments filed November 15, 2006, the OPRHP supports the selection of the Chemung variation.

[130] Representative Sherwood Boehlert also filed these comments for Ms. Supa and requested that they be included in the record.

Docket No. CP98-150-006, et al.                                    - 71 -

*Millennium* Order,[131] and in the final supplemental EIS for the NE-07 project. In each instance, we concluded that the pipeline route along the powerline was preferable to following Line A-5 in this area. This includes the alternative routes mentioned by Mr. Supa. We did not see the need to obtain any additional information about the offset route along Boswell Hill Road since field observation of the route, the close proximity of several residences adjacent to the existing pipeline right-of-way, and additional impact identified by residents along Boswell Hill Road showed that it was not a reasonable alternative. For this reason, we did not send Millennium additional data requests and determined that additional analysis was not required. We note that if pipeline construction damages any wells, Millennium will repair or replace the water supplies and provide temporary water supplies until the repairs are made. Millennium will also repair septic systems, if they are damaged by construction. The location of the pet cemetery on the Lewis property was known prior to the 2002 *Millennium* Order, as were the potential impacts to the other features mentioned by Ms. Supa. There is no 150 foot requirement for the separation of natural gas pipelines and residences as Mr. Supa claims.

233.    In regard to Ms. Supa's concerns about "fault currents," environmental condition 45 in the Interim Order required Millennium to consult with the NYSEG regarding pipeline construction and operation adjacent to powerlines between MPs 232.2 to 243.5. As a result of this consultation, Millennium moved its pipeline 55 feet from grounded powerline structures, as recommended by NYSEG. No new information has been filed in this proceeding that would persuade us to modify our prior conclusion that the preferred alignment of the Millennium pipeline is along the NYSEG powerline through the Supa property.

234.    Mr. Supa contends that the Tioga-Broome route variation is a "greenfield" project. The Tioga-Broome right-of-way will be adjacent to the existing powerline right-of-way. It will widen the utility corridor, but it will not create a new corridor. Thus, we conclude that Tioga-Broome route variation will not be a greenfield project.

235.    Ms. Supa states that the Tioga-Broome route variation is not documented in Millennium's August 31, 2006 supplemental filing. Ms. Supa contends that she was surprised to learn of the latest realignment during a January 26, 2006 site visit.

236.    The Tioga-Broome route variation has been a part of Millennium's amended proposals, since Millennium filed its amended application in Docket No. CP98-150-006 in August 2005. In an August 31, 2006 filing, Millennium asserts that it mentioned the

---

[131] 100 FERC at P 206-211.

Docket No. CP98-150-006, et al.                                                    - 72 -

possibility of a pipeline realignment within the Supa property downhill from the spring
during a January 26, 2006 site visit. Millennium contends that construction impacts can
be successfully mitigated along the preferred route and that the alternative alignment
mentioned in January 2006 will not be needed. Pending completion of the report about
the potential impact of pipeline construction on the Supa water supply system, as required
in environmental condition 58 of the Interim Order, we will not require a route change at
this point.[132]

### (b)     Mr. Donald Lewis

237.    In his November 20, 2006 comment letter, Mr. Lewis expresses concern about the
proximity of the pipeline to wells, sewer systems, a pet cemetery, residences, and apple
trees. Mr. Lewis is concerned about construction impacts on streams, springs that feed a
pond, access to a hunting cabin, and limits on future land use. Mr. Lewis asserts that
Millennium personnel are not willing to work with him and that decisions made at one
meeting are changed at the next meeting. Finally, Mr. Lewis states that he did not
receive a copy of the final supplemental EIS and that there is no reference to the
problems on his property.

238.    On November 29, 2006, Millennium filed a response, contending that it remains
committed to working with Mr. Lewis and other stakeholders regarding the project.

239.    We mailed the final supplemental EIS to over 1,000 individuals, organizations,
and agencies. We regret that Mr. Lewis did not get a copy.[133] Nevertheless, Mr. Lewis'
comments were addressed in Appendix I of the final supplemental EIS. Many of the
issues he raised were also addressed in the original Millennium proceeding.

### (c)     Conclusion

240.    For the reasons discussed above, we concur with environmental condition 18,
which requires Millennium to use the NYSEG variations, rather than the corresponding
pipeline segments previously approved in the Interim Order and the 2002 *Millennium*
Order.

### (2)     The Warwick Isle Route Variation

---

[132] *See* the Groundwater discussion below.

[133] We did not learn that Mr. Lewis had not received a copy of the final
supplemental EIS until he filed the comment letter.

Docket No. CP98-150-006, et al.                                         - 73 -

241.   The Warwick Isle route variation was developed to avoid a planned residential development.  We received no comments about this variation.  Thus, we concur with environmental condition 20, which requires Millennium to use the Warwick Isle route variation, rather than the corresponding pipeline segment previously approved in the Interim Order and the 2002 *Millennium* Order.

### (3)    Neversink River

242.   Millennium proposes to acquire and operate a 7.1-mile-long segment of Columbia's 24-inch diameter Line A-5, which crosses the Neversink River.  Millennium's proposal will avoid direct disturbance to the Neversink River, which is considered a sensitive waterbody due to the possible presence of federally endangered species.  Our staff evaluated this proposal.  We concur with the requirement in environmental condition 19 that Millennium use the existing pipeline segment rather than replace it with 30-inch diameter pipeline.

### (4)    The Line A-5 Replacement Project

243.   For the Line A-5 replacement project, our staff evaluated three route alternatives that would avoid construction through the Laurel Ridge community in Tuxedo Park, New York:  the County Road 84 and Warwick Brook Road alternative; the Route 17/17A alternative; and the Sterling Forest State Park/Laurel Ridge alternative.  Most of the comments filed about the Line A-5 replacement project concerned the replacement of Line A-5 in Laurel Ridge.  Although the Sterling Forest State Park/Laurel Ridge alternative will affect land within the Sterling Forest State Park, Millennium developed, in consultation with the PIPC, an Environmental Management and Construction Plan (EM&CP) which describes the environmental construction and mitigation procedures it will use to minimize environmental impacts to the park.  We believe that use of the EM&CP will mitigate construction impacts in the park and that the Sterling Forest State Park/Laurel Ridge alternative will avoid construction through the Laurel Ridge residential area.  We agree with the final supplemental EIS' requirement that Millennium should use the Sterling Forest State Park/Laurel Ridge alternative.[134]

244.   In comments filed November 15, 2006, the OPRHP and PIPC support the selection of the Sterling Forest State Park/Laurel Ridge alternative.  They recognize that Algonquin's proposals will require the replacement of a 26-inch diameter pipeline along

_____

[134] *See* environmental condition 21.

Docket No. CP98-150-006, et al.                                          - 74 -

the border of Harriman State Park and that this activity will affect park land. The OPRHP and PIPC assert that they will work with Algonquin to minimize impacts to Harriman State Park and its resources, because they expect Millennium and Algonquin to adhere to the construction and restoration measures identified in its Environmental Construction Standards (ECS) and the EM&CP for construction in Harriman and Sterling Forest State Parks.[135]

### (5)     The Ramapo River HDD Variation

245.   Our staff evaluated an alternative to the proposed horizontal direct drilling (HDD) crossing of State Route 17, the Metro-North Railroad, the Ramapo River, and Interstate 87 on the A-5 replacement project. As proposed, Millennium's line would follow Line A-5. The alternative would pass through a planned residential community. The community's real estate developer suggested moving the pipeline closer to the original Millennium project route along Line A-5. Millennium developed the Ramapo River HDD variation, which moved the pipeline out of the planned residential development. We compared the Ramapo River HDD variation to the alternative route and the route approved for the original Millennium project. We believe that the Ramapo River HDD variation is reasonable and will avoid the planned residential development. We concur with the finding in the final supplemental EIS that requires Millennium to use the Ramapo River HDD variation.[136]

### (b)     EPI

246.   Our staff evaluated numerous broad corridors and minor route variations between Victor and Corning, New York and determined that EPI's proposed route was reasonable, because it avoided or minimized impacts to environmental resources and, in particular, minimized impacts to agricultural resources. Originally, EPI considered looping the existing Empire system along the northern-most 1.2 miles of the project. However, during the pre-filing period, and based on landowner input, EPI decided to propose replacing that segment of pipeline with a larger diameter pipeline to minimize impacts to abutting landowners. As for the Oakfield compressor station, our staff compared three aboveground facility site alternatives to the proposed site (Alternative Site 1) and

---

[135] In comments filed November 10, 2006, the Northern Tuxedo Residents Association also support the selection of the Sterling Forest State Park/Laurel Ridge alternative.

[136] *See* environmental condition 22.

concluded that EPI's proposed site was the preferred alternative for the new compressor station.

247.   In an October 23, 2006 filing, EPI reports that it conducted additional pipeline alignment, environmental, and cultural resource surveys along its proposed route during the spring and early summer of 2006.  EPI states that it conducted the surveys on some properties where access had been denied previously, where route modifications were made mainly at the request of landowners, or where issues of constructability were observed.  These route modifications are minor and within the same properties as shown on the route alignment maps filed by EPI in March 2006, with the exception of Variation #53 (between approximate MPs 29.2 and 29.5).  Variation #53 will return the pipeline alignment to the original location proposed in EPI's October 11, 2005 application and will avoid certain impacts to businesses immediately north and south of New York State Route (NYSR) 14A, including an existing drainage system beneath a parking lot (south side of NYSR 14A) and one or more septic system storage tanks (north side of NYSR 14A).  The parking lot is crossed by heavy tractor trailer traffic to one of the businesses.  Variation #53 will avoid impacts to these areas and move the pipeline route into an adjacent agricultural area, adding approximately 195 feet to the pipeline length.  EPI did not identify any wetlands, waterbodies, cultural resources, or residences during surveying the alternative route.  Since Variation #53 affects agricultural land, EPI will implement its Erosion and Sedimentation Control and Agricultural Mitigation Plan (ESCAMP), developed in consultation with the New York State Department of Agriculture and Markets (NYSDA&M), for construction in agricultural areas.

248.   On November 17, 2006, EPI filed supplemental information about Variation #53, asserting that it will avoid a saucer-shaped depression on the affected property and some drain tiles where feasible and will repair any tiles that are damaged.  EPI states that it will use the best management practices identified in its ESCAMP for topsoil stripping, management, and replacement.  We find that EPI's use of Variation #53 is reasonable.

### (c)   Algonquin

249.   Algonquin proposes to replace existing pipeline facilities, modify facilities at three existing compressor stations and a meter station, and construct a new metering and regulating station.  Our staff did not evaluate alternative sites to the proposed modifications of Algonquin's existing compressor stations, because modification of existing facilities is preferable to the construction of new facilities at alternative sites when feasible.  Further, because the proposed replacement of existing pipeline will have less environmental impact and is considered preferable to the creation of new routes or corridors, no major route alternatives or minor route variations were considered for the pipeline replacement portion of the project.

Docket No. CP98-150-006, et al.                                                    - 76 -

250.    Algonquin also proposes to construct a new compressor station.  Our staff
evaluated five alternative sites (Sites B through F) to the originally proposed site (Site A)
for the Oxford compressor station.  Subsequently, we issued a *Notice of Alternative
Project Site* to inform the public that Site F was being considered as the preferred site.[137]
The owner of Site A submitted comments, expressing concerns about the proposed use of
the property.  Algonquin commented that the property may no longer be for sale.  The
draft supplemental EIS concluded that Sites A and F would be reasonable for the
compressor station.  On June 13, 2006, Algonquin requested that Site F be considered the
preferred site for the Oxford compressor station.  Local officials also filed comments in
support of Site F, since it would be adjacent to a planned commercial development.  The
Connecticut Siting Council (CSC) independently reviewed the information about the
proposed and alternative sites for the Oxford compressor station and found Site F to be
preferable.[138]

                        (d)    **Iroquois**

251.    On October 23, 2006, Ms. Colleen Carroll filed a comment letter that was similar
to several form letters that were filed in opposition to the construction of the Brookfield
compressor station at the High Meadow Road site in Brookfield by Iroquois and to the
construction of the meter and regulation station at the same site by Algonquin.
Ms. Carroll raised concerns about the compressor station's proximity to the Whisconier
Middle School, residences, air quality, aquifer impacts, noise, and alternative locations.
In addition to letters from Ms. Carroll and others, during the scoping and comment period
for the draft supplemental EIS, homeowners in Brookfield expressed concern about these
facilities, as did the Attorney General of Connecticut and other Connecticut state and
local government representatives.

252.    In combination with the final supplemental EIS about Millennium's original
proposals and the environmental assessment about the Brookfield compressor site, our
staff evaluated five alternative sites, including the Vale Road site suggested by the city
officials of Brookfield and other concerned citizens and parties.  The alternative sites are
on properties where the Iroquois and Algonquin pipelines are co-located.  One of these

---

[137] The Notice was issued on March 8, 2006.

[138] On June 30, 2006, the CSC issued its *Findings of Fact and Opinion and
Recommendations* about Algonquin's proposed project in Connecticut.  The CSC's
environmental condition 40 requires Algonquin to use Site F for the Oxford compressor
station.

Ex. 2.

# PROPOSED EASEMENTS
## TO
## MILLENIUM PIPELINE COMPANY, LLC
## FROM
## PFEIFER REALTY CORPORATION

ALL THOSE TRACTS OR PARCELS OF LAND in the Town of Highland, Sullivan County, State of New York, being portions of the lands of Pfeifer Realty Corp. described in Liber 2184 Page 223 as recorded in the Sullivan County Clerk's Office on April 20, 2000.

## PERMANENT EASEMENT

Beginning at a point on the northeasterly line of the lands of Pfeifer Realty Corp. (Tax Map # 4.B-1-1) a distance of 45 feet, more or less northwesterly from the easterly corner of said Pfeifer; thence westerly through the lands of said Pfeifer, parallel to and 25 feet distant from a proposed pipeline, a distance of 698 feet, more or less to a point; thence northwesterly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 231 feet, more or less to a point; thence northerly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 380 feet, more or less to a point on said northeasterly line of Pfeifer; thence southeasterly along said line a distance of 66 feet, more or less to a point; thence southerly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 319 feet, more or less to a point; thence southeasterly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 196 feet, more or less to a point; thence easterly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 587 feet, more or less to a point on said northeasterly line of Pfeifer; thence southeasterly along said line a distance of 105 feet, more or less to the Point of Beginning.

The above described parcel contains 1.38 acres, more or less.

## TEMPORARY WORKSPACE EASEMENT

Beginning at a point at the easterly corner of the lands of Pfeifer Realty Corp. (Tax Map # 4.B-1-1); thence southwesterly along the southeasterly line of said Pfeifer a distance of 4 feet, more or less to a point; thence westerly through the lands of said Pfeifer, parallel to and 50 feet distant from a proposed pipeline, a distance of 853 feet, more or less to a point; thence northwesterly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 248 feet, more or less to a point; thence northerly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 410 feet, more or less to a point on the northeasterly line of Pfeifer; thence southeasterly along said line a distance of 33 feet, more or less to a point; thence southerly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 380 feet, more or less to a point; thence southeasterly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 231 feet, more or less to a point; thence

easterly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 698 feet, more or less to a point on said northeasterly line of Pfeifer; thence southeasterly along said line a distance of 45 feet, more or less to the Point of Beginning.

The above described parcel contains 0.78 acre, more or less.

## EXTRA TEMPORARY WORKSPACE EASEMENTS

### Southerly Parcel

Beginning at a point on the southeasterly line of the lands of Pfeifer Realty Corp. (Tax Map # 4.B-1-1) 4 feet, more or less southwesterly from the easterly corner of said Pfeifer; thence southwesterly along said southeasterly line of Pfeifer a distance of 29 feet, more or less to a point; thence westerly through the lands of said Pfeifer, parallel to and 75 feet distant from a proposed pipeline, a distance of 95 feet, more or less to a point; thence northerly through the lands of said Pfeifer a distance of 25 feet more or less to a point; thence easterly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 109 feet, more or less to the Point of Beginning.

### Middle East Parcel

Commencing at a point on the northeasterly line of the lands of Pfeifer Realty Corp. (Tax Map # 4.B-1-1) a distance of 150 feet, more or less northwesterly from the easterly corner of said Pfeifer; thence westerly through the lands of said Pfeifer, parallel to and 25 feet distant from a proposed pipeline, a distance of 478 feet, more or less to the Point of Beginning.

Thence westerly through the lands of said Pfeifer, parallel to and 25 feet distant from a proposed pipeline, a distance of 109 feet, more or less to a point; thence northwesterly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 196 feet, more or less to a point; thence northerly through the lands of said Pfeifer, parallel to and 25 feet distant from said proposed pipeline, a distance of 122 feet, more or less to a point; thence easterly through the lands of said Pfeifer a distance of 25 feet, more or less to a point; thence southerly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 114 feet, more or less to a point; thence southeasterly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 178 feet, more or less to a point; thence easterly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 100 feet, more or less to a point; thence southerly through the lands of said Pfeifer a distance of 25 feet, more or less to the Point of Beginning.

### Middle West Parcel

Commencing at a point at the easterly corner of the lands of Pfeifer Realty Corp. (Tax Map # 4.B-1-1); thence southwesterly along the southeasterly line of said Pfeifer a distance of 4 feet, more or less to a point; thence westerly through the lands of said Pfeifer, parallel to and 50 feet distant from a proposed pipeline, a distance of 853 feet, more or less to a point; thence northwesterly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 248 feet, more or less to a point; thence northerly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 311 feet, more or less to the Point of Beginning.

Thence westerly through the lands of said Pfeifer a distance of 25 feet, more or less to a point;

thence northerly through the lands of said Pfeifer, parallel to and 75 feet distant from said proposed pipeline, a distance of 100 feet, more or less to a point; thence northwesterly through the lands of said Pfeifer parallel to and 75 feet distant from said proposed pipeline, a distance of 99 feet, more or less to a point; thence northeasterly through the lands of said Pfeifer a distance of 13 feet, more or less to a point on the northeasterly line of said Pfeifer; thence southeasterly along said line a distance of 118 feet, more or less to a point; thence southerly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 99 feet, more or less to the Point of Beginning.

**Northwesterly Parcel**

Commencing at a point at the easterly corner of the lands of Pfeifer Realty Corp. (Tax Map # 4.B-1-1); thence southwesterly along the southeasterly line of said Pfeifer a distance of 4 feet, more or less to a point; thence westerly through the lands of said Pfeifer, parallel to and 50 feet distant from a proposed pipeline, a distance of 853 feet, more or less to a point; thence northwesterly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 248 feet, more or less to a point; thence northerly through the lands of said Pfeifer, parallel to and 50 feet distant from said proposed pipeline, a distance of 410 feet, more or less to a point; thence northwesterly along the northeasterly line of said Pfeifer a distance of 1043 feet, more or less to the Point of Beginning.

Thence southwesterly through the lands of said Pfeifer a distance of 3 feet, more or less to a point; thence northwesterly through the lands of said Pfeifer, parallel to and 75 feet distant from said proposed pipeline, a distance of 100 feet, more or less to a point; thence northeasterly through the lands of said Pfeifer a distance of 3 feet, more or less to a point on said northeasterly line; thence southeasterly along said line a distance of 100 feet, more or less to the Point of Beginning.

The above described parcels contain 0.39 acre, more or less.

The above described parcels are shown on Exhibit 10S209.11 entitled "Exhibit A, Proposed Pipeline Crossing Property of Pfeifer Realty Corporation ", dated March 2007.



# PROPOSED EASEMENTS
## TO
## MILLENNIUM PIPELINE COMPANY, LLC
## FROM PFEIFER REALTY CORPORATION

ALL THAT TRACT OR PARCEL OF LAND in the Town of Highland, County of Sullivan, State of New York, being a portion of the land of Pfeifer Realty Corporation described in Liber 2184 Page 223 as recorded in the Sullivan County Clerk's Office on April 20, 2000.

## ACCESS RIGHT OF WAY

Commencing at a point at the northeasterly corner of the lands now or formerly of Pfeifer Realty Corporation (Tax Map # 4B-1-1) at its intersection with the division line between Tax Map # 4B-1-2 on the northwest and said Tax Map # 4B-1-1 on the southeast; thence southwesterly along the northwesterly line of said Pfeifer, a distance of 3 feet, more or less, to the Point of Beginning.

Thence southeasterly through said Pfeifer, a distance of 28 feet, more or less, to a point; thence southwesterly through said Pfeifer, along a line parallel to and 25 feet distant from a northwesterly line of said Pfeifer, a distance of 2,083 feet, more or less, to a point; thence westerly through said Pfeifer, along a line parallel to and 25 feet distant from a northerly line of said Pfeifer, a distance of 4,563 feet, more or less, to a point on the westerly line of said Pfeifer; thence northerly along said Pfeifer, a distance of 25 feet, more or less, to a point on the northerly line of said Pfeifer, said line also being the centerline of "Old Mt. Hope & Lumberland Turnpike (N.O.H.)"; thence easterly along said Pfeifer, a distance of 4,547 feet, more or less, to a point; thence northeasterly along the northwesterly line of said Pfeifer, a distance of 2,068 feet, more or less, to the Point of Beginning;

The above described parcel contains 3.806 acres, more or less.

The above described parcel is shown on Exhibit 10S209.03 entitled "Exhibit A, Access Right of Way Crossing Property of Pfeifer Realty Corporation ", dated October 2007.



Docket No. CP98-150-006, et al.                                        - 77 -

sites has been developed and is no longer available. Our staff identified wetlands and
other resources on the remaining properties that would limit the available area for
construction of a compressor station. Although the Vale Road site alternative is preferred
by a number Brookfield residents and public officials who feel that the proposed site is
too close to Whisconier Middle School and a number of private residences, we concluded
in the *Iroquois* Order that the Vale Road site was not preferable to the High Meadow
Road site. Further, we found that the compressor station could be safely constructed and
operated at the High Meadow Road site and found no conflicts or significant safety issues
with the location relative to the school.

253.    All of the issues raised in Ms. Carroll's comment letter and in other comments
were addressed in the final supplemental EIS. Further, similar issues were addressed in
the 2002 *Iroquois* Order. In each instance, the Vale Road site was not recommended.
The final supplemental EIS determined that construction and operation of the Brookfield
compressor station and related facilities at the proposed High Meadow Road site can be
accomplished in a safe and reliable manner. The final supplemental EIS also found that
the High Meadow Road site is the preferred alternative, if Iroquois constructs and
operates the facilities in accordance with the procedures identified in its application and
supplemental filings and with the additional mitigation required in environmental
conditions 51 to 54. We concur with that finding.[139]

### 2.    Geology

254.    The NE-07 project's impact on exploitable mineral resources will be minimal.
The final EIS for the original Millennium project listed active mining operations that
would be crossed or would be within 1,500 feet of the pipeline. Millennium's proposed
pipeline will not cross any additional active mining operation sites. EPI's right-of-way
will cross one active New York State Department of Environmental Conservation
(NYSDEC)-permitted sand and gravel pit property south of the New York State
Thruway.

255.    Geologic hazards (seismicity, landslides, and karst terrain) will not pose a
significant hazard for the project. Blasting will be required in areas of shallow, hard
bedrock where other methods of trench excavation are not successful. Where blasting is

---

[139] In its June 30, 2006 Order, the CSC compared the High Meadow Road site to
the Vale Road site and found that the High Meadow Road site is the preferred location
for the compressor station, because the High Meadow Road site will have less
environmental impact and there will be fewer residences in close proximity to the site.

required, Millennium, EPI, and Algonquin will conduct pre- and post-blast surveys of all structures with willing landowners and utilities within 150 feet of the construction work area to assess any damage to existing structures. Licensed contractors will blast in accordance with appropriate regulations. Iroquois does not anticipate the need to blast.

### 3.    Soils

256.    Construction of the NE-07 project will disturb soils and increase the potential for soil erosion, compaction, loss of soil productivity, and damage to existing drainage tiles. Each applicant will implement specific erosion and sedimentation control measures consistent with the Upland Erosion Control, Revegetation, and Maintenance Plan (Plan) and Wetland and Waterbody construction and Mitigation Procedures (Procedures). These measures include compaction testing and mitigation and repair of any drainage tiles damaged during construction. Approximately 3.3 acres of prime farmland soils, as classified by the Natural Resource Conservation Service, will be permanently converted to developed areas at EPI's Oakfield compressor station. In addition, EPI's pipeline will cross agricultural areas containing soils with high water tables, which are prone to compaction. EPI will implement its ESCAMP, developed in consultation with the NYSDA&M, to minimize potential impacts on agricultural lands and will develop overwintering procedures for use in these areas, if restoration cannot be completed before October 1. Millennium and EPI will continue to work with the NYSDA&M regarding specialized construction and overwintering procedures in agricultural areas. We find that implementation of these procedures will minimize impact on soils.

### 4.    Groundwater

257.    EPI's proposed facilities overlie four New York State Department of Health-mapped principal aquifers. Algonquin's proposed facilities overlie four EPA-designated principal aquifer areas. Algonquin's facilities will also overlie two EPA-designated sole source aquifers, a town-designated aquifer (Haines Pond aquifer system), and a Primary Recharge Zone of the Town of Brookfield Aquifer Protection District (under Algonquin's Brookfield meter station and Iroquois' Brookfield compressor station). The Great Swamp Aquifer underlies Iroquois' existing Dover compressor station and is a principal aquifer for the region.

258.    In addition to the private water supply wells and springs listed in the final EIS for Millennium's original project, the construction areas for the three NYSEG variations and the Warwick Isle route variation will be within 150 feet of 63 private wells or springs. Further, we identified seven private water supply wells within 150 feet of the construction area along the Line A-5 replacement project, nine private wells or springs within 150 feet of EPI's construction areas, and eleven private water supply wells within

Docket No. CP98-150-006, et al.                                              - 79 -

150 feet of Algonquin's replacement pipeline construction area. Algonquin plans to conduct pre-construction surveys to verify the presence and location of any other wells within 150 feet of the pipeline construction right of way and its Brookfield meter station. Environmental condition 15 requires that Millennium, EPI, Algonquin, and Iroquois provide an update, prior to construction, to the information filed about locations of water wells and springs within 150 feet of construction workspaces. Environmental condition 16 requires that Millennium, EPI, and Algonquin develop a plan to report any complaints that they may receive during project construction concerning water supply yield or quality and how each was resolved.

259.    All of the applicants have Spill Prevention Control and Countermeasures (SPCC) Plans for their projects that include procedures to avoid spills of hazardous materials, to clean up spills, and to report incidents during construction and operation of the facilities. Environmental condition 42 requires Algonquin to modify its SPCC Plan to address daily vehicle maintenance (*i.e.*, to inspect for leaks to further minimize possible impact due to operation of construction equipment) for consistency with the other applicants' SPCC Plans.

260.    We do not believe that construction and operation of the NE-07 project will adversely affect groundwater quality. The applicants will construct and operate facilities in accordance with approved project-specific environmental construction plans, SPCC plans, and the Plan and Procedures to minimize any potential for groundwater impacts. Also, the applicants will avoid and minimize impacts to groundwater resources by the use of standard and specialized construction procedures. The applicants will identify regulated wellhead protection zones around public groundwater supplies and implement appropriate protection measures during construction and operation in these areas. Further, the applicants will offer to conduct pre- and post-construction testing of private water wells within 150 feet of the construction work areas. If it is determined that any private water supply well is damaged as a result of the project, a temporary source of water will be provided until the damaged supply well is restored to its former capacity.

       a.       **The Supa Family**

261.    In her October 19 and November 15, 2006 letters, and in his November 16 and 17, 2006 letters, Ms. Alice Supa and Mr. Peter Supa, respectively, contend that the wells drilled to study the water supply on their property, as required in the Interim Order, have damaged the family's water system. They allege that the damage includes sedimentation and contamination by a petroleum product. They request that the Commission require Millennium to repair the damage. Ms. Supa also asserts that Millennium "took us to court under the law of eminent domain."

Docket No. CP98-150-006, et al.                                                    - 80 -

262.  As discussed in the 2002 *Millennium* Order, Mr. Peter Supa requested that
Millennium prepare a report with site specific diagrams to illustrate the flow of water to
his spring and cistern and to prepare a plan to avoid his water supply.[140]  Environmental
condition 58 of the Interim Order required Millennium to prepare site specific diagrams
to illustrate the flow of water to the spring and cistern prior to beginning pipeline
construction.  If the results of the testing indicated that the pipeline trench would convey
water away from the spring, we required Millennium to develop engineering and/or other
mitigation measures (including a re-route upslope to avoid the water table) to maintain
uninterrupted flow to the spring and cistern.  To meet this testing requirement,
Millennium installed piezometers in the wells drilled along the pipeline route on the Supa
property and recorded water measurements in the wells for over a year.  We note that
Millennium initiated an eminent domain proceeding in order to get access to the Supa
property to comply with the requirement of environmental condition 58.

263.  The Supa property is on the south side of Harrington Road in Johnson City, New
York and the residence is near the road at an elevation of approximately 1,010 to
1,020 feet.  A review of the topographic map for this area shows that the Supa spring is at
an elevation of approximately 1,130 to 1,140 feet, meaning that the spring is an estimated
120 to 130 feet higher in elevation than the residence.  South of, and upslope of, the
spring are the three existing powerline towers within the NYSEG right-of-way.  The
pipeline right-of-way is farther south and upslope from the powerlines.  Elevations vary
along the powerline and pipeline corridor but, directly south of the spring, the ground
surface where the pipeline will be installed is at an elevation of approximately 1,200 feet.
At this location, the pipeline right-of-way will be 70 to 80 feet higher in elevation than
the spring.  The Supa spring is approximately 1,400 feet from the residence and the
pipeline will be an estimated 300 feet from the spring.

264.  On November 29, 2006, Millennium filed supplemental information about the
Supa's comments, contending that the well testing has not damaged the Supa water
supply system.  Millennium states that its consultant conducted a year-long hydrologic
study on the Supa property by installing 16 piezometers to monitor groundwater levels,
characterize the source of water supply, and evaluate water quality.  Initial hydrologic
evaluation activities occurred from September 27 through October 6, 2005 and included
drilling, sampling soil and rock, and installing piezometers.  Millennium states that it
drilled 10 borings along the pipeline route to depths of 10 to 20 feet, which is deeper than
the seven to eight feet anticipated for the excavated depth of the pipeline trench, and three
borings upslope from the Supa spring and downslope from the pipeline trench.

---

[140] 100 FERC at P 210.

265.    After the borings were drilled, Millennium installed piezometers. Two piezometers were installed in borings 10, 11, and 12. The tops of the borings were filled with concrete and protective steel casings with lockable caps. The piezometers were removed between October 23 and October 27, 2006, at the conclusion of the test period. The borings were plugged by removing the concrete and protective casing, followed by grouting with a bentonite slurry.

266.    Millennium asserts that the Supas reported two instances where their cistern water was cloudy. The first was in October 2005 when the Supa's reported sediment in the cistern. Millennium contends that this coincided with several days of steady rainfall that began on October 7, 2005 and ended a three or four month drought. Millennium states that it recommended to the Supas that the cistern be flushed. Millennium asserts that Mr. Supa flushed the cistern on two consecutive days and reported to Millennium that the water cleared and that the sediment in the system was removed.

267.    Millennium states that the second instance occurred in early 2006, following record-breaking rainfall that caused flooding in central and eastern New York. The Supas contacted Millennium to report that sediment was again in the cistern and that the cistern was making unusual gurgling noises. Millennium contends that members of its team went on site to assess the problem a few days later, but that there was no longer any sediment and the gurgling noises had ceased. Millennium believes these instances are the result of the extremely high rainfall.

268.    Millennium also commented about the presence of petroleum hydrocarbons that were found in well number one on January 12, 2006. Millennium states that prior to that time, no hydrocarbons had been detected. Soil samples did not show any hydrocarbon and there was no evidence of any hydrocarbons during the installation of the piezometers. Millennium states that during the readings taken on January 12, 2006, a hydrocarbon coating was observed on the water level probe when it was removed, together with an odor of hydrocarbon, and a sheen was found on the water sample, as well as some product globules within the water sample. Millennium contends that it analyzed this water sample and found it to be diesel fuel. Millennium has not commented about possible sources of the diesel fuel. Millennium states that it hand delivered the results of the analysis to Ms. Supa on February 15, 2006. When piezometer one was removed on October 27, 2006, Millennium's consultant conducted a routine health and safety meeting with the Supas prior to its removal to address the considerations associated with diesel fuel. All personal protective equipment worn by on-site personnel was worn in accordance with standard safety requirements outlined in site-specific health and safety plans. Millennium states that this was done as a precautionary measure, not because there was any evidence suggesting the presence of any significant quantity of hydrocarbons.

Docket No. CP98-150-006, et al.                                      - 82 -

269.   Millennium's November 29, 2006 supplemental filing did not indicate whether diesel fuel or any other product was observed prior to or after the instance reported on January 12, 2006. Further, Millennium does not indicate possible sources for the diesel fuel. For these reasons, we will require Millennium to report to the Commission the potential sources for the diesel fuel observed on January 12, 2006 and whether there was any further evidence of diesel fuel after the January 12, 2006 occurrence. Thus, we will add environmental condition 55 to this order, which states that:

> Prior to construction, Millennium shall file with the Secretary of the Commission (Secretary), for review and written approval of the Director of the Office of Energy Projects (OEP), a report about the diesel fuel observed on the Supa property in test boring one on January 12, 2006. The report shall provide information about potential sources of diesel fuel and shall address whether further evidence of diesel fuel was observed during any subsequent instances of monitoring the test borings. The report shall also address the issue of the need for clean up and a plan for clean up.

270.   Millennium's report about the potential impact of project construction on the Supa's water system is pending. Millennium asserts that when the report is completed, it will file the report as required with the Commission for review and written approval. Further, Millennium contends that it will file a site-specific construction plan for crossing the Supa property, giving consideration to alternative construction methods in a manner consistent with environmental condition 23 in this order.

271.   If the Supa's water system was damaged by well testing, Millennium states that it will make appropriate repairs. Millennium also states that it will implement environmental condition 23 of this order, which requires it to file a site-specific plan for construction and restoration of affected areas on the Supa property and to consider alternative construction methods, such as stove-pipe construction and limits to access across the Supa property to further mitigate construction impact. Further, consistent with environmental condition 58.e. of the Interim Order, if the hydrologic study shows that the pipeline trench will convey water away from the spring, Millennium must develop engineering and other mitigation measures, or both (including a re-route upslope from the proposed pipeline route to avoid the water table), to maintain uninterrupted flow to the spring and cistern. Since Millennium has already agreed to make repairs to the Supa's water system if repairs are needed and since Millennium's report about the Supa's water supply is pending, we do not believe that additional environmental conditions are required at this time.

Docket No. CP98-150-006, et al.                                                  - 83 -

### 5.    Surface Water

272.    The effect of the NE-07 project on surface waters will be mainly associated with pipeline construction. Construction of aboveground facilities will not directly affect surface waters. The applicants propose to use appropriate erosion and sediment controls and SPCC Plans to minimize and control runoff from areas disturbed by construction. The applicants will restore all construction workspaces after construction. The draft supplemental EIS finds that operation of the NE-07 project facilities will have minimal impact on surface water.

273.    Millennium's construction will affect 556 waterbodies (including waterbodies crossed by access roads and located adjacent to workspaces), of which 500 will be crossed by pipeline construction using dry crossing techniques (e.g., dam and flume, HDD, or dry ditch). This includes all of the intermittent streams and all but three of the perennial waterbodies. An additional 53 streams will be crossed by access roads or will be adjacent to the project. The pipeline crossings of Owego Creek and Nanticoke Creek will be in areas where there has been severe erosion, which may require restorative work outside construction workspaces. Millennium filed site specific plans addressing how these areas will be restored after construction. Millennium proposes to cross Wallkill River by a dam and flume, but if water flow is too high, it may use an HDD as a contingency plan.

274.    Due to the potential presence of federally endangered Indiana bats in some parts of its project area, Millennium will conduct tree clearing between October 1 and March 30. Millennium will install equipment bridges across waterbodies to facilitate this activity. The NYSDEC informed us that it may require a variance from the section 401 Water Quality Certificate for this activity, since this timing will conflict with the waterbody construction timing window.[141] Environmental condition 25 requires Millennium to provide, prior to construction, the milepost locations of the waterbodies that will be included in the section 401 variance request.

275.    The NYSDEC requested that Millennium investigate the feasibility of crossing Catharine Creek by HDD. The NYSDEC identified Catharine Creek as the highest quality trout stream in western New York and that, along with the NYSDEC-regulated

---

[141] The construction timing windows for coldwater fisheries are from June 1 through September 15 and coolwater and warmwater fisheries are from June 1 through November 30.

Docket No. CP98-150-006, et al.                                                  - 84 -

wetland, is the most sensitive location on the west end of Millennium's project.[142] We believe that Millennium's site specific plans to cross Catharine Creek by HDD are reasonable. Environmental condition 24 requires Millennium to file a plan when an HDD crossing is unsuccessful for review and written approval prior to use of the alternative crossing method, if needed.

276.    The National Park Service, Upper Delaware Scenic and Recreational River (NPS) is concerned about project impacts on the Delaware River and the cumulative impact of multiple waterbody crossings within its drainage basin. Environmental condition 26 requires Millennium keep the NPS informed about the schedule for crossing waterbodies within this area and to update the progress of construction within the Delaware River drainage basin.

277.    As a result of detailed engineering and constructability reviews made subsequent to issuance of the final EIS for Millennium's original proposals and our draft supplemental EIS, Millennium proposes to change crossing methods for 231 waterbodies. Most of the changes involve the substitution of a type of dry-ditch crossing method, rather than the method identified previously. Only a few of the changes in the construction methodology were substantive in nature. Millennium also consulted with the NYSDEC, COE, FWS, The Nature Conservatory, and Trout Unlimited regarding the crossing methods for the larger or more sensitive waterbodies to develop the most appropriate crossing method that will have a high degree of successful completion. On July 31, 2006, Millennium filed site specific plans for crossing several of these waterbodies. We addressed the use of these plans in the final supplemental EIS and concluded that the plan's use is reasonable. Because the NYSDEC and COE have been consulted and requested these changes, we expect that they will approve the plans as part of their permitting processes.

278.    EPI's construction will cross 111 waterbodies, including 50 perennial waterbodies, of which 48 will be crossed using dry crossing techniques. EPI will cross 61 intermittent waterbodies during no flow periods or will employ dry crossing methods. An additional five waterbodies will be crossed by access roads. At the request of the NYSDEC, EPI is conducting engineering analyses concerning the feasibility of crossing Ganargua Creek by HDD and examining proposed crossings of the Canandaigua outlet and Keuka Lake outlet by HDD, but has not yet completed its engineering review. EPI is also investigating the feasibility of crossing Shequaga Creek with a bore. Environmental conditions 32 and 33 require that EPI complete these analyses and file site specific plans

---

[142]  The COE concurs with the NYSDEC's request.

Docket No. CP98-150-006, et al.                                                    - 85 -

for the crossings prior to construction. The pipeline crossings at Glen Creek and Townsend Creek are known to be areas where there has been severe erosion, which may require restorative work outside construction workspaces. Environmental conditions 34 and 35 require EPI to develop plans addressing how these areas would be restored after construction and to file the plans for this work prior to construction.

279.    Algonquin's pipeline replacement project will cross 10 surface waters, of which one (Mahwah River) is perennial. Algonquin filed a site-specific crossing plan for the Mahwah River and associated wetlands. The meandering Mahwah River has moved over Algonquin's two pipelines within the permanent right-of-way. Algonquin has requested approval from the Commission, COE, and NYSDEC to permanently relocate a section of the Mahwah River channel by about 30 feet to the south to prevent scour over the pipelines. Algonquin contends that this will facilitate construction, minimize construction impacts to the river, and allow Algonquin to restore and maintain cover over the two pipelines in the future. We believe that Algonquin's plan is acceptable, since it addresses the issue of constructing its pipeline at this location and anticipates the possibility of continued meandering of the Mahwah River channel which may affect pipeline operation in the future. However, Algonquin must receive approval from the COE and NYSDEC for this modification. Those decisions are pending.

280.    Algonquin requested variances from sections V.B.2.a. and VI.B.1.a. of the Procedures so that it may place extra workspaces within the 50-foot-wide setback from waterbodies and wetlands. Algonquin provided specific locations where it will use the variances. Environmental condition 43 approves the request at the identified locations only and requires Algonquin to file, prior to construction, site specific plans showing all construction workspaces where the variance is used.

281.    In its November 15, 2006 comment letter, the DOI recommends that the applicants survey waterbody contours prior to clearing and construction in order to ensure that streams are restored to a stable pattern, profile, and dimensions. The DOI asserts that the applicants should restore contours of temporarily disturbed waterbodies to as close to pre-construction conditions as practicable.

282.    We will require the applicants to restore waterbodies to pre-construction conditions in a manner that is consistent with section V.C. of the Procedures. This includes stabilizing the stream banks and restoring the waterbody to as close as practicable to the pre-construction contour. The applicants' environmental construction measures (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) include measures consistent with section V.C. of the Procedures.

Docket No. CP98-150-006, et al.                                    - 86 -

### 6.    Wetlands

283.    According to field delineations and reviews of national wetland inventory maps, the NE-07 project facilities will cross approximately 674 wetlands (a crossing length of 28.2 miles), affecting an estimated 185.6 acres during construction. Included in this total will be approximately 30 crossings of NYSDEC-regulated freshwater wetlands (a total crossing length of 3.1 miles), affecting about 25.7 acres during construction. Construction of the aboveground facilities for the NE-07 project components will convert a total of 0.1 acre of wetland to developed land. In addition, Millennium will permanently fill 13 small wetlands within its permanent right-of-way, impacting 0.26 acre of wetland.

284.    The primary effect on wetlands from pipeline construction will be the temporary and permanent conversion of palustrine forested wetlands (PFO) to non-forested wetland within the pipeline right-of-way and other temporary workspaces. The applicants will clear approximately 31.7 acres of PFO (including mixed PFO and other wetland types), of which approximately 21.3 acres will be permanently converted to palustrine emergent marsh wetlands and scrub shrub wetlands within the permanent right-of-way. The remaining 10.4 acres of PFO will be allowed to revert to forested wetland, representing a long-term impact as it will take over 25 years to re-establish forest vegetation. The applicants minimized potential impacts on PFO by routing the pipeline facilities within or adjacent to existing cleared rights-of-way for a significant percentage of the project's total length. Generally, following an existing right of way corridor through forested areas is preferable to establishing a new corridor, since a portion of the cleared corridor can be used for some of the construction and permanent right-of-way. Further, the COE required Millennium, EPI, and Algonquin to develop wetland mitigation plans that address compensation for the loss of permanent forested wetlands and for restoration of forested wetlands affected by clearing temporary workspaces.

285.    On December 4, 2006, in response to an October 13, 2006 site visit to the 4.8-mile-long pipeline right-of-way in Rockland County, Algonquin filed supplemental information, including correspondence with the COE and NYSDEC, regarding wetland impacts. Based on agency consultation, Algonquin proposes to reduce the size of additional temporary workspaces to eliminate impacts to forested wetlands in wetlands 02, 03, 04, and 07. However, depending on the final plan for the crossing of these waterbodies, forested wetland impacts will not be completely eliminated in wetland 01 or during the crossing of the Mahwah River. Algonquin indicates that it has not finalized the plan for crossing the Mahwah River, since it is still negotiating with the affected landowner. Since this plan may differ from the plan filed with the Commission, we will add environmental condition 56 to this order:

Docket No. CP98-150-006, et al.                                    - 87 -

> Prior to construction, Algonquin shall file with the Secretary, for review
> and written approval of the Director of OEP, the final site-specific plan for
> crossing the Mahwah River developed in consultation with the COE,
> NYSDEC, and the affected landowner(s).

286.   Further, Algonquin contends that it eliminated impacts for forested wetlands at the
Oxford compressor station.  Originally, construction would have impacted an estimated
0.5 acre of forested wetland associated with wetland 01 at this site.  Algonquin modified
its workspace requirements to eliminate this impact.

287.   There will be minimal, short-term effects on palustrine emergent marsh wetlands
and scrub shrub wetlands within temporary workspaces and the permanent right-of-way,
as these areas will be allowed to revegetate naturally and will be restored in vegetative
cover similar to that found prior to construction.  If seeding is used in wetland areas, the
seed mix will contain native plant species.  Consistent with section VI.C.4 of the Plan,
wetland restoration plans will include measures for re-establishing herbaceous and/or
woody species, controlling the invasion and spread of undesirable exotic species (*e.g.*,
purple loosestrife and phragmites), and monitoring the success of the revegetation and
weed control efforts.  The success of restoration will be monitored for at least three years.
If revegetation is not successful at the end of three years, the applicants will need to
develop and implement (in consultation with a professional wetland ecologist, the COE,
or the NYSDEC, as appropriate) a remedial plan to actively revegetate the wetland.

288.   We understand that the COE may require wetland mitigation and compensation
for loss of forested wetlands as part of the permit the COE will issue to the applicants.
Environmental conditions 37 and 46 require that EPI and Algonquin, respectively,
consult with the COE about wetland mitigation and compensation, consistent with the
preliminary plans proposed by Millennium, and file the final version of the wetland
mitigation and compensation plans with the Secretary.  Millennium already agreed to do
this.

289.   In its November 15, 2006 comment letter, the DOI recommends that the applicants
survey wetland contours prior to clearing and construction in order to ensure that the
wetlands are restored to pre-disturbance hydrological conditions.  The DOI contends that
all wetlands should be delineated prior to construction.

290.   The applicants will delineate wetlands prior to construction in a manner consistent
with section VI.A.1 of the Procedures.  The applicants will restore wetlands consistent
with section VI.C of the Procedures following construction, which also indicates that
wetland hydrology should be maintained.  Section VI.B.2.a. requires the applicants to
comply with COE permit terms and conditions.  Further, the adequacy of the restoration

Docket No. CP98-150-006, et al.                                      - 88 -

of wetland hydrology is reflected in the success of wetland revegetation, which will be monitored for at least three years after construction. We believe that impacts on wetlands will be minimized, if the NE-07 project is constructed in accordance with the construction and restoration measures identified by each applicant in its environmental construction plan (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) and SPCC Plan, as supplemented with the COE-approved mitigation plans and the environmental conditions contained in this order.

### 7.    Vegetation and Wildlife

291.    The construction and operation of the NE-07 project will result in the temporary and permanent alteration of wildlife habitat and have a direct impact on wildlife through disturbance, displacement, and mortality. The clearing of forest for construction and operation of the pipeline and aboveground facilities will result in a change of forested wildlife habitats to herbaceous and shrub habitat types. Construction of the project will permanently affect approximately 439.4 acres of upland forest within the permanent right-of-way and approximately 14.0 acres of forest within aboveground facility sites. After construction, the temporary construction right of way and extra work areas in previously forested areas will be allowed to revegetate naturally and will eventually return to pre-construction conditions.

292.    Within the permanent right-of-way, the applicants will convert forested areas from forest habitat to herbaceous and shrub cover for the operation of the pipeline facilities. Specifically, Millennium will convert approximately 367.8 acres, EPI will convert approximately 81.0 acres, Algonquin will convert approximately 5.2 acres, and Iroquois will convert approximately 2.9 acres.

293.    The New York Natural Heritage Program (NYNHP) identified nine significant natural communities near Millennium's proposed facilities, including the Line A-5 replacement project within Harriman State Park. Millennium's construction plans in these areas were developed with the PIPC to minimize impacts to park resources and are described in the EM&C Plan for Harriman State Park. The NYNHP has not yet responded about potential significant natural communities near Iroquois' Dover compressor station. However, since this is an existing compressor station and the new facilities will be constructed in maintained spaces within and adjacent to the existing facility, we do not anticipate impact to significant natural communities in that area.

294.    The Algonquin pipeline replacement component of the project, the Ramapo station, the Stony Point compressor station, and the Hudson River valve site are in the New York-New Jersey Highlands, an area designated by New York as a Significant Habitat Complex of the New York Bight Watershed. However, all activities and

Docket No. CP98-150-006, et al.                                        - 89 -

facilities that will be constructed within the New York-New Jersey Highlands will occur along existing rights-of-way or at existing aboveground facilities. Thus, we do not anticipate any significant impacts to the wildlife of this significant habitat complex as a result of the project.

295.    We believe that potential impacts on wildlife have been reduced to a level that is not significantly adverse, due to the routing of the pipeline facilities within or adjacent to existing cleared rights-of-way and the adoption of restoration procedures that will promote revegetation of temporary work areas to approximate pre-construction habitat conditions. In addition, vegetation maintenance procedures during operation of the NE-07 project components include limitations on the timing and frequency of mowing and other activities to maximize opportunities for general wildlife and avian species to use the habitat, while allowing for operation of the pipeline and aboveground facilities.

### 8.    Fisheries

296.    The final EIS for the original Millennium project included a description of potential impacts to fisheries. Millennium's proposed route modifications herein, including the NYSEG and Warwick Isle route variations, will not affect the previously reported scope of potential fishery impacts or the mitigation measures proposed by Millennium or required by the Commission in its Interim Order and the 2002 *Millennium Order*.

297.    In regard to the Neversink River, Millennium now proposes to use a 7.1-mile-long segment of Columbia's existing 24-inch diameter Line A-5 pipeline for the river crossing, rather than attempting a crossing of the Neversink River, as originally proposed. This will avoid any impacts to fisheries or other aquatic resources in the Neversink River. Most of the streams in the Columbia Line A-5 replacement portion of the project are identified by the NYSDEC as coolwater or warmwater fishery streams, while the Ramapo River and Stony Brook are classified as coldwater fishery streams. The two Ramapo River channels will be crossed using the HDD crossing method and Stony Brook will be crossed using a dry crossing method.

298.    EPI's construction will cross 47 perennial streams classified as warmwater fisheries and three coldwater fisheries. Algonquin's pipeline replacement project will cross the Mahwah River, which supports both warmwater and coldwater fisheries, and an additional nine intermittent waterbodies that support only warmwater fisheries. There will be no impact on fisheries due to construction or operation of Iroquois' facilities.

299.    The construction impacts to fishery resources will include temporary habitat alteration and substrate disturbance at the site of the pipeline installation across

Docket No. CP98-150-006, et al.                                                    - 90 -

waterbodies. In addition, some invertebrates will likely be lost at the immediate waterbody crossings. The applicants propose a waterbody crossing method for each waterbody crossing. The COE and the applicable state permitting agencies are reviewing these proposals as part of the required federal and state permitting processes. The use of HDDs and dry-ditch crossing methods will reduce or eliminate downstream turbidity and sedimentation resulting from construction activities. When successful, HDD crossings will have no in-stream and fisheries impacts. Dry crossing techniques and the use of specified construction timing windows will minimize impact on water quality and will avoid interruption of spawning runs at waterbodies. The operation and routine maintenance of the project facilities will not adversely affect fishery resources.

300.    We believe that implementing the Procedures, as well as the measures identified by each applicant in their environmental construction plans (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) and SPCC Plans, will minimize impacts on fisheries resources.

## 9.    <u>Endangered and Threatened Species</u>

301.    To comply with the requirements of section 7 of the Endangered Species Act, we conducted informal consultation with the FWS and the NMFS regarding the presence of federally-listed or proposed endangered or threatened species and their critical habitats in the project areas. A total of six federally listed endangered or threatened species were considered as potentially occurring in the vicinity of the project facilities. The species include the endangered Indiana bat, shortnose sturgeon, and dwarf wedge mussel. The threatened species include the bald eagle, bog turtle, and Leedy's roseroot. The final Biological Assessment for the NE-07 project is in the final supplemental EIS.

302.    The FWS indicated that suitable summer habitat for the Indiana bat might be present in the vicinity of the NE-07 project. At the request of the FWS, Millennium conducted field surveys in 2005 to assess potential effects of the project on the Indiana bat in Orange and Rockland Counties. Millennium captured fifteen Indiana bats during mist netting surveys including reproductive adult females, adult males, and juveniles. Radiotelemetry studies on the bats captured by Millennium identified 11 roosts, including maternity roosts, in nearby habitat outside the project construction areas. No known bat roosts exist within the project right-of-way. However, Millennium will remove some potential Indiana bat roosting habitat during construction. Considering that the pipeline is a linear project and will be constructed along an existing cleared right-of-way, we estimate this impact to be an insignificant portion of the overall suitable habitat available in the vicinity of the project. We determined that Millennium's proposals may affect, but is not likely to adversely affect, the Indiana bat if tree clearing for construction is limited to the period between October 1 and March 30. This is the only period in which

Docket No. CP98-150-006, et al.                                      - 91 -

Millennium may clear trees or conduct future maintenance activities which might require tree pruning or clearing.[143] If Millennium must clear trees outside this construction window, it should employ the services of a qualified bat scientist to investigate trees or conduct other surveys, as may be recommended by the FWS, for the presence of Indiana bats, or both, to avoid a take of bats.[144]

303.   A known Indiana bat hibernaculum exists within six miles of Algonquin's Hanover compressor station in Morris County, New Jersey. Suitable habitat may occur near Algonquin's Stony Point compressor station and the pipeline replacement project in Rockland County and the Southeast compressor station in Putnam County. Limited clearing of suitable summer roosting, maternity, and foraging trees in these project areas could affect the Indiana bat if it occurs during bat activity periods. Algonquin completed field surveys of the project locations identified as potential habitat in May and August of 2006. Based on the executive summary of a report filed by Algonquin on July 31, 2006, no Indiana bats were found. On September 26, 2006, Algonquin filed a report entitled, *"2006 Summer Mist Net Survey for the Federally-Endangered Indiana Bat on the Algonquin Ramapo Expansion Project."*[145] Algonquin states that it captured 227 bats representing six species, but none of the captured bats were from a federally threatened or endangered species, and no Indiana bats were captured in any project area.

304.   On December 4, 2006, Algonquin filed supplemental information about Indiana bats and the Hanover compressor station. Algonquin asserts that subsequent to filing its survey report, the New Jersey field office of the FWS informed Algonquin that an individual immature Indiana bat had been documented during a separate mist survey at the adjacent Morristown Municipal Airport. Algonquin consulted with the FWS during a site visit to the Hanover compressor station. As a result of this consultation, Algonquin proposes to incorporate additional conservation measures into the site construction plan to reduce the amount of upland forest that will be cleared at this location, reducing the impact on potential roosting habitat for Indiana bats. Originally, Algonquin estimated that about 7.83 acres of upland forest would be cleared for construction, but it has reconfigured its workspace and reduced the amount of forest clearing to about 2.16 acres. Algonquin states that it will identify and flag potential roost trees prior to clearing

---

[143] *See* environmental condition 27.

[144] The FWS' comments about impacts on Indiana bats along Millennium's portion of the project are pending.

[145] This document was not available prior to sending the final supplemental EIS to the printer.

Docket No. CP98-150-006, et al.                                      - 92 -

activities to avoid and preserve these trees. This will occur in areas close to proposed staging areas in the northwest portion of the property and along the gravel access road from Park Avenue eastward along the fence line of the existing compressor station site. Further, Algonquin contends that it will limit tree clearing to the October 1 through March 30 timing window.

305.    Algonquin's reduction in land requirements in upland forest at the Hanover compressor station will minimize impacts on potential Indiana bat roosting trees and its commitment to conduct tree clearing only during the timing window at this location will avoid direct impacts to Indiana bats that might be using the trees for roosting during other time periods. While preliminary results indicate that no Indiana bats were found in other project areas, potential Indiana bat habitat may be affected by construction. For this reason, environmental condition 44 which requires Algonquin to clear trees in the areas surveyed for Indiana bats only between October 1 and March 30, pending comment by the FWS, should remain unchanged.[146]

306.    The FWS commented that impacts to the Indiana bat will be unlikely in EPI's project areas, since Indiana bat habitat does not appear to be within the vicinity of EPI's project components. We concur with this conclusion.

307.    The NYSDEC determined that the shortnose sturgeon potentially occurs in the vicinity of Algonquin's Hudson River valve site. However, the modifications to the Hudson River valve site will not involve any in-water activities in the Hudson River, nor will any of the project components result in any temporary or permanent disturbances to the Hudson River. Algonquin initially proposed using the Hudson River as the source for hydrostatic test water, which means it would place intake hoses into the river. The COE commented that intake hoses installed in navigable waters may be a section 10 regulated activity and there may be an unknown impact on the federally endangered shortnose sturgeon. Subsequently, Algonquin stated that it will not use the Hudson River as a supply source for hydrostatic test water and that it will find an alternative water supply source.

308.    The original Millennium project involved construction across the Haverstraw Bay portion of the Hudson River affecting shortnose sturgeon. Since the NE-07 project will not involve any construction in the bay, in a September 19, 2006 letter, the NMFS concurs with our determination that this project is not likely to adversely affect any listed

---

[146] The FWS' comments about impacts on Indiana bats along Algonquin's portion of the project are pending.

Docket No. CP98-150-006, et al.                                    - 93 -

species under its jurisdiction, including the shortnose sturgeon. Further, because of the change to the project since it was proposed, the NMFS states that the September 14, 2001 Biological Opinion it issued for the original Millennium project is invalid. Due to this letter, our consultation with the NMFS concluded.

309.   The dwarf wedge mussel occurs in the Neversink River in Orange County. Millennium does not propose to replace a segment of Columbia's existing 24-inch diameter Line A-5 pipeline that crosses the Neversink River in order to avoid any construction in the vicinity of the river. Based on this proposed alternative, we concluded that the Millennium's proposal will not adversely impact the dwarf wedge mussel.[147]

310.   The NYNHP indicated that Millennium's project will cross five known bald eagle nesting or wintering areas. Based on the NYSDEC's statements in the final EIS for Millennium's original proposals, no adverse affects on bald eagles are expected at four of those activity areas, because there are no known nests within a half mile of the project and the closest known nest is about 3,000 feet from the project. The NYSDEC requested that there be no construction in areas adjacent to the Mongaup River/Rio Reservoir area between December 1 and July 31 to avoid the nesting and overwintering periods in this bald eagle activity area. Millennium and the FWS agreed to construct the crossing of the Mongaup River between October 15 and November 30.

311.   There may be limited impact on eagles, if blasting is required in designated bald eagle activity areas that are used for nesting and winter habitats near the Mongaup River/Rio Reservoir near MP 330.0. Thus, environmental condition 29 requires Millennium to consult with FWS and the NYSDEC to develop a bald eagle activity area construction plan to address blasting in activity areas. Further, environmental condition 30 requires Millennium to consult with the NYSDEC and FWS at least one month prior to the start of construction to get an update on any additional nests that may have been found in the project area. With implementation of our recommended mitigation, we conclude that the proposed action would not adversely affect or jeopardize the continued existence of the bald eagle.[148]

312.   The FWS indicated that the bog turtle is known to occur in the vicinity of Millennium's proposed construction in Orange County and requested that a Phase I Habitat Assessment survey be conducted to determine if suitable habitat existed for the

---

[147] FWS' comments on the impact to the dwarf wedge mussel are pending.

[148] FWS' comments on the impact to the bald eagle are pending.

Docket No. CP98-150-006, et al.                                    - 94 -

species. Millennium conducted its Phase I bog turtle habitat surveys in the spring and fall of 2005 and in April and May 2006. Of the 96 wetlands surveyed in 2005 and 2006, three wetlands contain potential bog turtle habitat. One wetland exhibits suitable habitat within two breached manmade ponds. The landowner may rebuild the ponds. If this occurs, the wetland would no longer offer suitable habitat for the species. Also, this wetland is in an area of Orange County where no known bog turtle populations occur and that is lacking suitable surrounding habitat. Thus, the site is likely temporary and it is unlikely to contain bog turtles. The second wetland may contain suitable bog turtle habitat, but the vegetation consists primarily of the common reed (*Phragmites australis*), an invasive plant species, whose habitat is not used by the bog turtle due to the lack of basking and nesting habitat. In addition, this wetland is located near the summit of Pound Mountain, an area that is likely inaccessible to the species due to steep slopes and rough, rocky terrain. For this reason, the site is unlikely to contain bog turtles. The third wetland with suitable bog turtle habitat is adjacent to the project construction area and is separated from the right-of-way by a rock wall. Environmental condition 28 requires Millennium to install turtle exclusion fencing during the bog turtle window of activity (April 15 to October 31) along the wetland identified as potential bog turtle habitat, to employ a bog turtle monitor to be on hand when construction coincides with the bog turtle window of activity, to conduct a daily pre-construction survey of the project site, and to provide daily monitoring and relocation of bog turtles to suitable habitat outside the construction area when necessary. If this mitigation is used during construction, we conclude that the bog turtle is unlikely to be adversely affected by construction of Millennium's project.

313.   Algonquin conducted a Phase I Habitat Assessment survey of all areas of potentially suitable bog turtle habitat at the pipeline replacement corridor, Stony Point compressor station, Southeast compressor station, and Oxford compressor station project areas. Algonquin found no suitable habitat at the Oxford compressor station site, some marginal wetland habitat along the pipeline replacement corridor and near the Southeast compressor station, and marginal bog turtle habitat was located both on and adjacent to the Stony Point compressor station. In a January 11, 2006 letter, the FWS concurred with the survey findings for the Oxford compressor station site.[149] Due to the marginal nature of the habitat at the Southeast compressor station and the pipeline replacement area, it may be unlikely that the project will adversely impact the bog turtle at these sites. No wetlands will be directly impacted or disturbed during construction and modifications to the Stony Point or Southeast compressor station. Nevertheless, due to the fact that

---

[149] FWS' comments on the impact of Algonquin's project on bog turtles at other locations are pending.

Docket No. CP98-150-006, et al.                                             - 95 -

possible habitat was found nearby, Algonquin proposed bog turtle avoidance measures for these two compressor stations. In these measures, Algonquin agreed to install turtle exclusion fencing and to assign a biological monitor to survey for the presence of turtles prior to and during the initial clearing and site preparation required for the staging areas. The biological monitor will inspect the sites periodically during the construction phase of the project to provide oversight for the construction crews, as needed. For these reasons, we conclude that construction and operation of Algonquin's proposals will not adversely affect the bog turtle.

314.    In October 2001, Iroquois conducted field surveys for bog turtles at the Dover compressor station and located potential bog turtle wetland habitat. However, the construction workspace would be at least 300 feet away from the wetland. Thus, we find that Iroquois' proposals will be unlikely to adversely affect the bog turtle.[150]

315.    The FWS indicated that Leedy's roseroot occurs along the face of shale cliffs approximately two miles from portions of EPI's proposed construction. Nevertheless, the FWS believes that the proposed work will not adversely affect Leedy's roseroot, provided that the project activities avoid disturbance of any adjacent cliff vegetation. Because no cliff areas were observed at EPI's project areas and no disturbance of suitable cliff vegetation will occur, we conclude that Leedy's roseroot is unlikely to be adversely impacted by EPI's proposals.

316.    On July 31, 2006, Millennium filed a minor route variation to avoid impacts to one identified timber rattlesnake den and its associated habitat, stating that it will implement the previously agreed-to avoidance and mitigation measures for rattlesnake den sites. Millennium developed this route variation in consultation with the NYSDEC to minimize impacts on this New York state-listed threatened species. In addition, a NYSDEC rattlesnake expert will assess the site to determine if further avoidance measures may be necessary. Algonquin states that it will have a rattlesnake monitor on hand during construction of various components of its project as recommended by the NYSDEC.

        **10.    Land Use**

317.    Generally, Millennium's and EPI's pipelines will be installed within a 75-foot-wide right-of-way, of which 50 feet will be maintained for operation. The Algonquin pipeline replacement project will use a 100-foot-wide construction right-of-way, which

---

[150] The FWS comments on the impact of Iroquois' project in New York are pending.

Docket No. CP98-150-006, et al.                                            - 96 -

includes an existing 75-foot-wide permanent easement for operation. The construction of the applicants' pipelines and aboveground facilities will directly disturb approximately 3,461.1 acres of land for the construction rights-of-way, extra work areas, and aboveground facilities. Following construction, the applicants will retain 1,683.5 acres of permanent right-of-way for operation of the pipelines and associated aboveground facilities.

318.   The applicants will construct approximately 212.3 miles of pipeline adjacent to or within existing rights-of-way. The remaining 52.2 miles of pipeline will be constructed on new rights-of-way. The new right-of-way segments will be distributed throughout the length of the NE-07 project and will be incorporated into the proposed route because of topography, engineering, or residential constraints.

## 11.   Residential Areas

319.   There are approximately 173 residential structures within 50 feet of the construction work areas. The Sterling Forest State Park/Laurel Ridge alternative will avoid five of these residences. The Warwick Isle route variation and the Ramapo River HDD variation will avoid planned residential communities. Each applicant will implement mitigation measures contained in its environmental construction plans (Millennium's ECS, EPI's ESCAMP, and Algonquin's E&SCP) during construction in residential areas or will use the Plan (Iroquois). These measures will include fencing the construction work area, preserving mature trees and landscaping, reducing the construction work areas as necessary to maintain 25 feet between the residence and the work area (where feasible), using drag section or sewer line construction techniques to install the pipeline, and restoring residential properties immediately after backfilling the trench. Environmental condition 13 requires Millennium, EPI, and Algonquin to update the list of residences within 50 feet of the construction right-of-way prior to construction. Environmental condition 14 requires Millennium, EPI, and Algonquin to file site specific plans for construction within 25 feet of any residence. We find that use of the mitigation measures in the environmental construction plans will minimize temporary impacts due to construction, when construction activities are near residences.

## 12.   Recreation and Public Interest Areas

320.   Millennium's pipeline will cross Soaring Eagle/Mark Twain State Park, Sterling Forest State Park, Harriman Forest State Park, Kakiat County Park, and the Appalachian

Docket No. CP98-150-006, et al.                                   - 97 -

Trail.[151]  The pipeline will also cross campgrounds, church grounds, and private shooting ranges.  After the draft supplemental EIS was issued, the Harwood Club filed comments opposing the project, since the project might affect the use of its properties in Orange and Sullivan Counties for hunting, fishing, and other recreation.  The final supplemental EIS addressed the Harwood Club's questions about pipeline construction and impacts on wildlife.  Also, Millennium states that it will work with recreational property owners, which includes the Harwood Club, to minimize impacts to recreational use of property.  We conclude that there will be minimal impact on recreation and public interest areas due to effective routing, use of existing corridors, minimizing width of construction rights-of-way, timing of construction activities based on consultations with the appropriate local government and owner representatives, and post-construction restoration.  Millennium will use the EM&CP it developed in consultation with the PIPC to mitigate environmental impacts due to construction in Sterling Forest State Park and Harriman Forest State Park.

321.    Algonquin will consult with the PIPC about construction in Harriman State Park and with the Rockland County Division of Environmental Resources about construction in Kakiat County Park.  Environmental condition 48 requires Algonquin to file the results of this consultation with the Secretary prior to construction.

### 13.    Coastal Zone Management Consistency

322.    The construction areas for Algonquin's Hudson River valve site modification will be within New York's Coastal Zone Management Boundary.  The NYSDOS determined that Algonquin's project meets its general consistency concurrence criteria and that no further review of the proposed activity will be required.[152]  No other project construction would affect coastal zone areas.

### 14.    Visual Resources

323.    Approximately 212.3 miles (80 percent) of the proposed pipeline construction will be adjacent to existing rights of way or in roads, reducing the need to establish new utility corridors.  The expansion of existing corridors may result in visual impacts, particularly in areas where existing vegetation provides screening of powerline rights-of-way from

---

[151] We addressed the crossing of the Appalachian Trail in the final EIS for Millennium's original proposals.  That discussion is incorporated by reference.

[152] NYSDOS' General Concurrence was dated March 15, 2006.

Docket No. CP98-150-006, et al.                                                                - 98 -

nearby residences. To mitigate for this visual impact, the applicants will minimize clearing of trees and vegetation that provide important visual screening of an existing right of way from adjacent residences. Where screening must be removed for safety considerations, the applicants will plant fast growing trees or shrubs within temporary work areas between a residence and an existing right-of-way.

324. Aboveground facilities will result in various visual impacts. Millennium will construct its Corning compressor station adjacent to an existing compressor station that is already a dominant visual element. The modifications to Algonquin's existing compressor station sites will not significantly change visual impacts. EPI will construct its proposed Oakfield compressor station on agricultural and open lands. The construction will change the viewshed of the residents who live nearby. This impact may be substantial to these residents, but it will be minimized and partially obscured by topography. EPI will consider additional screening to mask the facility. Algonquin will construct its proposed Oxford compressor station within an area that will be obscured from the viewsheds by forest.

325. Iroquois' proposed construction at the Brookfield compressor station will be adjacent to existing aboveground natural gas facilities. The property and the surrounding area are also visually affected by the cleared 90-foot-wide Algonquin pipeline right-of-way, the cleared 50-foot-wide Iroquois pipeline right-of-way, a powerline right-of-way, and a railroad. The new facilities will be viewed together with these existing features. Iroquois will retain the wooded buffer along High Meadow Road and the 68.3-acre property is mainly covered with forested areas, which will be retained during operation of the facility. These forested areas will partially screen the facility. The buildings Iroquois will construct to house the new facilities and to minimize visual impact will be "barn-like" and similar in architecture to other buildings in the general area. If needed, Iroquois will also minimize lighting and develop additional landscaping.

326. We have not identified any visual affects to State or National Register of Historic Places eligible or potentially eligible properties. Thus, no additional mitigation measures are required.

### 15.    **Cultural Resources**

327. The applicants filed with the Commission and the state historic preservation offices (SHPOs) cultural resource survey reports covering approximately 245.6 miles (93 percent) of the pipeline routes and extra work areas including access roads, pipe storage/contractor yards, compression station properties, and measuring stations. Approximately 8.8 miles along the Millennium's route and 9.6 miles along EPI's route have yet to be surveyed due to denial of access. No areas remain to be surveyed for

Docket No. CP98-150-006, et al.                                              - 99 -

Algonquin's or Iroquois' proposals. The New York and Connecticut SHPOs commented on the reports and made recommendations for additional work to several specific components of the projects. We concur with the SHPOs' recommendations. Because additional surveys and testing are still required and final determinations of eligibility and effect have not been made for this project, we anticipate executing a programmatic agreement with the New York State Historic Preservation Officer and the Advisory Council on Historic Preservation for construction in New York. Also, we recommend that construction be deferred until cultural resource surveys, testing, and any required mitigation plans have been completed and the reports filed, along with the SHPOs' comments, as appropriate.

### 16.   Air and Noise

328.    We identified no significant short- or long-term impact on air or noise quality that will result from construction and operation of the NE-07 project. We anticipate that the project will meet all applicable federal, state, and local air quality and noise regulations. The applicants will comply with the Clean Air Act's[153] state improvement plan and the timely attainment of the national ambient air quality standards. With the implementation of the recommended mitigation measures, we find that sound levels attributable to the project will be adequate to protect human health and welfare with an adequate margin of safety.

329.    Algonquin, Millennium, EPI, and Iroquois cumulatively propose the construction of four new compressor stations, the modification and/or upgrading of four existing compressor stations, and the construction of approximately 265 miles of pipeline and related facilities. During operation, the compressor stations will emit varying quantities of criteria pollutants. However, the combustion of natural gas produces significantly lower emissions when compared to the combustion of coal or oil. One of the project's primary goals is to increase the availability and use of natural gas as opposed to other traditional fossil fuels.

330.    To address the Clean Air Act general conformity rule, we performed an applicability analysis to determine if a formal conformity determination must be completed. Since the emissions from the project construction and operation will be below the applicability threshold and will not be regionally significant, we determined that a formal conformity determination was not required.

_____

    [153] 42 U.S.C. § 7401-7671q.

Docket No. CP98-150-006, et al.                                    - 100 -

331.    Several components of the new and modified compressor stations, as well as construction associated with the project, will generate noise.  The compressor station components generating noise include, but will not be limited to:  the turbine, compressor, turbine exhaust and ducting, aboveground piping, lube oil coolers, gas after coolers, air intake systems, air handling units, and blowdown equipment.  The use of noise control measures for the compressor stations and associated equipment will be necessary to reduce the potential impact to surrounding areas and ensure compliance with federal, state, and local regulations.  Noise control measures that have been evaluated and will be incorporated where necessary include, but will not be limited to:  the use of appropriate building materials, installation of muffler systems, use of acoustical pipe insulation, and the installation of air intake and blowdown silencers.  Environmental conditions 31 (Millennium), 38 (EPI), 49 and 50 (Algonquin), and  53 and 54 (Iroquois) require that the noise levels of the new and modified compressor stations not exceed a day-night sound level (Ldn) of 55 standard A weighting curve for sound levels (dBA) at nearby noise sensitive areas (NSAs) when the stations are operated at full load.  We will require the applicants to conduct post-construction noise surveys no later than 60 days after placing the compressor stations in service.  If the surveys show that noise levels exceed an Ldn of 55 dBA at the NSAs, we will require the applicants to install additional noise controls to meet the level within one year of the in-service date of the facilities.

332.    Construction noise will be intermittent and will vary from hour to hour at any single location depending on the equipment in use and the operation being performed.  Since construction will move at about 400 feet per day, the duration of exposure to high noise levels related to construction will be limited to a relatively short period of time at any one location.

## 17.    Reliability and Safety

333.    We have not identified any unacceptable reliability or safety risks associated with the project.  Millennium, Algonquin, Iroquois, and EPI will design, construct, operate, and maintain the pipelines and aboveground facilities in accordance with the DOT's Minimum Federal Safety Standards in 49 C.F.R. Part 192.  These regulations are intended to ensure adequate protection for the public and to prevent natural gas facility accidents and failures.  Part 192 specifies material selection and qualification, design requirements, and protection from internal, external, and atmospheric corrosion.  Pipelines and compressor stations are built in areas of varying population density throughout the United States.  Because avoidance of populated areas is not always possible, the standards in the Federal regulations become more stringent as the human population density increases.  Millennium, Algonquin, Iroquois, and EPI will select contractors to construct the pipeline according to these standards and each company's individual project specific plans.  These facilities will be designed to maintain minimal

Docket No. CP98-150-006, et al.                                    - 101 -

hazard potential to the surrounding area.  Thus, we find that this project does not present a substantial safety risk to the public.

334.    Ms. Supa is concerned about the safety and reliability of Columbia's Line A-5 and the line's ability to provide gas service to the Endicott and Union Center meter and regulating stations.  She notes that gas pressure on Line A-5 will be lowered to 300 psi, but that this is a "feeble and unsafe" attempt to keep the aging Line A-5 in service.

335.    Ms. Supa's comments refer to the continued operation of segments of Line A-5 as laterals for delivery of gas to customers at the two meter and regulating stations.  The operating pressure will be reduced since the laterals will no longer be operated as Columbia's mainline due to the construction of Millennium's pipeline.  Existing service obligations will be maintained at these delivery points via these segments of the old Line A-5 pipeline, so there will be no loss of service.  In its November 29, 2006 supplemental filing, Millennium contends that this pipeline segment has a maximum operating pressure of 702 psig, but that the existing market demand can be met while operating at 300 psig.  Millennium also asserts that future market growth in this area may be accommodated by operating the pipeline segment at higher pressure.  Since all of the pipeline facilities will be operated in compliance with the requirements for operation and maintenance under the DOT's Minimum Federal Safety Standards at 49 C.F.R. Part 192, we find that there is no safety risk to the public.

### 18.    Additional Requirements

336.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  We encourage cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[154]

337.    The applicants shall notify the Commission's environmental staff by telephone or facsimile of any noncompliance identified by other federal, state, or local agencies on the same day that they are notified.  The applicants shall file written confirmation of such notification with the Secretary within 24 hours.

---

[154] *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988); *National Fuel Gas Supply v. Public Service Comm.*, 894 F.2d 571 (2d Cir. 1990); and *Iroquois Gas Transmission System, L.P.*, 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

Docket No. CP98-150-006, et al.                                    - 102 -

338.   At a hearing held on December 21, 2006, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the applications, as supplemented, and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

(A)   The certificate issued in the 2002 *Millennium* Order is amended to permit Millennium to acquire, construct, and operate facilities, as more fully described in the applications to amend in Docket Nos. CP98-150-006, CP98-150-007, and CP98-150-008 and the body of this order.

(B)   The certificate issued in the 2002 *Millennium* Order is amended to permit Millennium to lease capacity from Columbia, as more fully described in the application and in the body of this.

(C)   Millennium's motion to vacate the authorization issued in the Interim Order and the 2002 *Millennium* Order is granted.

(D)   Millennium's proposal for regulatory asset treatment is accepted, subject to the condition that Millennium will not propose to recover any unrecovered costs under the negotiated contracts from any other non-negotiated rates customer and that Millennium will only record regulatory assets to the extent its capacity is subscribed.

(E)   Millennium shall file actual tariff sheets at least 90 days prior to the in-service date of the proposed facilities that reflect compliance with the NAESB standards in effect at that time and the modifications discussed in this order.

(F)   In Docket No. CP06-76-000, a certificate of public convenience and necessity is issued authorizing Algonquin to construct and operate facilities, as described more fully in this order and in the application.

(G)   Algonquin's proposed incremental reservation rate under Rate Schedule AFT-1 is approved.

(H)   Algonquin shall ensure that the fuel use costs for its proposal are the responsibility of the expansion shippers and Algonquin.

(I) Algonquin shall file a tariff sheet consistent with its *pro forma* tariff sheet at least 60 days prior to its proposed effective date.

(J) The certificate issued in the *Iroquois* Order is amended to permit Iroquois to construct and operate facilities, as more fully described in the application in Docket No. CP02-31-002 and the body of this order.

(K) Iroquois' request for pre-approval of rolled-in rate treatment is granted, subject to the conditions described in the body of this order.

(L) The certificate issued in the 2002 *Millennium* Order is amended to permit Columbia to abandon facilities, as more fully described in the applications in Docket Nos. CP98-151-003 and CP98-151-004 and in the body of this order.

(M) The certificate issued in the 2002 *Millennium* Order is amended to permit Columbia to lease capacity from Millennium, as more fully described in the applications and in the body of this order.

(N) Columbia's request for a limited-term certificate, with pre-granted abandonment authority on the in-service date of Millennium's system, is granted.

(O) Columbia's request for waiver of the compliance and reporting requirements for the limited-term certificate is denied.

(P) Columbia is prohibited from submitting a TCRA filing to recover the Account 858 costs associated with the Millennium lease until it submits an NGA section 4 filing to remove the costs of the Line A-5 facilities from its base rates.

(Q) Columbia shall notify the Commission within 10 days of the date of the abandonment of Line A-5.

(R) In Docket No. CP06-5-000, a certificate of public convenience and necessity is issued authorizing EPI to construct and operate the facilities described in this order and in EPI's preliminary determination.

(S) In Docket No. CP06-6-000, a blanket transportation certificate is issued to EPI under Subpart G of Part 284.

(T) In Docket No. CP06-7-000, a blanket construction certificate is issued to EPI under Subpart F of Part 157.

Docket No. CP98-150-006, et al.                                    - 104 -

(U) Empire's section 284.224 blanket certificate is terminated on the in-service date of the proposed connector facilities.

(V) The requests for rehearing and clarification of the preliminary determination issued to EPI are granted and denied, as indicated in the body of the order.

(W) EPI shall file any renegotiated contract containing non-conforming provisions and negotiated rate contract(s) or numbered tariff sheets at least 90 days prior to the commencement of service.

(X) EPI shall file actual tariff sheets at least 90 days before the in-service date of its facilities that reflect compliance with NAESB standards in effect at that time and the modifications discussed in this order.

(Y) The certificates issued in Ordering Paragraphs (A), (F), (J), and (R) are conditioned on Millennium's, Algonquin's, Iroquois', and EPI's compliance, respectively, with all of the applicable regulations under the NGA, particularly the general terms and conditions set forth in Parts 154, 157, and 284, and paragraphs (a), (c), (d), (e), and (f) of section 157.20.

(Z) Millennium, Algonquin, Iroquois, and EPI shall file executed firm transportation contracts with their shippers prior to construction of any authorized facilities.

(AA) Algonquin and Iroquois shall file their negotiated rate contract(s) or numbered tariff sheets as described in the body of this order at least 60 days prior to the commencement of service on their proposed facilities. Millennium and EPI shall file not less than 90 days prior to the commencement of service.

(BB) Millennium and EPI shall make filings within three years after their in-service date justifying their existing recourse rates or proposing alternative rates, as discussed in the body of this order for Millennium and in the preliminary determination for EPI.

(CC) Millennium, Algonquin, Iroquois, and EPI shall maintain separate books, accounts, and records for transportation provided under their negotiated rates and for transportation provided under their recourse rates. Algonquin shall maintain separate books and records for its incremental service.

Docket No. CP98-150-006, et al.                                    - 105 -

(DD)  Millennium's, Algonquin's, Iroquois', and EPI's facilities shall be constructed and made available for service within three years of the date of the order in this proceeding.

(EE)  The certificates issued herein are conditioned on Millennium's, EPI's, Algonquin's, and Iroquois' compliance with the environmental conditions set forth in Appendix C to this order.

(FF)  Millennium, Algonquin, Iroquois, and EPI shall notify the Commission's environmental staff by telephone or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies the applicants herein.  Millennium, Algonquin, Iroquois, and EPI shall file written confirmation of such notification with the Secretary within 24 hours.

(GG)  The untimely motions to intervene by the parties listed in Appendix B are granted.

(HH)  Baltimore Gas' request for a technical conference in Docket No. CP05-19-000 is denied.

(II)  Consolidated Edison's and Orange and Rockland's request for a consolidated technical conference in Docket Nos. RP06-231-002, RP06-365-000, and the NE-07 project is denied.

(JJ)  In all other respects, the Interim Order, the 2002 *Millennium* Order and the *Iroquois* Order shall remain in full force and effect.

By the Commission.

( S E A L )


                              Magalie R. Salas,
                                 Secretary.

Docket No. CP98-150-006, et al.                                                    - 106 -

## Appendix A

Motions to Intervene in Docket No. CP98-150-006

Algonquin Gas Transmission, LLC
City of New York, New York
Columbia Gas Transmission Corporation
Consolidated Edison Company of New York, Inc.
El Paso Eastern Pipeline Group
KeySpan Delivery Companies[155]
Northern Tuxedo Residents' Association
Town of Tuxedo, New York
Woodstone Lakes Development, LLC


Motions to Intervene in Docket No. CP98-150-007

Central Hudson Gas & Electric Corporation
City of New York, New York
Consolidated Edison Company of New York, Inc.
KeySpan Delivery Companies
Northern Tuxedo Residents' Association
Town of Cortlandt, New York
Village of Croton-on-Hudson, New York
Columbia Gas Transmission Corporation


Motions to Intervene in Docket No. CP98-150-008

City of New York, New York
County of Westchester, New York
Town of Cortlandt, New York

---

[155] The KeySpan Delivery Companies consist of KeySpan Energy Delivery New York, KeySpan Energy Delivery Long Island, Boston Gas Company, Colonial Gas Company, EnergyNorth Natural Gas, Inc., and Essex Gas Company.

Docket No. CP98-150-006, et al.                                      - 107 -

Motions to Intervene in Docket No. CP98-151-003

Benson, Lawrence A.
El Paso Eastern Pipeline Group
Orange and Rockland Utilities, Inc.
Town of Tuxedo, New York
Woodstone Lakes Development, LLC

Motions to Intervene in Docket No. CP98-151-004

Orange and Rockland Utilities, Inc.
Proliance Energy, LLC

Motions to Intervene in Docket No. CP05-19-000

Baltimore Gas and Electric Company
Benson, Lawrence A.
Central Hudson Gas & Electric Corporation
Cities of Charlottesville and Richmond, Virginia (joint motion)
City of New York, New York
Darder, Charles
Dougherty, Christopher and Marianna
East Ohio Gas Company d/b/a Dominion East Ohio and Hope Gas, Inc. d/b/a Dominion
    Hope (joint motion)
Freier, Rolf
NiSource Distribution Companies[156]
Northern Tuxedo Residents' Association
Orange and Rockland Utilities, Inc.
Piedmont Natural Gas Company, Inc.
PSEG Energy Resources and Trade LLC
Rockland County Solid Waste Management Authority
Town of Tuxedo, New York
UGI Utilities, Inc.
Virginia Natural Gas, Inc.

---

[156] The NiSource Distribution Companies consist of Columbia Gas of Kentucky, Inc., Columbia Gas of Maryland, Inc., Columbia Gas of Pennsylvania, Inc., and Columbia Gas of Virginia, Inc.

Docket No. CP98-150-006, et al.                                    - 108 -

Motions to Intervene in Docket No. CP06-76-000

Brookfield, Connecticut Board of Education
Central Hudson Gas & Electric Corporation
Consolidated Edison Company of New York, Inc. and Orange and Rockland Utilities,
        Inc. (joint motion)
Empire State Pipeline
Iroquois Gas Transmission System
KeySpan Delivery Companies
Millennium Pipeline Company, L.L.C.
New England Local Distribution Companies
New Jersey Natural Gas Company
New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation
        (joint motion)
Pilot's Mall LLC
PSEG Energy Resources and Trade LLC
Town of Brookfield, Connecticut
Yankee Gas Services Company

Motions to Intervene in Docket No. CP02-31-002

Algonquin Gas Transmission, LLC
Central Hudson Gas & Electric Corporation
Consolidated Edison Company of New York, Inc.
Millennium Pipeline Company, L.L.C.
New Jersey Natural Gas Company
Niagara Mohawk Power Corporation d/b/a National Grid
State of Connecticut
Town of Brookfield, Connecticut

Docket No. CP98-150-006, et al.                                    - 109 -

## Appendix B

Untimely Motions to Intervene in Docket No. CP98-150-006

County of Westchester, New York
Empire State Pipeline
Hartwood Club, Inc.
Mirant NY-Gen, LLC
Town of Cortlandt, New York
Village of Croton-on-Hudson, New York

Untimely Motion to Intervene in Docket No. CP98-150-007

County of Westchester, New York
Hartwood Club, Inc.

Untimely Motion to Intervene in Docket No. CP98-151-003

Mirant NY-Gen, LLC

Untimely Motions to Intervene in Docket No. CP05-19-000

City of New York, New York
Murray, Steve
Northern Tuxedo Resident's Association
Town of Tuxedo, New York

Untimely Motion to Intervene in Docket No. CP06-76-000

Connecticut Siting Council

Docket No. CP98-150-006, et al.                                    - 110 -

## Appendix C

## Environmental Conditions for the NE-07 Project

1.    Millennium, EPI, Algonquin, and Iroquois shall follow the construction
procedures and mitigation measures described in their applications and supplements
(including responses to staff data requests) and as identified in the final supplemental
EIS, unless modified by this order for their respective projects. Millennium, EPI,
Algonquin, and Iroquois must:

    a.    request any modification to these procedures, measures, or conditions in a
          filing with the Secretary;

    b.    justify each modification relative to site specific conditions;

    c.    explain how that modification provides an equal or greater level of
          environmental protection than the original measure; and

    d.    receive approval in writing from the OEP **before using that modification**.

2.    The Director of OEP has delegation authority to take whatever steps are necessary
to insure the protection of all environmental resources during construction and operation
of the projects. This authority shall allow:

    a.    the modification of conditions of the order; and

    b.    the design and implementation of any additional measures deemed
          necessary (including stop-work authority) to assure continued compliance
          with the intent of the environmental conditions as well as the avoidance or
          mitigation of adverse environmental impact resulting from project
          construction and operation.

3.    **Prior to any construction**, Millennium, EPI, Algonquin, and Iroquois shall each
file an affirmative statement with the Secretary, certified by a senior company official,
that all company personnel, environmental inspectors, and contractor personnel will be
informed of the environmental inspector's authority and have been or will be trained on
the implementation of the environmental mitigation measures appropriate to their jobs
before becoming involved with construction and restoration activities for their respective
projects.

Docket No. CP98-150-006, et al.                                    - 111 -

4.     The authorized facility locations shall be as shown in the final supplemental EIS, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of any construction,** Millennium, EPI, Algonquin, and Iroquois shall each file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the order for their respective projects. All requests for modifications of environmental conditions of the order or site specific clearances must be written and must reference locations designated on these alignment maps/sheets.

5.     Millennium, EPI, Algonquin, and Iroquois shall each file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary for their respective projects. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, and documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction** in or near that area.

This requirement does not apply to route variations required herein or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.     implementation of cultural resources mitigation measures;

b.     implementation of endangered, threatened, or special concern species mitigation measures;

c.     recommendations by state regulatory authorities; and

d.     agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

Docket No. CP98-150-006, et al.                                    - 112 -

6.      Within 60 days of the acceptance of this certificate and **before construction** begins, Millennium, EPI, Algonquin, and Iroquois shall each file an initial Implementation Plan with the Secretary for review and written approval by the Director of OEP, describing how they will implement the mitigation measures required by the order for their respective projects. Millennium, EPI, Algonquin, and Iroquois must file revisions to the plan as schedules change. The plan shall identify:

a.      how Millennium, EPI, Algonquin, and Iroquois will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

b.      the number of environmental inspectors assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

c.      company personnel, including environmental inspectors and contractors, who will receive copies of the appropriate material;

d.      what training and instructions Millennium, EPI, Algonquin, and Iroquois will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change), with the opportunity for OEP staff to participate in the training session(s);

e.      the company personnel (if known) and specific portion of Millennium's, EPI's, Algonquin's, and Iroquois' organization having responsibility for compliance;

f.      the procedures (including use of contract penalties) Millennium, EPI, Algonquin, and Iroquois will follow if noncompliance occurs; and

g.      for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

    i.      the completion of all required surveys and reports;

    ii.     the mitigation training of on-site personnel;

    iii.    the start of construction; and

Docket No. CP98-150-006, et al.                                          - 113 -

iv.    the start and completion of restoration.

7.    Millennium, EPI, Algonquin, and Iroquois shall each employ a team (*i.e.*, two or more or as may be established by the Director of OEP) of environmental inspectors per construction spread for their respective projects. The environmental inspectors shall be:

a.    responsible for monitoring and ensuring compliance with all mitigative measures required by the order and other grants, permits, certificates, or other authorizing documents;

b.    responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (*see* condition 6 above) and any other authorizing document;

c.    empowered to order correction of acts that violate the environmental conditions of the order, and any other authorizing document;

d.    a full-time position, separate from all other activity inspectors;

e.    responsible for documenting compliance with the environmental conditions of the order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

f.    responsible for maintaining status reports.

8.    Millennium, EPI, Algonquin, and Iroquois shall each file updated status reports prepared by the lead environmental inspector with the Secretary on a **weekly** basis **until** all construction related activities, including restoration and initial permanent seeding, are complete for their respective projects. On request, these status reports will also be provided to other Federal and state agencies with permitting responsibilities. Status reports shall include:

a.    the current construction status of each spread, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

b.    a listing of all problems encountered and each instance of noncompliance observed by the environmental inspectors during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other Federal, state, or local agencies);

Docket No. CP98-150-006, et al.                                        - 114 -

    c.     corrective actions implemented in response to all instances of noncompliance, and its cost;

    d.     the effectiveness of all corrective actions implemented;

    e.     a description of any landowner/resident complaints which may relate to compliance with the requirements of the order and the measures taken to satisfy the concerns; and

    f.     copies of any correspondence received by Millennium, EPI, Algonquin, or Iroquois from other Federal, state, or local permitting agencies concerning instances of noncompliance, and the company's response.

9.    Millennium, EPI, Algonquin, and Iroquois each must receive written authorization from the Director of OEP **before commencing service** from their respective projects. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way is proceeding satisfactorily.

10.    **Within 30 days of placing the certificated facilities in service**, Millennium, EPI, Algonquin, and Iroquois shall each file an affirmative statement with the Secretary, certified by a senior company official for their respective projects:

    a.     that the facilities have been constructed and installed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.     identifying which of the certificate conditions Millennium, EPI, Algonquin, and Iroquois has complied with or will comply with. This statement shall also identify any areas along the right-of-way where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

11.    Millennium, EPI, Algonquin, and Iroquois shall hire and fund a third-party contractor, to work under the direction of the Commission staff, for the sole purpose of monitoring compliance with the environmental conditions attached to the order for their respective projects, including all measures proposed by the companies. A draft monitoring program shall be developed by the companies and filed with the Commission for review and approval of the Director of OEP, along with a proposal from potential contractors that will be available to provide the monitoring and reporting services. The monitoring program shall include the following elements:

Docket No. CP98-150-006, et al.                                    - 115 -

   a.     the employment by the contractor of one to two full-time, on-site monitors per construction spread;

   b.     the employment by the contractor of a full-time compliance manager to direct and coordinate with the monitors, manage the reporting systems, and provide technical support to the Commission staff;

   c.     a systematic strategy for the review and approval by the contract compliance manager and monitors of variances to certain construction activities as may be required by each company based on site-specific field conditions;

   d.     the development of an Internet web site for the posting of daily or weekly inspection reports submitted by both the third party monitors and each company's environmental inspectors; and

   e.     a discussion of how the monitoring program could incorporate and/or be coordinated with the monitoring or reporting that may be required by other federal and state agencies.

12.    Millennium, EPI, Algonquin, and Iroquois shall each establish an environmental mitigation complaint resolution procedure that would be in place throughout construction and restoration of their respective projects. The procedure shall provide landowners and abutters with clear and simple directions for identifying and resolving their environmental mitigation problems or concerns during construction of the pipeline facilities and restoration of the right-of-way. **Prior to construction**, each company shall mail the complaint procedure to each landowner whose property would be crossed by the project and abutters whose properties are adjacent to a road or utility right-of-way that would be used for installation of the pipeline. The complaint resolution procedure must:

   a.     include a local contact (and telephone number) and each pipeline company's "hotline" contact (and toll-free telephone number) that the landowner or abutter shall first call with his/her concerns;

   b.     indicate how long it would take after complaints/inquiries are made for the pipeline company to respond;

   c.     indicate that the response would inform the caller how and when problems were or would be resolved; and

Docket No. CP98-150-006, et al.                                    - 116 -

    d.      instruct the landowner or abutter that if he or she is still not satisfied with the response from contacting the pipeline company's "hotline," the Commission's Enforcement Hotline may be contacted at (877) 303-4340.

    In addition, each pipeline company shall include in its weekly status report a table that contains the following information for each problem or concern reported:

    a.      the identity of the caller and the date of the call;

    b.      the alignment sheet number, property identification number, and MP/survey station number of the property;

    c.      a description of the concern/problem; and

    d.      an explanation of how and when the problem was resolved, or why it has not been resolved.

13.    **Prior to construction**, Millennium, EPI, and Algonquin shall update the list of residences within 50 feet of the proposed facilities, and adopt the following measures to minimize the impact on residences within 50 feet of the construction rights-of-way for their respective projects:

    a.      avoid removal of trees and landscaping unless necessary to construct the pipeline or for the safe operation of the construction equipment;

    b.      restore all lawns, landscaping areas and driveways within the construction right of way area promptly after backfilling the trench; and

    c.      install and maintain construction fencing at the edge of the construction right-of-way for a distance of 100 feet on either side of the residence and at a minimum maintain this fencing throughout the open trench phases of the pipe installation.

14.    For any residence within 25 feet of the construction workspace, Millennium, EPI, and Algonquin shall file a site-specific plan with the Secretary for the review and written approval of the Director of OEP **before construction** for their respective projects. The plan shall include:

Docket No. CP98-150-006, et al.                                    - 117 -

    a.    a description of construction techniques to be used (such as reduced pipeline separation, centerline adjustment, use of stone-pipe or drag-section techniques, working over existing pipelines, pipeline crossover, bore, etc.), and include a dimensioned site plan that shows:

        i.    the location of the residence in relation to the new pipeline and, where appropriate, the existing pipelines;

        ii.    the edge of the construction workspace;

        iii.    the edge of the new permanent right-of-way; and

        iv.    other nearby residences, structures, roads, or waterbodies.

    b.    a description of how the company would ensure the trench is not excavated until the pipe is ready for installation and the trench is backfilled immediately after pipe installation; and

    c.    evidence of landowner concurrence if the construction workspace and fencing would be located within 10 feet of a residence.

15.    Millennium, EPI, Algonquin, and Iroquois shall file with the Secretary the location by MP of all drinking water wells and springs within 150 feet of the construction work area and include their distance and direction from the construction work areas for their respective projects, **before construction**.

16.    Millennium, EPI, and Algonquin shall include in their weekly construction progress reports any complaints concerning water supply yield or quality and how each was resolved. **Within 30 days of placing the facilities in service**, each company shall file a summary report identifying all potable water supply systems damaged by construction and how they were repaired for their respective projects.

17.    Millennium, EPI, Algonquin, and Iroquois shall **defer** implementation of any cultural resource treatment plan or measure (including archaeological data recovery), construction or use of all staging, storage, and temporary work areas or new or to-be-improved access roads for their respective projects **until**:

    a.    each company files with the Secretary all additional required cultural resource inventory, evaluation reports, and any necessary treatment plans and the SHPO comments; and

Docket No. CP98-150-006, et al.                                    - 118 -

    b.    the Director of OEP reviews and approves all reports and plans and notifies the companies in writing that treatment plans or measures may be implemented or construction may precede.

All material filed with the Commission containing location character and ownership information about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CONTAINS PRIVILEGED INFORMATION — DO NOT RELEASE."**

## Millennium's Conditions

18.    Millennium shall use the proposed NYSEG Chemung route variation (MP 198.0 to MP 203.6), the NYSEG Tioga-Broome route variation (MP 232.2 to MP 245.0), and the NYSEG Delaware route variation (MP 284.4 to MP 284.9) rather than the segment of the original, approved Millennium project route between these MPs.

19.    Millennium shall acquire from Columbia and continue to use the approximately 7.1-mile-long segment of 24-inch diameter Line A-5 pipeline between MPs 340.5 and 347.7, rather than replace this segment with new 30-inch diameter pipeline.

20.    Millennium shall use the proposed Warwick Isle route variation (MP 350.8 to MP 351.6), rather than the segment of the original, approved Millennium project route between these mileposts.

21.    Millennium shall incorporate the Sterling Forest State Park/Laurel Ridge alternative between (MPs 367.8 and 368.5). Millennium shall consult with the FWS to determine the need for any additional surveys for federally-listed threatened or endangered species and consult with the SHPO to determine the need for additional cultural resource surveys along the Sterling Forest State Park/Laurel Ridge alternative. Millennium shall file with the Secretary, for written review and approval by the Director of OEP, revised construction alignment sheets that show the modified route and workspaces, **prior to construction** in this area.

22.    Millennium shall incorporate the Ramapo River HDD variation (MPs 369.4 to 370.3). Millennium shall consult with the FWS to determine the need for any additional surveys for federally-listed threatened or endangered species and consult with the SHPO to determine the need for additional cultural resource surveys along the Ramapo River HDD variation. Millennium shall file with the Secretary, for written review and approval by the Director of OEP, revised construction alignment sheets that show the modified route and workspaces, **prior to construction** in this area.

23.    Millennium shall develop a site-specific plan for construction and restoration across the Supa property (approximate MP 242.0). In developing the plan, Millennium shall consider alternative construction methods, such as the stove-pipe method, and limited access across the Supa property along the construction right-of-way after construction. Millennium shall file the site-specific plan with the Secretary for review and written approval of the Director of OEP **prior to construction** in this area.

24.    Millennium shall file with the Secretary a plan for the crossing of any waterbody where the HDD is unsuccessful. This shall be a site-specific plan that includes scaled drawings identifying all areas that would be disturbed by construction. Millennium shall file this plan concurrent with its application to the COE and NYSDEC for a permit to construct using this plan. The Director of OEP must review and approve this plan in writing before construction of the crossing using this plan.

25.    Millennium shall file with the Secretary **prior to construction** a list of the waterbodies where equipment bridges would be installed to facilitate tree clearing along the construction right of way between October 1 and March 30, to avoid impacting the federally endangered Indian bat, and provide documentation of approval of this activity from the NYSDEC.

26.    Millennium shall provide the NPS with an initial waterbody crossing schedule for Delaware River tributary crossings and provide updates to that schedule as may be needed in a manner consistent with section II.A.2 of our Procedures.

27.    Millennium shall conduct tree clearing during the period of October 1 to March 30, to minimize adverse affects on the Indiana bat in the areas of known bat activity, between MPs 346 and 363. Future maintenance activities that involve tree removal, pruning, or similar activities, shall be scheduled to occur between October 1 and March 30 to avoid disturbing roosting bats. Millennium shall employ the services of a qualified bat scientist to investigate trees and/or conduct other surveys as may be recommended by the FWS for the presence of Indiana bats if removal of a limited number of trees is necessary between April 1 and September 30, to avoid a take of bats.

28.    Millennium shall install turtle exclusion fencing during the bog turtle window of activity (April 15 to October 31), where Wetland W611 borders the project construction area. Further, Millennium shall employ a bog turtle monitor to be on hand when construction coincides with the bog turtle window of activity, to conduct a daily pre-construction survey of the Wetland W611 project site and to provide daily monitoring and relocation of bog turtles to suitable habitat outside the Wetland W611 construction area when necessary.

Docket No. CP98-150-006, et al.                                    - 120 -

29.     If blasting is required in designated bald eagle activity areas when bald eagles are present, Millennium shall develop in consultation with the NYSDEC and FWS a bald eagle activity area construction plan that identifies the MP locations where blasting would occur within bald eagle activity areas and a schedule of when blasting would occur. The bald eagle activity area construction plan and all associated consultation documents shall be filed with the Secretary **before construction**.

30.     Millennium shall consult with the FWS and NYSDEC at least one month before the start of construction to determine if any additional bald eagle nests have been found in the vicinity of the project area. Documentation of the results of this consultation shall be filed with the Secretary **before construction**.

31.     Millennium shall file a post-construction noise survey with the Secretary **no later than 60 days** after placing its new compressor station in Corning, New York, in service. If the noise attributable to the operation of both Millennium's compressor station and the adjacent existing Columbia Corning compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Millennium shall install additional noise controls to meet the level **within one year** of the in-service date. Millennium shall confirm compliance with this requirement by filing a second noise survey with the Secretary **no later 60 days** after it installs the additional noise controls.

## EPI's Conditions

32.     EPI shall file with the Secretary, **prior to construction across Ganargua Creek**, a site-specific plan for completing the crossing of the creek at CMP 3.6 and wetland 80B for review and written approval of the Director of OEP. The plan shall include scaled drawings identifying all areas and resources that would be disturbed by construction workspaces including pipe lay down areas. The Ganargua Creek crossing plan shall also be provided to the COE and NYSDEC for their review. Any comments EPI receives from these agencies shall be filed with the Secretary.

33.     EPI shall file with the Secretary site specific plans for completing the crossings of Canandaigua outlet (CMP 15.1) and Keuka Lake outlet (CMP 40.6) by HDD, prior to construction of the waterbody crossings, for review and written approval by the Director of OEP. The plans shall include scaled drawings identifying all areas and resources that would be disturbed by construction workspaces including pipe lay down areas.

34.     EPI shall file with the Secretary, **prior to construction of the waterbody crossing**, site specific plans for completing the crossing of Shequaga Creek (CMP 67.0) by a bored crossing, for review and written approval of the Director of OEP. The plan

Docket No. CP98-150-006, et al.                                    - 121 -

shall include scaled drawings identifying all areas and resources that would be disturbed by construction workspaces.

35.    EPI shall file with the Secretary for review and written approval of the Director of OEP, site-specific restoration plans, including scaled drawings, for the crossing of Glen Creek (CMP 62.9) and Townsend Creek (CMP 63.8) that describe and show the areas that would be affected by restoration and how these areas would be restored, **prior to construction of the waterbody crossings**. Also, EPI shall provide any correspondence concerning this issue with the NYSDEC and the COE.

36.    EPI shall file with the Secretary, **prior to construction of the Oakfield compressor station**, a final site-specific plan for the access road to the proposed compressor station, that identifies how it would cross the unnamed waterbody on a permanent and temporary basis and identifies all of the temporarily and permanently affected areas, for review and written approval of the Director of OEP.

37.    EPI shall consult with the COE to develop a wetland mitigation plan, consistent with that prepared for the original Millennium project, to compensate for impacts to forested wetlands. The plan shall include on-site restoration of all affected wetlands, as well as off-site forested wetland acquisition, at a minimum ratio of 2:1, and forested wetland creation, at a minimum ratio of 1:1, for the total acreage of forested wetlands that would be converted to non-forested wetland communities, and shall address restoration of temporary workspaces. EPI shall file the final wetland mitigation plan with the Secretary as soon as it is available.

38.    EPI shall make all reasonable efforts to ensure that its predicted noise levels from the Oakfield compressor station are not exceeded at nearby NSAs, and file a noise survey with the Secretary **no later than 60 days** after placing the new compressor station in service. However, if the noise attributable to the operation of the compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, EPI shall file a report on what changes are needed and install additional noise controls to meet that level **within one year** of the in-service date. EPI shall confirm compliance with the Ldn of 55 dBA requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

39.    EPI shall file with the Secretary for review and written approval of the Director of OEP site specific plans identifying how noise would be reduced during horizontal directional drilling at Canandaigua outlet and Keuka Lake outlet **prior to construction of the crossings**. The plan shall include projected daytime and nighttime noise levels at nearby residences and mitigation measures that would be used to minimize noise at these residences.

Docket No. CP98-150-006, et al.                                    - 122 -

**Algonquin's Conditions**

40.    Algonquin shall use Site F for construction of the Oxford compressor station in Oxford, Connecticut.

41.    Algonquin shall file with the Secretary for review and written approval by the Director of OEP, a request for site specific variances to section V.B.2 of our plan. The request shall include milepost location(s), spacing for the permanent slope breakers, and reasons for the requested variance at the identified location(s).

42.    Algonquin shall expand its SPCC Plan to specifically include a requirement that all construction equipment be inspected daily for leaks.

43.    Algonquin may use extra workspaces within 50 feet of these resources: Mahwah River, AMP 0.54; Intermittent Stream (Wetland 02), AMP 0.76; Intermittent Stream, AMP 1.43; Intermittent Stream, AMP 2.35; Intermittent Stream, AMP 2.95; Intermittent Stream (Wetland 03), AMP 3.26; Intermittent Stream (Wetland 04), AMP 3.29; Intermittent Stream, AMP 4.12; Intermittent Stream, AMP 4.66; and Intermittent Stream, AMP 4.87. However, **prior to the use of these extra workspaces**, Algonquin shall file with the Secretary for review and written approval by the Director of OEP, site specific plans for each of the identified locations that show the configuration and dimensions of the extra workspaces relative to the waterbody or wetland, the setback from these resources, the proposed pipeline construction right-of-way, and all existing or proposed pipeline facilities. The site specific plans shall be included with the pipeline construction alignment sheets.

44.    Algonquin shall conduct tree clearing during the period of October 1 to March 30, to minimize adverse affects on the Indiana bat pending comment by the FWS. Future maintenance activities that involve tree removal, pruning, or similar activities, shall be scheduled to occur between October 1 and March 30 to avoid disturbing roosting bats.

45.    Algonquin may use an additional 25 feet of temporary extra workspace adjacent to the existing Algonquin right of way at these locations: Wetland 01, AMP 0.29 to AMP 0.60; Wetland 02, AMP 0.73 to AMP 0.82; Wetland 03, AMP 3.25 to AMP 3.27; and Wetland 04, AMP 3.28 to AMP 3.31. However, **prior to the use of these extra workspaces**, Algonquin shall file with the Secretary site specific plans for each location showing all workspaces and the existing and proposed pipeline facilities, for review and written approval by the Director of OEP. Algonquin shall also file with the Secretary concurrence from the COE about the use of these areas.

Docket No. CP98-150-006, et al.                                      - 123 -

46.    Algonquin shall consult with the COE to develop a wetland mitigation plan, consistent with that prepared for the original Millennium project, to compensate for impacts to forested wetlands. The plan shall include on-site restoration of affected wetlands, off-site forested wetland acquisition, at a minimum ratio of 2:1, and forested wetland creation, at a minimum ratio of 1:1, for all forested wetlands that would be converted to non-forested wetland communities and shall also address restoration of temporary workspaces. Algonquin shall file the final wetland mitigation plan with the Secretary as soon as it is available.

47.    Algonquin shall file with the Secretary **prior to construction**, information about any additional pipe/contractor yard(s) it would use to construct its project including topographic maps showing the pipe/contractor yard locations and quantified information about impacts on land use, residences, wetlands, wildlife, and vegetation for review and written approval of the Director of OEP.

48.    Algonquin shall file with the Secretary all mitigation plans for construction of the pipeline and restoration of the construction right-of-way developed with the PIPC for construction in Harriman State Park and with the Rockland County Division of Environmental Resources for construction in Kakiat County Park **before construction in the parks** for review and written approval of the Director of OEP.

49.    Algonquin shall file a post-construction noise survey with the Secretary **no later than 60 days** after placing the modified Hanover, Stony Point, and Southeast compressor stations in service. If the noise attributable to the operation of any of these compressor stations at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Algonquin shall install additional noise controls to meet the level **within one year** of the in-service date. Algonquin shall confirm compliance with this requirement by filing a second noise survey with the Secretary **no later 60 days** after it installs the additional noise controls.

50.    Algonquin shall make all reasonable efforts to assure its predicted noise levels from the Oxford compressor station are not exceeded at nearby NSAs, and file a noise survey with the Secretary, the CSC, and the Towns of Oxford and Middlebury **no later than 60 days** after placing the new compressor station in service. However, if the noise attributable to the operation of the compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Algonquin shall file a report on what changes are needed and install additional noise controls to meet that level **within one year** of the in-service date. Algonquin shall confirm compliance with the Ldn of 55 dBA requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

Docket No. CP98-150-006, et al.                                                    - 124 -

<u>**Iroquois' Conditions**</u>

51.      Iroquois shall develop in consultation with the Connecticut Department of
Environmental Protection, a plan for handling waste materials that may be encountered
during construction of any facilities at the Brookfield compressor station site on High
Meadow Road in Brookfield, Connecticut.  This plan should be filed with the Secretary
for review and written approval by the Director of OEP, **prior to construction** of the
compressor station.

52.      Iroquois shall make all reasonable efforts to ensure that its predicted noise levels
from the Brookfield compressor station are not exceeded at nearby NSAs, and file a noise
survey with the Secretary and the CSC **no later than 60 days** after placing the new
compressor station in-service.  However, if the noise attributable to the operation of the
compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Iroquois
shall file a report on what changes are needed and install additional noise controls to meet
that level **within one year** of the in-service date.  Iroquois shall confirm compliance with
the Ldn of 55 dBA requirement by filing a second noise survey with the Secretary **no
later than 60 days** after it installs the additional noise controls.

53.      Before construction and once the final site layout, building design and equipment
selection are determined, Iroquois shall file with the Secretary a comprehensive noise
analysis showing that the noise levels at nearby NSAs, such as schools (specifically the
Whisconier Middle School), hospitals, and residences would not exceed an Ldn of 55
dBA, due to the operation of the Brookfield compressor station at full load.

54.      Iroquois shall file a post-construction noise survey with the Secretary **no later
than 60 days** after placing the modified Dover compressor station in service with the
proposed additional gas coolers.  If the noise attributable to the operation of the modified
compressor station at full load exceeds an Ldn of 55 dBA at any nearby NSAs, Iroquois
shall install additional noise controls to meet the level **within one year** of the in-service
date.  Iroquois shall confirm compliance with this requirement by filing a second noise
survey with the Secretary **no later 60 days** after it installs the additional noise controls.

<u>**Additional Conditions**</u>

55.      Prior to construction, Millennium shall file with the Secretary, for review and
written approval of the Director of OEP, a report about the diesel fuel observed on the
Supa property in test boring one on January 12, 2006.  The report shall provide
information about potential sources of diesel fuel and shall address whether further

Docket No. CP98-150-006, et al.                              - 125 -

evidence of diesel fuel was observed during any subsequent instances of monitoring the test borings. The report shall also address the issue of the need for clean up and a plan for clean up.

56.    Prior to construction, Algonquin shall file with the Secretary, for review and written approval of the Director of OEP, the final site-specific plan for crossing the Mahwah River developed in consultation with the COE, NYSDEC, and the affected landowner(s).